IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ADMIIN INC. d/b/a PARO INC., | |
| Plaintiff, | |
| v. | No. 23-cv-04430 |
| | Honorable Franklin U. Valderrama |
| LUKE KOHAN and FIRMKEY SOLUTIONS LLC, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Admiin Inc. d/b/a Paro Inc. (Paro) moves this Court to enter an emergency temporary restraining order (TRO) against its former employee, Defendant Luke Kohan (Kohan) and the company he co-founded, Defendant FirmKey Solutions LLC (FirmKey), pursuant to Federal Rule of Civil Procedure 65(b). For the reasons stated below, the Court denies Paro's request for an emergency temporary restraining order.

## Background

Paro, a Delaware Corporation with its principal place of business in Chicago, Illinois, is "an artificial intelligence-powered marketplace" providing "various finance and accounting solutions to businesses through a combination of expert fractional talent, data-driven tools and guiding insights." R. 1, Compl. ¶¶ 2, 10.[1] Through its "AI-powered platform, Paro matches clients with the best-fit expert to solve problems

---

[1]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

and drive growth. Paro's carefully curated expert community provides a range of financial services to clients, from basic bookkeeping and accounting to highly specialized corporate development and strategic advisory services." *Id.* ¶ 10. Paro assigns employees to different client accounts. *Id.* ¶ 11. Paro has devoted substantial money, time, and resources in developing its clients, and maintains their contact information, names of client contacts, types of services purchased throughout the client relationship, and fee information. *Id.* ¶ 13. Paro also has a roster of experts. *Id.* ¶ 16. Paro maintains this information is kept confidentially, along with other confidential information as defined in the Employment Agreement (Confidential Information). *Id.* To safeguard this information, Paro protects it with computer passwords, limits employee access, restricts access to non-employees, requires certain employees (like Kohan) to sign Non-Competition, Non-Solicitation, Non-Disclosure and Invention Assignment Agreements, which, among other things, prohibit the download, transfer, or duplication of Confidential Information, and requires Paro employees to return all Confidential Information when they leave employment. *Id.* ¶ 17.

Kohan, a citizen of New York, is a former Paro Senior Account Executive. Compl. ¶ 18. As a Senior Account Executive, Kohan was responsible for converting leads from Paro's marketing team into long-term clients, managing full sales cycle from new leads to closing deals, building relationships with clients, and supporting Paro team members. *Id.* In this role, he had direct client contact and expert contact, and knowledge of Paro's Confidential Information. *Id.* ¶ 19. At the hearing held on

July 17, 2023 (TRO hearing), Paro described Kohan's employment as being responsible for the "white label client suite" at Paro, which is how Paro describes their biggest and most valuable clients. Kohan voluntarily resigned his employment with Paro in March 2023, and co-founded FirmKey in April 2023. *Id.* ¶¶ 28–29. FirmKey is engaged in the business of providing various finance and accounting solutions to businesses. *Id.* ¶ 4. FirmKey is a Minnesota limited liability corporation. *Id.*

When he began his employment with Paro on October 3, 2020, Kohan signed a Non-Competition, Non-Solicitation, Non-Disclosure and Invention Assignment Agreement (Employment Agreement). Compl. ¶ 20; R. 1-1, Exh. A (Agmt.). In the Employment Agreement, Kohan agreed not to disclose, use, or misappropriate Paro's Confidential Information. *Id.* ¶ 21. The Employment Agreement also provided that Kohan could not, for a period of 12 months after leaving his employment (the Restricted Period), (1) compete directly or indirectly with Paro, (2) solicit any of Paro's clients and employees, or (3) interfere with Paro's client and employee relationships. *Id.* ¶ 22. The non-competition restriction is contained in Section 4 of the Employment Agreement (Non-Compete) and provides:

> I agree that during the period of my employment with the Company I will not engage in any other employment, occupation or consulting arrangement anywhere in the world, nor will I engage in any other activities that conflict with my obligations to the Company. During the Restricted Period (as defined below), I will not, anywhere in the Restricted Territory (as defined below), without the Company's prior written consent, directly or indirectly, alone or as a partner, member, manager, owner, joint venturer, officer, director, employee, consultant, agent, contractor, stockholder or in any other capacity of any company or entity, engage in the Business, have any financial interest in any company or entity engaging in the Business or make any loans to any company or entity engaging in the Business. For purposes of this Agreement, the term "**Business**" means (a) the provision of outsourced

financial services, including bookkeeping and accounting, financial analysis and CFO strategy services, or (b) the provision, development, marketing, sale or maintenance of products or services which are substantially similar to those developed, marketed, distributed, sold, maintained or otherwise provided by, or actively planned to be developed, marketed, distributed, sold, maintained or otherwise provided by the Company during the term of my employment with the Company. Notwithstanding the foregoing, my ownership of not more than one percent (1%) of the outstanding shares of stock of any corporation having a class of securities actively traded on a national securities exchange or on the NASDAQ Stock Market shall not be deemed, in and of itself, to violate the provisions of this Section 4. I agree and acknowledge that the restrictions in this Section 4 shall apply throughout the Restricted Territory, and that the geographic scope of the restriction is necessary and reasonable because the Company conducts business at least nationally, and the restriction is necessary to protect the legitimate business interests of the Company. I further agree and acknowledge that the restrictions in this Section 4 shall apply to self-employment by me.

Agmt. ¶ 4.

The Non-Compete not only includes being an employee of a competitor, but also an owner of a competitor. Agmt. ¶ 4. Based on Paro's TRO Motion, and the confirmation of counsel at the TRO hearing, Paro is only alleging breach of the Non-Compete restrictive covenant, and no other provisions of the Employment Agreement.

The "Restricted Territory" for purposes of the Non-Compete includes "the United States and each other country, province, state, city, or other political subdivision in which the Company carries on, had carried on the Business during the term of [his] employment and/or the Restricted Period." Agmt. ¶ 8(f).

The Employment Agreement also includes a modification or "blue-pencil" provision which states:

If any provision or term in Sections 2, 4, and/or 7 of this Agreement is declared invalid or unenforceable by a court of competent jurisdiction, the invalid and unenforceable portion shall be reformed to the maximum time, geographic

scope, activity-related restrictions and/or limitations permitted by applicable law, so as to be valid and enforceable.

Agmt. ¶ 8(d).

In terms of bad acts by Kohan and FirmKey, Paro alleges as follows:

(1) Kohan founded and began working for FirmKey, a direct competitor to Paro, in April 2023, in violation of the Non-Compete (Compl. ¶¶ 29–30);

(2) Kohan "viewed Paro as a training ground, and he is now using, or will use, Confidential Information he learned at Paro" in violation of his Non-Compete (Compl. ¶ 30);

(3) Kohan "will not be able to compartmentalize his knowledge of Paro's Confidential Information while operating FirmKey" and will "consciously or unconsciously, inevitably draw upon his vast and intimate knowledge of Paro's Confidential Information" (Compl. ¶ 31);

(4) Kohan's knowledge of Paro's Confidential Information will assist him in performing his responsibilities at FirmKey, and in targeting Paro's clients and experts, and Kohan "cannot help but draw upon this knowledge in performing his duties for FirmKey" (Compl. ¶ 32); and

(5) Kohan's "inevitable disclosure and use of Paro's Confidential Information will allow FirmKey to gain a substantial unfair advantage with Paro" (Compl. ¶ 34).

Paro also generally alleges that Kohan "has threatened to misappropriate or will inevitably misappropriate trade secrets and confidential information maintained by Paro in this district." Compl. ¶ 8. Regarding FirmKey, Paro alleges that FirmKey does business in this District, has also "threatened to misappropriate or will inevitably misappropriate trade secrets and confidential information maintained by Paro in this district." *Id.* ¶ 9.

Paro attaches information from FirmKey's website, as well as Kohan's LinkedIn page, to its Verified Complaint. In those attachments, FirmKey is described

as "targeting industries, services, and nuanced projects that align with our partners' respective backgrounds, interests, and bandwidth." R. 1-3, Kohan LinkedIn Post.

Now Paro brings this lawsuit, through a Verified Complaint for Injunctive and Other Relief, asserting the following claims against Kohan and FirmKey: (1) Breach of the Employment Agreement (Kohan) (Count I); (2) Violation of the Illinois Trade Secrets Act (Kohan and FirmKey) (Count II); (3) Violation of the Defend Trade Secrets Act (Kohan and FirmKey) (Count III); and (4) Tortious Interference with Contract (FirmKey) (Count IV).

Paro filed its Verified Complaint on July 10, 2023. The same day, Paro filed an Emergency Rule 65 Motion for Temporary Restraining Order and Preliminary Injunction (TRO Motion), R. 7, Mot. TRO, and Memorandum of Law in support of its Motion. R. 8, Memo. TRO. Through its TRO Motion, Paro seeks to: (i) enjoin Kohan from working for FirmKey, and FirmKey from employing Kohan, (ii) enjoin Kohan and FirmKey from soliciting Paro's clients or experts, (iii) enjoin Kohan and FirmKey from misappropriating Paro's Confidential Information and trade secret information, (iv) enjoin FirmKey from interfering with Kohan's contractual obligations to Paro, (v) require Kohan and FirmKey to return Paro's Confidential Information and trade secret information. Mot. TRO, Proposed Order. Paro also seeks its attorneys' fees and costs. *Id.* Paro also filed a Motion for Expedited Discovery. R. 9, Mot. Discovery.

Kohan and FirmKey filed a response opposing the TRO and preliminary injunction, supported by Kohan's Declaration. R. 13, Resp.; R. 13-1, Decl. Kohan.

The Court heard oral argument on the TRO[2] on July 17, 2023. R. 15.

## Legal Standard

A TRO is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *See Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

The standard for obtaining a TRO is the same as that is required to issue a preliminary injunction. *See Merritte v. Kessel*, 561 Fed. Appx. 546, 548 (7th Cir. 2014). To obtain a TRO, a movant must demonstrate: (1) a likelihood of success on the merits; (2) that it has no adequate remedy at law; and (3) that it will suffer irreparable harm if the relief is not granted. *See Right Field Rooftops, LLC*, 80 F. Supp. 3d at 832 (citing *Smith v. Executive Dir. Of Ind. War. Mem'ls Comm'n*, 742 F. 3d 282, 286 (7th Cir. 2014)).

If the moving party meets this three-element threshold showing, the court "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction[.]" *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (quoting *Planned Parenthood, of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018)). "Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable

---

[2]The Court will schedule a preliminary hearing, and rule on the preliminary injunction once it receives the full presentation of facts and law. *See Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 80 F. Supp. 3d 829, 832 (N.D. Ill. 2015).

harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citing *Abbott Labs. v Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992)).

The Seventh Circuit has described this balancing test as a "sliding scale": "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win[,] the more that balance would need to weigh in its favor." *GEFT Outdoors*, 992 F.3d at 364 (citing *Planned Parenthood*, 896 F.3d at 816). Finally, in balancing the harms, the court must consider the interests of non-parties in granting or denying the requested relief. *Ty, Inc., v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

In resolving a motion for TRO, the Court reviews the record from a "neutral and objective viewpoint" without accepting Paro's allegations as true, nor drawing reasonable inferences in Paro's favor. *Doe v. University of Chicago*, 2022 WL 16744310, at *2 (N.D. Ill. Nov. 7, 2022) (citing *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022)). The Court must "make factual determinations on the basis of a fair interpretation of the evidence before the court" at this stage. *Darryl H. v. Coler*, 801 F.2d 893, 898 (7th Cir. 1986). However, the findings are only preliminary, and "do not bind the district court as the case progresses." *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011).

## Analysis

### I.   Choice of Law

Before addressing whether Paro has met its burden for a temporary restraining order, the Court must determine what law governs.

The Employment Agreement contains a choice of law provision specifying that Illinois law applies to disputes arising out of the Agreement. Agmt. ¶ 11(a).

Paragraph 11(a) of the Employment Agreement specifically states:

This Agreement will be governed by the laws of the State of Illinois. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in Chicago, Illinois for any lawsuit arising from or relating to this Agreement, and agree that such courts shall be the sole and exclusive venue for any such lawsuits (excepts with respect to post-judgment enforcement proceedings) filed by either party, in regard to claims or actions arising from or relating to this Agreement; provided, however, that nothing in this Section 11(a) shall restrict the Company from bringing a lawsuit in another venue to the extent the Company is also bringing a lawsuit against a third party who is not subject to jurisdiction in Chicago, Illinois.

Agmt. ¶ 11(a).

Based upon the briefs and the representations of the parties at the TRO hearing, all parties agree that Illinois law applies to the state law claims alleged by Paro.[3] Neither Paro nor Kohan argue that any other law applies.

The law is clear that where a valid contract has been formed, a court should enforce the choice of law provision contained within that contract unless it violates the forum state's public policy, and the forum state has a materially greater interest in the litigation than the chosen state. *See*, *e.g.*, *Demitropoulos v. Bank One*

---

[3]At the TRO hearing, the parties both took the position that even if New York applied to the state law claims, the Court would reach the same result.

*Milwaukee, N.A.*, 915 F. Supp. 1399, 1413 (N.D. Ill. 1996) (following § 187 of the Restatement (Second) of Conflict of Laws where "as here, the parties to a contract have included an express choice of law provision in their contract"). Further, a court will only overrule a choice of law contained in a contract if "(1) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (2) its application would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." *Old Republic Ins. Co. v. Ace Property and Cas. Ins. Co.*, 906 N.E. 2d 630, 636 (Ill. App. Ct. 2009) (cleaned up).[4]

Here, the Court finds Paro, as a business headquartered in Illinois, has made a sufficient showing that Illinois has a substantial relationship to the parties and the dispute. *See Aon Risk Services Companies, Inc. v. Alliant Insurance Services, Inc.*, 415 F. Supp. 3d 843, 848 (N.D. Ill. 2019) (applying Illinois law to restrictive covenant dispute involving an employment agreement with a choice of law provision specifying Illinois).

The Court having determined that Illinois law governs this dispute, now turns to whether Paro has met its burden for the issuance of a TRO.

## II.     TRO Factors

The Court begins with the likelihood of success. Paro insists that it has shown a likelihood of success on the merits for all of its claims. For the reasons that follow,

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

the Court finds that Paro has not demonstrated a likelihood of success on the merits of its claims.

### a. Likelihood of Success

### i. Breach of Contract (Count I)

Count I of the Verified Complaint asserts a claim for breach of the Non-Compete restrictive covenant contained in the Employment Agreement. Memo. TRO at 3–4. As stated above, at the TRO hearing, Paro confirmed it was only alleging a breach of this restrictive covenant by Kohan, and not any other restrictive covenants contained in the Employment Agreement. Accordingly, the Court only analyzes the Non-Compete restrictive covenant.

In relevant part, Paro's Non-Compete covenant prohibits Kohan, during the Restricted Period, from engaging in the Business, and defines "Business" as:

> (a) the provision of outsourced financial services, including bookkeeping and accounting, financial analysis and CFO strategy services, or (b) the provision, development, marketing, sale or maintenance of products or services which are substantially similar to those developed, marketed, distributed, sold, maintained or otherwise provided by, or actively planned to be during the term of [his] employment with the Company.

Agmt. ¶ 4.

Before addressing whether the restrictive covenant is reasonable, the Court must satisfy itself that (1) the Non-Compete is ancillary to a valid contract and (2) is supported by adequate consideration. *Allied Waste Services of North America, LLC v. Tibble*, 177 F. Supp. 3d 1103, 1107 (N.D. Ill. 2016) (citing *Fifield v. Premier Dealer Services, Inc.*, 993 N.E.2d 938, 942 (Ill. App. Ct. 2013)). Here, Paro has demonstrated that the Employment Agreement is a valid contract, that Kohan received a salary,

commissions, bonuses, and thousands of shares in stock options, and he was employed by Paro for over two years. Kohan and FirmKey do not challenge the validity of the Employment Agreement itself, and instead argue that based on his original salary of $75,000, the Non-Compete would not be enforceable if a recently passed Illinois law— the Illinois Freedom to Work Act—applied retroactively. *See* 820 ILCS 90/10. However, that law became effective on January 1, 2022, and does not have retroactive effect. 820 ILCS 90/5. Thus, the Court finds at this preliminary stage, the challenged restrictive covenant is ancillary to a valid contract, and supported by adequate consideration.

The Court now turns to the reasonableness of the restrictive covenant in question. Before enforcing a restrictive covenant, the Court must determine whether it is reasonable. *W. Capra Consulting Group, Inc. v. Snyder*, 2019 WL 3935045, at *9 (N.D. Ill. Aug. 20, 2019). Under Illinois law, "[a] restrictive covenant . . . is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). In analyzing whether a restrictive covenant is, in fact, for a "legitimate business interest," the Court must examine "the totality of the facts and circumstances of the individual case. Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions. No factor carries any more weight than

any other, but rather its importance will depend on the specific facts and circumstances of the individual case." *Id.* at 403.

Paro argues that Paro and FirmKey are direct competitors, and that Kohan has access to and knowledge of Paro's Confidential Information when he was an employee of Paro's, and is a co-founder of FirmKey. Memo. TRO at 4. Paro did not address the near-permanence of its client relationships, or the time and restrictions placed on the Non-Compete restrictive covenant, in its brief. However, at the TRO hearing Paro, when asked, explained that although it is not an old company, Paro has longstanding clients which are the result of countless people hours and other "sweat equity" to secure those client relationships. Paro also represents that it does business in all 50 states, and some business in Europe, such that the geographic scope of the Non-Compete is reasonable. Finally, Paro describes Paro's business as "niche" and contends that the definition of "Business" in the Employment Agreement captures the protection of a legitimate business interest of Paro, namely "the provision of outsourced financial services" and "substantially similar" services to those offered by Paro. Paro defends the breadth of the Non-Compete restrictive covenant by reiterating that Kohan agreed to it when he signed the Employment Agreement, and by maintaining that this restrictive covenant would not prohibit Kohan from finding employment in the financial services industry generally.

In response, Kohan and FirmKey insist that FirmKey is not a competitor of Paro's. Specifically, argue Kohan and FirmKey, unlike Paro, FirmKey matches companies with accounting help, which differs from Paro's business because Paro is

a matchmaking service for big accounting firms that need help. Resp. at 3–4. Kohan and FirmKey maintain that these are different businesses with different clients. *Id.*

However, Kohan and FirmKey concede that FirmKey's business, like Paro's, is a matchmaking business connecting clients with experts or vendors. *See* Resp. at 4. At this preliminary stage, and without the benefit of evidence from the parties on the respective businesses of either company, the Court accepts that Paro and FirmKey are competitors.

Next, and most importantly, Kohan and FirmKey contend that the restrictive covenant is too broad as to both the prohibited activity and the geographic scope, and also because it is "insolubly ambiguous." Resp. at 4–6. Specifically, Kohan and FirmKey argue that the definition of "Business" is overly broad and ambiguous. *Id.* at 4–5. Kohan and FirmKey argue that, "if enforced," this restrictive covenant "would prevent Mr. Kohan from taking virtually any job in his chosen area of expertise." *Id.* at 5 (citing cases).

The Court agrees with Kohan and FirmKey that the scope of the restrictive covenant is problematic. Specifically, the Court finds "the provision of outsourced financial services" to be overbroad. The Court confirmed at the TRO hearing that the term is not defined in the Employment Agreement. Breaking down the phrase outsourced financial services, "outsource" is commonly defined as "(of a company or organization) to purchase (goods) or subcontract (services) from an outside supplier or source." Outsource, Dictionary.com, https://www.dictionary.com/browse/outsource (last visited July 18, 2023). "Financial services" has an indefinite number of

meanings, and can include banking, brokerage, mortgages, credit cards, payment services, real estate, taxes, accounting, bookkeeping, investments, and on and on. This is corroborated by Paro's Verified Complaint, which describes the financial services it provides to clients as "from basic bookkeeping and accounting to highly specialized corporate development and strategic advisory services." Compl. ¶ 10. Thus, the language in the Non-Compete is capable of many meanings.

Further, the definition of "Business" articulated in the Employment Agreement also includes "the provision, development, marketing, sale or maintenance of products or services which are *substantially similar*" to Paro's. Agmt. ¶ 4 (emphasis added). In its TRO Motion, Paro focuses on Kohan's alleged breach of the Non-Compete. But, as discussed above, the Court's first inquiry must be whether the restrictive covenant itself is reasonable. Notably, in its TRO Motion, Paro has not supported the breadth of this specific Non-Compete clause, or comparably broad clauses, with any case law. Conversely, Kohan and FirmKey identify several cases, including *AssuredPartners, Inc. v. Schmitt,* 44 N.E.3d 463, 471 (Ill. App. Ct. 2015) which they contend support the proposition that scope of the challenged Non-Compete is overbroad. Resp. at 5–6.

In A*ssuredPartners,* the court found unreasonable a non-compete restrictive covenant which prohibited the employee, a wholesale insurance broker specializing in lawyers' professional liability insurance, from working in professional liability insurance anywhere in the United States or its territories. 44 N.E.3d at 472. The court focused on the fact there was no qualification in the restrictive covenant that

the restrictions were limited to the employee's activities relating to the specific professional liability insurance practice he had developed during his prior employment, but rather applied to all liability insurance practices. *Id.* Additionally, the court was troubled by the broad geographic scope, which restricted the employee from working in his chosen field in the United States and its territories. This restriction observed the court, would place an undue burden on him by forcing him to leave the country to work in the same field. *Id.* at 473. While there are differences between the covenant in *Assured Partners* and the Non-Compete in this case— namely the length of the restriction being 28 months instead of 12 months— *AssuredPartners* supports the general proposition that restrictions on activities must be narrowly tailored to protect only against activities that threaten the employer's interest. *Id.* Here, it is Paro's position that Kohan worked on "the white label suite of clients," which is primarily the larger companies and accounting firms, suggesting a legitimate interest in protecting Paro against Kohan contacting or soliciting that suite of customers, yet the Non-Compete is a wholesale restriction on Kohan working at a competing business in any capacity for a period of one year. Notably, Paro has not identified for the Court any case where a one-year, nationwide non-compete restrictive covenant has been upheld as enforceable.

The Court also finds similarities between the covenant at issue in this case and the covenant at issue in *Oce N. Am., Inc. v. Brazeau*. 2009 WL 6056775 (N.D. Ill. Sept. 4, 2009), report and recommendation adopted, 2010 WL 5033310 (N.D. Ill. Mar. 18, 2010). In *Oce*, employees employed in non-sales or non-service capacities were

16

restricted from becoming "associated with, through ownership, employment, self-employment, consultancy, contract or otherwise, any Competing Business." *Id.* at *4. The covenant was nationwide for a period of 12 months. *Id.* at *3. The court found the covenant was not enforceable under Illinois law, noting that Illinois law disfavors non-competition clauses, which are closely examined, and the subject covenant was overly broad to secure any of the company's protectable interests. *Id.* at *8. Further, the court identified several cases where one-year, nationwide non-competition agreements were found to be invalid, and noted that the plaintiff did not point to any case where a similar covenant had been upheld. *Id.* at *8 n.79 (collecting cases). Finally, the court stated that "if the temporal and geographic restrictions on an employee's conduct are broad, as they are here, the agreement's activity restrictions should be correspondingly narrowly drawn to protect the employee's ability to be employed in his chosen field." *Id.*; *see also Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 526, (Ill. App. Ct. 2007) (finding a "blanket bar on all activities for competitors" to be excessive and unreasonable as a matter of law).

So too here. Enforcement of the Non-Compete would, in effect, preclude Kohan from working in any capacity in the industry in which Paro does business anywhere in the United States, or other parts of the world where Paro has conducted business. As counsel for Paro stated during the TRO hearing, it is Paro's position that it plays in the entire "outsourced financial services" sandbox, marketing to companies of all sizes, including mom-and-pop shops, Fortune 500 companies, and some of the largest accounting firms in the United States. Paro, however, concedes that Kohan was

working on the "white label suite of clients" as a Senior Account Executive at Paro, which is primarily the larger companies and accounting firms. In other words, the Non-Compete is not an activity restraint limited to the clients that Kohan serviced, but goes beyond those clients to those he never serviced, and restricts him from working in any capacity for a competitor. Given the broad geographic scope of the covenant, the restrictions would need to be narrowly drawn to protect Kohan's ability to work in his chosen field. *See Oce*, 2009 WL 6056775, at *8.

Ultimately, the Non-Compete is far broader than necessary to protect Paro's legitimate business interests, which, as best the Court can discern, primarily involve protecting its confidential client and client-related information, which could have been dealt with a far narrower restrictive covenant, *e.g.* restricting Kohan from contacting or working with those clients and experts for a period of time. While Paro contends this Employment Agreement memorializes the deal Kohan made and agreed to when he became an employee of Paro, and Paro is entitled to the benefit of its bargain, this contention does not make the Non-Compete reasonable. *Advent Electronics, Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir. 1997) ("It is improper under Illinois law to enforce a non-competition clause merely because the parties agreed to such an arrangement.") Further, the Non-Compete would impose an undue hardship on Kohan in finding work in his chosen field. Unlike circumstances where other courts have found a covenant to be reasonable because it is narrowly tailored to protect the former company's business interest by restricting an employee from selling to certain customers of the company, and would not prevent the company's

competitors from doing business, full-stop, here the effect is just that. Namely, Kohan cannot work for any competitor anywhere in the United States, and beyond, if Paro has done business in that jurisdiction.

At the TRO hearing, Paro highlighted the "modification"—or blue-pencil— provision of the Employment Agreement for the Court, which provides that in the event the Non-Compete (or other restrictive covenants) are determined to be invalid, the covenant should be reformed "to the maximum time, geographic scope, activity-related restrictions and/or limitations permitted by applicable law, so as to be valid and enforceable." Agmt. ¶ 8(d).

Paro invites the Court to blue-pencil the Non-Compete to render it enforceable. The Court declines the invitation. For starters, whether to blue-pencil an overly broad restrictive covenant is discretionary under Illinois law. *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Intern. Inc.*, 616 F. Supp. 2d 805, 818 (N.D. Ill. 2009) (declining to blue-pencil a non-competition agreement where the "Non-Compete agreement is simply too broad and far-reaching to be salvageable"). That said, it is true that under Illinois law, a court may slightly alter a restrictive covenant to reflect the intent of the parties rather than completely invalidate the covenant. *Weitekamp v. Lane,* 620 N.E. 2d 454, 461-62 (Ill. App. Ct. 1993). This principle, however, does not apply where the restrictive covenant is not reasonable. *See Eichmann v. Nat'l Hops. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1149 (Ill. App. Ct. 1999). Here, at this stage, the Court finds the Non-Compete is unreasonable and unjustified by Paro's legitimate business interests. Paro presented the Employment Agreement, with this

Non-Compete, to Kohan when he joined Paro, and the Court declines the invitation to rewrite the restrictive covenant for Paro. *See* Oce, 2009 WL 6056775 at *13 (declining to blue pencil unreasonable non-compete where rewriting the covenant would be "tantamount to drafting a brand new provision with no evidence in the record that this was the parties' true intention") Even if the Court were inclined to blue-pencil the Non-Compete, Paro has not informed the Court how the Non-Compete could be modified. In conclusion, the Court will not re-write the overly broad Non-Compete restrictive covenant.

Thus, at this preliminary stage, the Court finds Paro has not met its burden to show a reasonable likelihood of success on the merits with respect to Count I of its Verified Complaint.[5]

### ii. Illinois Trade Secrets Act (Count II) and Defend Trade Secrets Act (Count III)

Paro also brings claims under both the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and the Illinois Trade Secrets Act, 765 ILCS 1065/1, against both Kohan and FirmKey. Because "the pertinent definitions of the two acts overlap," the Court analyzes the likelihood of success of the two claims together. *See Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1129 (N.D. Ill. 2019) (analyzing claims together in ruling on preliminary injunction).

---

[5]The Court notes that this preliminary determination is not binding on the Court, and the parties will be able to introduce evidence at the preliminary injunction hearing as to all Counts, including Count I. With the benefit of full presentation of facts and the law at the preliminary injunction hearing, resolution of this issue may differ. *See*, *e.g.*, *Allied Waste Services of North America*, 177 F. Supp. 3d at 1110 (recognizing on a motion to dismiss that "unless the covenant is patently unreasonable, the parties must be given a full opportunity to develop the necessary evidentiary record").

For Paro to show that Kohan and FirmKey misappropriated a trade secret, Paro must demonstrate that "(1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner." *Allied Waste Services of North America*, 177 F. Supp. 3d at 1112. Actual or threatened misappropriation may be enjoined under the Illinois Trade Secrets Act and the Defend Trade Secrets Act. 765 ILCS 1065/3 ("[a]ctual or threatened misappropriation may be enjoined"); 18 U.S.C. § 1836(b)(3)(A)(i) ("to prevent any actual or threatened misappropriation").

Based upon the TRO Motion, the Court understands that the primary information Paro is contending constitutes its trade secrets includes "customer lists and other client-related information." Memo. TRO at 7. At the TRO hearing, Paro elaborated upon what is meant by "client-related information"—clarifying that  it includes client identities, pricing models for clients, client contacts, margins, business models, strategies, and artificial intelligence tools. Paro maintains this information is protected and confidential, and Paro has gone to great lengths to maintain its secrecy through username and password-protection, and is only accessed on a need-to-know basis. Further, the information is subject to policies prohibiting misappropriation, and certain employees, like Kohan, are subject to agreements that they will not misappropriate that information.

In Response, Kohan and FirmKey do not argue that the trade secrets claimed by Paro are not, in fact, trade secrets, and do not contest Paro's description of how the information is maintained confidentially.

At this preliminary stage, the Court finds Paro has made a sufficient showing that the information at issue constitutes trade secrets. Paro alleges its trade secrets include customer lists and client-related information, and that it has maintained the secrecy of this information through confidentiality agreements and password-protection. *See Aon Risk Services Companies, Inc.*, 415 F. Supp. 3d at 848 (finding plaintiff had demonstrated the information at issue, which included client information and client lists, constituted trade secrets and that plaintiff had taken reasonable steps to maintain their secrecy).

Turning to whether actual or threatened misappropriation of Paro's trade secrets has occurred or is likely to occur, Paro maintains that Kohan and FirmKey have "threatened" and will "inevitabl[y]" misappropriate Paro's trade secrets and confidential information. Compl. ¶ 1. Paro concedes it does not have any evidence of actual misappropriation. Thus, Paro's theory is one of "inevitable disclosure."

In response, Kohan and FirmKey argue that Paro cannot simply rely upon speculation and no evidence, even when relying upon the inevitable disclosure theory. Resp. at 7.

The Seventh Circuit has upheld injunctions which prevent an employee from working for a competitor for a specified period of time based on a theory of inevitable disclosure. *PepsiCo, Inc. v. Redmond*, 54 F. 3d 1262, 1269 (7th Cir. 1995). To evaluate an inevitable disclosure theory, courts consider three factors: "(1) the level of competition between the former and new employer; (2) the similarity between the employee's former and new positions; and (3) the actions the new employer has taken

22

to prevent the use or disclosure of the former employer's trade secrets." *Packaging Corporation of America, Inc. v. Croner*, 419 F.Supp.3d 1059, 1070 (N.D. Ill. 2020). However, Courts do not often invoke the inevitable disclosure doctrine "because a broad application would be an effective bar against employees taking similar positions with competitive entities." *Oce*, 2009 WL 6056775 at *10.

*PepsiCo* is the seminal case involving the inevitable disclosure doctrine in the Seventh Circuit. 54 F. 3d 1262. In *PepsiCo*, a high-level employee of PepsiCo left to work for a "fierce" competitor, Quaker Oats, in a similar position on a competing product line. *Id.* at 1264–65. The employee was subject to a confidentiality agreement, but not a covenant not to compete. *Id.* at 1264. PepsiCo sought a temporary restraining order and preliminary injunction enjoining the employee from working at Quaker Oats. *Id.* at 1265. At the preliminary injunction hearing PepsiCo introduced evidence of trade secrets and confidential information that the employee knew of, and that the employee had "extensive and intimate knowledge" about PepsiCo's strategic goals. *Id.* The district court granted the preliminary injunction, concluding that the employee would have a high-level position at Quaker Oats working on the Gatorade product line, where PepsiCo's trade secrets and confidential information "would necessarily influence his decisions." *Id.* at 1267. The Seventh Circuit affirmed, stating that PepsiCo had demonstrated that the employee had knowledge of particularized plans and processes that were unknown to others in the industry, and which gave the new employer an advantage over competitors. *Id.* at 1269. The Seventh Circuit also noted the employee's lack of forthrightness both in his conduct prior to obtaining new

23

employment and in his testimony, which led the district court to conclude that disclosure under the circumstances was probable. *Id.* at 1270-71. Notably, the Seventh Circuit implied that "general skills and knowledge acquired during his tenure at PepsiCo" would be insufficient to conclude that misappropriation of trade secrets was inevitable. *Id.* at 1269.

*PepsiCo* is distinguishable from this case. Importantly, *PepsiCo* was decided at the preliminary injunction stage, not on a TRO motion. 54 F. 3d at 1265. The trial court there had the benefit of an evidentiary record. *Id.* Not so here. The Court does not have the benefit of any evidentiary record on the claimed trade secrets to evaluate this theory, or to consider the factors necessary in making a finding of an inevitable disclosure. For example, although at the TRO hearing Paro argued that Kohan cannot operate or function in his new position without relying upon Paro's trade secrets, there is no record from which the Court can accept that contention. Further, while the Court has accepted that Paro and FirmKey are competitors based on the allegations in the Verified Complaint, the level of competition between the entities is unknown, as Paro acknowledges FirmKey is a start-up recently in business. This is very different than an employee leaving PepsiCo for Quaker Oats, as those companies are both well-established. *Id.* 1264–65. And while the crux of the trade secret and Confidential Information that Paro is concerned with is its customer information, this information is not similar in kind to the strategic planning-type information the ex-PepsiCo employee had knowledge of in his high-level role at PepsiCo. *Id.* at 1267. Instead, Paro's TRO Motion is predicated on the fact that Kohan's skills and

knowledge gained while at Paro would lead to the inevitable disclosure of Paro's trade secrets. However, the Seventh Circuit in *PepsiCo* cautioned that such generalized knowledge would not be enough to conclude that the disclosure of trade secrets was inevitable. *Id.* at 1269.

At the TRO hearing, the Court asked Paro if it could identify any cases where a court decided an emergency TRO on the basis of the inevitable disclosure doctrine. In response, in addition to *PepsiCo*, Paro identified *Strata Marketing, Inc. v. Murphy*, 740 N.E. 2d 1166, 1178 (Ill. App. Ct. 2000) and *Lucini Italia Co. v. Grappolini*, 2003 WL 1989605 (N.D. Ill. Apr. 28, 2003). For the reasons discussed above, the Court finds *PepsiCo* distinguishable, and also finds *Strata Marketing* and *Lucini* distinguishable.

In *Strata Marketing*, an Illinois appellate court resolved an appeal which involved a motion to dismiss an Illinois Trade Secrets Act claim. *Strata Marketing*, 740 N.E.2d at 1178. The appellate court determined that the claim in that case could proceed under a theory of inevitable disclosure, and concluded that plaintiff had pled sufficient allegations to withstand a motion to dismiss. *Id.* However, the resolution of that issue on the denied temporary restraining order was not addressed by the appellate court. *Id.* The Court finds the *Strata Marketing* case inapposite for purposes of resolving the emergency temporary restraining order, as the Court is not tasked with deciding a motion to dismiss. As for *Lucini,* that case did not involve an emergency TRO. 2003 WL 1989605 at 1. Instead, it was decided on the merits

following a bench trial. *Id.* In other words, like *PepsiCo*, the district court had the benefit of an evidentiary record.

Further, the Court notes that at least one other court in this District has found that for a claim under the Defend Trade Secrets Act, an inevitable disclosure theory is insufficient because the statute requires that the trade secret information actually be misappropriated. *Aon PLC v. Alliant Insurance Services, Inc.*, 2023 WL 3914886, at *5 (N.D. Ill. June 9, 2023). Specifically, "[t]he civil remedies provision of [the Defend Trade Secrets Act] precludes the imposition of injunctive relief for actual or threatened misappropriation based 'merely on the information the person knows.'" *Id.* (quoting 18 U.S.C. § 1836(b)(3)(A)(i)(I)). Here, Paro concedes that it is not proceeding on a theory of actual misappropriation. Thus, for this independent reason, Paro has not established a likelihood of success on its Defend Trade Secrets Act claim.

Accordingly, at this early stage, the Court finds Paro has not established a likelihood of success on the merits of its trade secrets claims. Paro concedes it is not contending Kohan improperly accessed trade secrets at any point during his employment with Paro, or held on to that information in violation of his Employment Agreement. Paro does not allege that Kohan or FirmKey has, in fact, used, disclosed, or relied upon any trade secret of Paro's. Paro does argue that Paro and FirmKey are direct competitors, and that Kohan cannot operate or function in his new position without relying upon Paro's trade secrets. In response, Kohan or FirmKey affirm, through a sworn Declaration of Kohan, that they do not possess any of Paro's trade secrets or confidential information. Kohan Decl. ¶ 8. This is in sharp contrast to the

26

cases where ex-employees have downloaded or accessed trade secrets or confidential information from their ex-employer, and the ex-employer has proof of that action, which usually drives the filing of a lawsuit and seeking emergency relief from the Court. *See*, *e.g.*, *Aon Risk Services Companies*, 415 F.Supp.3d at 848 (finding a likelihood of success on trade secret claims where employees took trade secrets prior to leaving the company). Paro's speculation that Kohan and FirmKey will, at some point, use the trade secrets is not sufficient at this emergency TRO stage, and Paro has not identified cases to support that such a finding of inevitable disclosure can be made at the TRO stage.

Thus, at this preliminary stage, the Court finds Paro has not met its burden to show a reasonable likelihood of success on the merits with respect to Count II or III of its Verified Complaint.

### iii. Tortious Interference with Contract Against FirmKey (Count IV)

Paro also asserts a claim for tortious interference with contract (the Employment Agreement between Paro and Kohan) against FirmKey only. To prove tortious interference with contract under Illinois law, Paro must show "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages." *Hess v. Kanoski & Associates*, 668 F.3d 446, 454 (7th Cir. 2012).

Paro maintains that FirmKey has tortiously interfered with the Employment Agreement by employing Kohan, and via the formation of the company itself, in violation of Section 4 of the Employment Agreement. Memo. TRO at 10. As confirmed with Paro at the TRO hearing, FirmKey is not subject to the Employment Agreement. Thus, to the extent Paro is alleging FirmKey will solicit Paro's clients or experts, or threatens to interfere with Paro's client or expert relationships, or will misappropriate Paro's Confidential Information itself, those allegations are not based upon tortious interference with Kohan's contract with Paro, and are not cognizable under this theory.

In response, Kohan and FirmKey argue, without citation to any authority, that a company cannot tortiously interfere with a contract. While it is true that an entity cannot be liable for interfering with its own contract, an entity can tortiously interfere with contracts, and that is not a claim that can only be stated against an individual. *See Cox v. Calumet Public Schools District 132*, 180 F. Supp. 3d 556, 564 (N.D. Ill. 2016).

Nevertheless, based upon the Court's finding that Paro has not demonstrated a likelihood of success as to Counts I–III of its Verified Complaint, it follows that Paro has also failed to meet its burden for Count IV. Specifically, the Court's finding with respect to the Non-Compete restrictive covenant forecloses a likelihood of success on the merits for the tortious interference claim. That is because, as confirmed by Paro at the TRO hearing, it is pursuing this theory based on Section 4 of the Employment Agreement.

Thus, at this preliminary stage, the Court finds Paro has not met its burden to show a reasonable likelihood of success on the merits with respect to Count IV of its Verified Complaint.

As Paro is required to establish a likelihood of success on the merits of its claims to obtain injunctive relief, the analysis of the remaining requirements for injunctive relief is unnecessary. *See*, *e.g.*, *Abbott*, 971 F.2d at 11 ("If the moving party cannot establish … these prerequisites, a court's inquiry is over and the injunction must be denied.") At this emergency TRO juncture, and on this record, Paro has not met its burden regarding the first requirement for obtaining injunctive relief. However, this ruling is not a suggestion that Paro will not be able to satisfy that burden at a preliminary injunction hearing after the parties have the opportunity to obtain discovery, which is addressed below. *See*, *e.g.*, *U.S. Army Corps of Eng'rs*, 667 F.3d at 782.

## II.     Expedited Discovery

Last, the Court addresses Paro's motion for expedited discovery. In its expedited discovery motion, Paro requests that it be permitted to engage in discovery in connection with the emergency relief it is seeking. The Court agrees that certain expedited discovery is appropriate in light of the scheduling a preliminary injunction hearing, so the Court and the parties will have a fuller evidentiary record for that hearing. *See Nobel Biocare USA, Inc. v. Lynch*, 1999 WL 958501, at *4 (N.D. Ill. Sept. 15, 1999). However, this proposed discovery will be limited, and the Court will require

the parties to submit a proposed discovery schedule in advance of commencing discovery.

## Conclusion

For the foregoing reasons, the Court resolves Paro's motion [7] as follows: the Court denies Paro's request for an emergency temporary restraining order, and enters and continues Paro's request for a preliminary injunction, to be resolved after limited discovery and an evidentiary hearing, if necessary. The Court grants Plaintiff's motion for expedited discovery [9], subject to the Court's review of a proposed discovery schedule.

The Court directs the parties to file a joint status report by July 24, 2023 addressing (i) proposed dates for an in-person preliminary injunction hearing, (ii) the anticipated length of a preliminary injunction hearing, (iii) the number of witnesses per side, and (iv) a proposed expedited discovery schedule, including the anticipated number of depositions per side, proposed number of interrogatories, number of requests to admit, and requests for production.

Dated: July 19, 2023

United States District Judge
Franklin U. Valderrama