IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ADMIIN INC., d/b/a PARO, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>LUKE KOHAN, an individual, and FIRMKEY SOLUTIONS, LLC, a Minnesota limited liability company,<br><br>Defendants. | Case No. 1:23-cv-04430<br><br>Judge Franklin U. Valderrama<br><br>Magistrate Judge M. David Weisman |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS RULE 65 MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to the Court's Minute Order dated September 5, 2023 [dkt. 32], Plaintiff Admiin Inc., d/b/a Paro, Inc. ("Paro" or the "Company") submits this Memorandum of Law in further support of its Motion for Preliminary Injunction. Because Defendant Luke Kohan is breaching Sections 4 and 7(b) of his Non-Competition Agreement, the Court should, for a period of twelve (12) months, enjoin him from working for and being affiliated with FirmKey Solutions, LLC ("FirmKey"), and from soliciting Paro's clients. Correspondingly, the Court should enjoin FirmKey from employing Kohan because FirmKey has tortiously interfered with Paro's contractual relationship with Kohan. As explained below, the developed record establishes that the restrictions in the Non-Competition Agreement are reasonable and enforceable, and without immediate injunctive relief, Paro will suffer irreparable harm. Accordingly, Paro respectfully requests that the Court grant its Motion for Preliminary Injunction.[1]

---

[1] For the time being, Paro withdraws without prejudice its Motion for Preliminary Injunction as it concerns its claims under the Illinois Trade Secrets Act (Count II) and the federal Defend Trade Secrets Act (Count III).

I. **INDISPUTABLE FACTS**

    A. **Paro**

In its Verified Complaint for Injunctive and Other Relief, Paro described the nature of its business; its Confidential Information, trade secrets and relationships with its clients and experts; and the steps it takes to protect its information and relationships. *See* dkt. 1. Paro incorporates those assertions herein. *E.g., IDS Life Insurance Co. v. SunAmerica Life Insurance Co.*, 136 F.3d 537, 542 (7th Cir. 1998) (at the preliminary injunction stage, "[v]erified complaints are the equivalent of affidavits"). Notably, Kohan agrees that Paro "matches a company with an independent expert from their network of freelancers," and that Paro's clients engage the experts for various finance-related services, including fractional and other accounting services, bookkeeping and CFO services. Kohan Dep., 32-35, 47.[2]

    B. **Luke Kohan and His Employment with Paro**

Kohan began his employment with Paro on October 19, 2020. Kohan Dep., 14. Prior to joining Paro, Kohan worked at Groupon for four years and Rodeo (a software company) for three months. *Id.*, 10-13. Kohan admits that, before joining Paro, he had no prior experience in the finance-related "matchmaking" industry. *Id.*, 53-54. Kohan was highly compensated at Paro, having earned $365,000 in cash compensation in his last year of employment with the Company, and he also received equity grants and other benefits. *Id.*, 58, 216-17.

Kohan held several different positions during his time at Paro, and in those roles, Kohan was responsible for, *inter alia*, cold calling, soliciting and servicing Paro's clients, and recruiting, vetting and interacting with Paro's experts. Kohan Dep., 19-30, 36, 48; *see also* Kohan Dep. Ex. 1. During his last nine months with Paro (July 2022 to March 2023), Kohan worked on the

---

[2] The excerpts from the record which are cited herein appear in Paro's accompanying Appendix of Exhibits in Further Support of Its Motion for Preliminary Injunction.

"CPA east" (or "white label") team, which focuses on providing staff augmentation services to accounting firms. *Id*., 28-29, 42-45. Although Paro offers an AI tool to help match clients and experts, Kohan's clients relied on *him* to identify an expert and make the match. *Id*., 36-39.

In consideration of Kohan's employment, compensation and benefits, Kohan and Paro signed a Non-Competition, Non-Solicitation, Non-Disclosure and Invention Assignment Agreement (the "Non-Competition Agreement" or "Agreement"). Kohan Dep. Ex. 2; *see also id.* at ¶ 8(a) (defining the consideration for the Non-Competition Agreement). Sections 4 and 7(b) of the Non-Competition Agreement contain 12-month non-compete and client non-solicitation restrictions, respectively. Kohan agreed that "the scope and duration of the restrictions" in the Agreement "are reasonable and necessary to protect [Paro's] legitimate business interests." *Id.* at ¶ 8(b). The Agreement also contains a tolling provision. *Id.* at ¶ 8(c).

In the Non-Competition Agreement, Kohan agreed that he would "become privy to Confidential Information of [Paro]," and he acknowledged the importance of Paro's relationships with its clients. Kohan Dep. Ex. 2 at p. 1 and ¶ 8(b). In his deposition, Kohan testified that he compiled and then entered client-related information into Paro's Salesforce database, including the client's requisition, needs and budget. Kohan Dep., 62, 65. Kohan's access to Salesforce was username and password-protected, and he considered the information in Salesforce to be confidential to Paro. *Id*., 61-62. Kohan further admits that he could access information relating to Paro's experts only by entering his username and password credentials. *Id*., 66-67. Kohan also considered Paro's pricing information and business strategies to be confidential. *Id*., 64-67.

C. **Kohan's Formation and Operation of FirmKey, a Direct Competitor of Paro**

Kohan and his partners, Samuel Harrison (an investment banker) and Joseph Hamilton (a CPA), formed FirmKey on February 20, 2023. Kohan Dep., 103-05, 140. Kohan tendered his

resignation to Paro several days thereafter, and his last day with the Company was March 10, 2023. *Id.*, 103-05, 116. FirmKey began operations on April 1, 2023. *Id.*, 111.[3]

Kohan did not consider his obligations under the Non-Competition Agreement prior to forming FirmKey. Kohan Dep., 107-09  Nor did he inform anyone at Paro that he was starting FirmKey, because it was "none of their business." *Id.*, 115-16. Kohan admits that he was able to start FirmKey based on the industry experience he gained at Paro. *Id.*, 107.

There can be no dispute that Paro and FirmKey are direct competitors. Kohan testified that, like Paro, FirmKey "matches" clients in need of finance-related services with industry experts (although FirmKey refers to experts as "vendors"). Kohan Dep., 105-06. But according to Kohan, Paro and FirmKey have different pricing models, and Paro places greater reliance on its AI tool to match clients and experts. *Id.*, 123-24. Kohan also claims that, unlike FirmKey, Paro offers "staff augmentation" services, whereby it matches an expert with a client, and the expert then provides services to the *client's* client. *Id.*, 127. Kohan's "understanding" of Paro's "focus" is incorrect, as Paro has always provided – and continues to provide – non-staff augmentation services by matching clients in need of CFO-related, accounting, bookkeeping and other finance-related services with qualified experts. Burdick Decl., ¶¶ 3-4; Kohan Dep., 129 (conceding that Paro provides non-staff augmentation services to clients) and Defendants' First Amended Answer and Affirmative Defenses [dkt. 24] at ¶ 37 (admitting that Paro "markets and provides various finance and accounting services to clients of all sizes"). And even if true (which it is not), Kohan's belief that Paro has shifted to a "staff augmentation" model is a

---

[3] Kohan, Harrison and Hamilton each hold a 33.33% ownership stake in FirmKey. Kohan Dep., 138-39. Kohan is CEO and President, Harrison is COO, and Hamilton is CFO. *Id.*, 135, 137-38. As CEO and President, Kohan's responsibilities for FirmKey include "business development, bringing in business" and overseeing FirmKey's software and technology systems. *Id.*, 135-36. Kohan employs the same business development strategies at FirmKey – specifically, identifying and contacting prospective clients and experts by email – as he did at Paro. *Id.*, 136-37.

distinction without a difference. At their cores, Paro and FirmKey provide the identical type of finance-related services by matching clients and experts. *See generally*, *e.g.*, Burdick Decl.

FirmKey's marketing materials and contracts with its "vendors" further confirm that Paro and FirmKey are direct competitors. Kohan testified that FirmKey's website – which describes FirmKey as offering CFO-related, Technical Accounting, Audit, Tax, Financial Planning & Analysis (FP&A), ERP Implementation, Transaction Advisory, and Bookkeeping services through its network of vendors – is accurate. *See* Kohan Dep. Ex. 7 at p. 6; Kohan Dep., 159. Paro offers the same exact services. Burdick Decl., ¶¶ 3-4; Verified Complaint at ¶¶ 2, 10.

FirmKey's template Vendor Terms & Conditions Agreement describes FirmKey as "specializing in creating business relationships … for … Clients in need of accounting services and qualified Vendors." Kohan Dep. Ex. 9 at p. 1; Kohan Dep., 186-87. Kohan admits that Paro provided the same services "in some capacity" while he was employed there. *Id.*, 187. Moreover, FirmKey's template Vendor Agreement establishes that, like Paro, FirmKey considers various categories of information, *including the details of its relationships with its clients and vendors*, to be confidential. Kohan Dep. Ex. 9 at ¶ 5.1. Vendors "acknowledge[] that FirmKey will be irreparably harmed by [the Vendors'] violation" of the Vendor Agreement. *Id.* at ¶ 14.

Kohan's May 2023 LinkedIn post announcing the launch of FirmKey also confirms that Paro and FirmKey are direct competitors. *See* Kohan Dep. Ex. 6. Kohan testified that the LinkedIn post accurately describes FirmKey's business offerings, including CFO, Controller, FP&A, CPA, ERP implementation, and bookkeeping services, and:

> "(A) on-demand access to our vetted coalition of specialists [vendors]
>
> (B) flexible project-based or ongoing fractional engagements [and]
>
> (C) a far more cost-effective, reliable, and rapid means of engaging with qualified, US-based accountants and consultants."

Kohan Dep. Ex. 6; Kohan Dep., 151-54. *Significantly, Kohan concedes that Paro offers the same services.* *Id.*, 156-57, 203.

When asked if FirmKey is a competitor of Paro, Kohan responded: "Maybe someone would consider it. I don't know if I would." Kohan Dep., 168. But tellingly, Kohan identified FirmKey's competitors as Upwork, TopTal and Makosi (*id.*) – the *same* companies (in addition to FirmKey) which Paro views as its (Paro's) competitors. Burdick Decl., ¶ 5.[4]

## II. THE COURT SHOULD GRANT PARO'S MOTION FOR PRELIMINARY INJUNCTION

### A. Rule 65 Standard

To obtain preliminary injunctive relief, Paro need only demonstrate that (1) it has some likelihood of success on the merits of its claims, (2) there is no adequate remedy at law, and (3) it will endure irreparable harm if injunctive relief is not granted. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012). Once Paro has met these requirements, the Court balances the harm that Defendants will suffer if the injunction is granted against the harm to Paro if relief is denied. *Id.* Finally, the Court considers whether the public interest would be adversely affected by the issuance of the injunction. *Id.* Here, with the benefit of a more developed record, each of the foregoing elements favors Paro.

### B. Paro is Likely to Succeed on the Merits of Its Breach of Contract and Tortious Interference Claims

#### 1. Kohan is Breaching the Terms of the Non-Competition Agreement

Paro need only demonstrate that it has "some chance" of succeeding on the merits of its breach of contract claim to justify the issuance of injunctive relief. *Lineback v. Spurlino*

---

[4] Kohan also identified TaskRabbit as one of FirmKey's competitors. Kohan Dep., 168. Paro does not consider TaskRabbit to be a competitor because TaskRabbit does not provide matchmaking services in the financial services space. Burdick Decl., ¶ 5.

*Materials, LLC*, 546 F.3d 491, 502 (7th Cir. 2008). This "threshold is low." *Brunswick Corp v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986); *see also Frullati Franchise Sys. v. Dana Areece & Co., Inc.*, 2001 U.S. Dist. LEXIS 8900 (N.D. Ill. June 27, 2001) (a plaintiff need only establish a "trivial chance of succeeding on the merits") (internal citation omitted). Here, Kohan has breached, and continues to breach, Sections 4 and 7(b) of the Non-Competition Agreement.

a. **Kohan Knowingly Signed the Non-Competition Agreement**

In its ruling denying Paro's Motion for a TRO [dkt 17], the Court noted that "Kohan and FirmKey do not challenge the validity of the [Non-Competition] Agreement itself." *See* TRO Ruling at 12. But in an about-face, Kohan now argues that he is not bound by the Agreement because he did not read the document before he signed it. Kohan Dep., 73, 75. Kohan testified that he thought the Agreement was "only" a non-disclosure and invention assignment agreement. *Id.*, 69, 73. Kohan claims that he read the Agreement for the first time on May 15, 2023 (more than 2½ years after he signed it) when he received Paro's first cease and desist letter. *Id*. 77-78.

Kohan's argument fails for several reasons. As a threshold matter, "[i]n Illinois a party to a contract is charged with knowledge of and assent to a signed agreement." *Faulkenberg v. CB Tax Franchise Systems*, 637 F.3d 801, 810 (7th Cir. 2011). "Ignorance of the contract's [relevant] provision[s] is no defense if they failed to read the contract before signing." *Id.*; *see also Davis v. Fenton,* 26 F. Supp. 3d 727, 737 (N.D. Ill. 2014) ("[B]y signing the retainer agreement, Plaintiff acknowledged that she read and understood the terms of the agreement.").

Moreover, Kohan's offer letter from Paro, which Kohan claims he read carefully and to which he requested revisions (Kohan Dep., 70, 77), clearly references Kohan's need to sign a "*non-compete* and confidentiality agreement." Burdick Decl. Ex. 1 at p. 1 (emphasis added). Kohan – who is intelligent and highly educated – further acknowledges that, prior to signing the

Non-Competition Agreement, he had the opportunity to review and ask questions about it, and to engage counsel to advise him about the terms of the document. Kohan Dep., 9, 74-76, 80. Kohan also acknowledges that Paro did not pressure him to sign the Agreement by a certain date. *Id.*, 74. Further, sixteen (16) days passed between the date on which Kohan executed the Agreement (October 3, 2020) and his start date with Paro (October 19), yet Kohan said nothing during the time about being duped into signing the Agreement or that he misunderstood its terms. *Id.*, 14, 69, 74-75. Indeed, Kohan acknowledged in the Agreement itself – in conspicuous ALL CAPS no less – that he reviewed the document before signing it and he understood its terms:

> I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT …. FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

Kohan Dep Ex. 2 at ¶ 11(i) (all caps in original); *see also* Kohan Dep., 80-81. Kohan sheepishly admitted in his deposition that he "should have read" the Agreement before signing it. *Id.*, 87. The Court should summarily reject Kohan's insincere attempt to skirt his contractual obligations.

### b. The Non-Compete Clause is Reasonable and Enforceable

It is well-established in Illinois that a restrictive covenant is reasonable if it (1) is no greater than is required for the protection of a legitimate business interest of the employer, (2) does not impose an undue hardship on the employee, and (3) is not injurious to the public. *Reliable Fire Equipment Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). This "three-prong test of reasonableness remains 'unstructured,'" and "precedents are of less than usual value because the question of reasonableness must be decided on an *ad hoc* basis." *Id.* at 400-01.

"Each case must be determined on its own particular facts. Reasonableness is gauged not just by some but by all of the circumstances. The same identical contract and restraint may be reasonable and valid under one set of circumstances, and unreasonable and invalid under another set of circumstances." *Id.* Judged in light of this standard, the non-compete clause in Section 4 of Kohan's Non-Competition Agreement is reasonable and enforceable.

In evaluating whether an employer has a legitimate, protectable business interest, courts consider a number of factors, including "the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and the time and place restrictions" of the covenant. *Reliable Fire,* 965 N.E.2d at 403. Kohan cannot dispute that Paro has invested a great deal of time, money and effort in forging its long-standing relationships with its clients and experts, or that he had access to Paro's Confidential Information. *E.g.*, Verified Complaint at ¶¶ 11-17; Kohan Dep., 61-67; Kohan Dep. Ex. 2 at p. 1 and ¶ 8(b). Indeed, as reflected in its template Vendor Agreement, FirmKey claims to possess and maintain similar confidential information of its own. Kohan Dep. Ex. 9. Thus, Paro has demonstrated that it has various legitimate business interests in need of protection. *E.g.*, *Abel v. Fox*, 654 N.E.2d 591, 597-598 (Ill. App. 1995) ("In Illinois, confidential information and customer relationships can be a protectable interest of an employer.").

Moreover, the length (12 months) and geographic scope of Section 4 are reasonable, narrowly tailored and regularly enforced by Illinois courts. *E.g.*, *Mintel Int'l Group, Ltd. v. Neegheen*, 2008 U.S. Dist. LEXIS 54119 (N.D. Ill. July 16, 2008) (plaintiff had "some likelihood of successfully demonstrating" reasonableness of non-compete restriction which barred defendant from competing with plaintiff "at any location worldwide" for one year); *Instrumentalist Co. v. Band, Inc.*, 480 N.E.2d 1273 (Ill. App. 1985) (enforcing two-year non-

compete restriction which restricted defendant from working for any entity which competed with plaintiff anywhere in the United States); *Gorman Publishing Co. v. Stillman*, 516 F. Supp. 98, 104-06 (N.D. Ill. 1980) (non-compete restriction, which barred defendant for a two-year period from "engag[ing] in a business directly competitive with Company anywhere in the United States or the foreign areas where the Company has done business or has planned or scheduled business," was "certainly reasonable," "not unduly burdensome," and "enforceable").[5]

Kohan has argued that Paro and FirmKey are not competitors, but his sworn testimony and LinkedIn post, coupled with FirmKey's marketing materials and contracts, belie his claim. *See infra.* Paro and FirmKey are both engaged in "matching" clients in need of finance-related services with industry experts. Accordingly, the Court correctly ruled that Paro and FirmKey are competitors. *See* TRO Ruling at 14.

The Court should similarly reject Kohan's argument that the term "Business," as it is defined in Section 4 of the Non-Competition Agreement, is "overbroad and ambiguous." Kohan concedes that he understands the nature of the business in which Paro engages. *E.g.*, Kohan Dep., 84-85. Thus, the term "Business" must be interpreted in the context of (a) the parties' consensus about the nature and scope of Paro's operations, (b) the Agreement as a whole, and (c) the indisputable nature and scope of FirmKey's business. *E.g.*, *Health Professionals, Ltd. v. Johnson*, 791 N.E.2d 1179 (Ill. App. 2003) ("Although a broad interpretation of this [non-compete] language would encompass *any* type of employment arrangement, we believe the

---

[5] In fact, Illinois courts routinely enforce non-compete restrictions lacking *any* stated geographic territory. *E.g.*, *Am. Transp. Grp., LLC v. John Power & Direct Traffic Sols.,* Inc., 2018 U.S. Dist. LEXIS 71493 (N.D. Ill. Apr. 27, 2018) (enforcing non-compete restriction without a geographic restriction "because ATG's business involves the transportation of freight across the entire United States"); *TLS Management Marketing Services, LLC v. Mardis Financial Services, Inc.,* 2016 U.S. Dist. LEXIS 165864, *8 (S.D. Miss. Nov. 30, 2016) ("Illinois courts have even approved non-competition covenants that lack geographic limitations when the employer's business activities are nationwide.") (applying Illinois law).

restrictions must be construed in light of the entire agreement and its purpose.") (emphasis in original); *Bloomington Urological Assocs., SC v. Scaglia*, 686 N.E.2d 389 (Ill. App. 1997) ("practice of medicine" appearing in non-compete agreement must be interpreted in context).

The term "Business" refers to "outsourced financial services," but the definition offers illustrations of such services, "including bookkeeping and accounting, financial analysis and CFO strategy services." Kohan Dep. Ex. 2 at ¶ 4; *e.g.*, *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 211 (1941) (holding that the term "including" may preface an illustrative example or it may serve to define the preceding term). And to avoid any uncertainty or confusion, the term "Business" is further defined to mean the provision of products or services "which are substantially similar to those … provided by … the Company *during the term of [Kohan's] employment with the Company*." Kohan Dep. Ex. 2 at ¶ 4 (emphasis added).

In its TRO Ruling, the Court relied primarily on two cases in finding, on a preliminary basis, that the non-compete restriction in Section 4 was unreasonable: *AssuredPartners, Inc. v. Schmitt*, 2015 IL App (1st) 141863, and *Océ N. Am., Inc. v. Brazeau*, 2010 U.S. Dist. LEXIS 25523 (N.D. Ill. Mar. 18, 2010). TRO Ruling at 15-17. But those cases are distinguishable. In *AssuredPartners*, the court ruled that the 28-month non-compete restriction was overbroad because, whereas the defendant sold professional liability insurance exclusively to attorneys ("LPLI"), his restriction barred him from selling *any* professional liability insurance, including to physicians, accountants and other non-attorney professionals. 2015 IL App (1st) 141863 at ¶ 35. In so ruling, the Court specifically noted that the defendant had decades of prior experience in the LPLI industry prior to signing his non-competition agreement with the plaintiff. *Id.*

In *Brazeau* – a case which the undersigned counsel knows very well – the court invalidated the defendant's non-compete restriction after applying the pre-*Reliable Fire*

"protectable interest" test, a test which *Reliable Fire* specifically abrogated. *See Brazeau*, 2010 U.S. Dist. LEXIS 25523 at *8. Moreover, the *Brazeau* court ruled that the non-compete restriction, as it applied to the defendant, was overbroad because the defendant's job with his new employer was in a different business unit than his prior job with the plaintiff. *Id*. at *27-28.

Here, by contrast, Kohan owes his entire breadth of training and experience in the industry to Paro. His non-competition restriction merely prohibits him from owning a business or working in the "matchmaking" space at it relates to the provision of *finance-related services*. He is free to work for any company which matches clients and experts in any other industry.

In its TRO Ruling, the Court also preliminarily ruled that Kohan's non-compete restriction is overbroad insofar as it bars Kohan from working for a competitor "in any capacity." TRO Ruling at 17-18. But the so-called "janitor rule" does not apply here because as CEo and President of FirmKey, Kohan has taken on much *greater* responsibilities than those he performed at Paro. *Johnson*, 791 N.E.2d at 1193 ("[W]e decline defendants' invitation to consider various hypothetical scenarios or interpretations of the agreement that would produce absurd results."). Indeed, Kohan is a co-founder and one-third owner of FirmKey, and in addition to prohibiting competitive employment, Section 4 of the Non-Competition Agreement also bars Kohan from "hav[ing] any financial interest in any company or entity engaging in the Business."[6]

          **c.    Kohan Also Has Breached the Client Non-Solicitation Restriction in the Non-Competition Agreement**

The record evidence also establishes that Kohan has breached the client non-solicitation restriction in Section 7(b) of the Non-Competition Agreement. Paro is not aware of any Illinois

---

[6] As the Court recognized in its TRO Ruling, the Non-Competition Agreement (at ¶ 8(d)) contains a "blue pencil" clause. TRO Ruling at 19. Although Paro avers that Section 4 of the Non-Competition Agreement is reasonable and enforceable, if the Court is inclined to disagree, Paro respectfully asks the Court to revisit the issue and modify the restriction "so as to be valid and enforceable."

case which has squarely addressed whether a LinkedIn post such as Kohan Deposition Exhibit 6 constitutes an unlawful "solicitation," but courts in other jurisdictions have ruled that where the defendant uses social media to announce his new position *and* includes an invitation to contact him and "learn more," the post amounts to unlawful activity. *Am. Achievement Corp. v. Jostens, Inc.*, 622 F. Supp. 3d 749 (D. Minn. 2022); *NRT Texas LLC v. Wilbur*, 2022 U.S. Dist. LEXIS 185685 (S.D. Tex. Sep. 7, 2022); *Mobile Mini, Inc. v. Vevea*, 2017 U.S. Dist. LEXIS 116235 (D. Minn. July 25, 2017); *Amway Global v. Woodward*, 744 F. Supp. 2d 657 (E.D. Mich. 2010).

Here, Kohan's LinkedIn post is much more than a "status update" about his employment. Kohan testified that he posted the LinkedIn announcement "to let people know I've started a new company" and to inform them of what FirmKey does. Kohan Dep., 157. Kohan stated that the post was "pretty well received" by the public. *Id.* Any objective and fair reading of the post leads to the conclusion that Kohan's intent was to induce members of his network to contact and work with FirmKey. *See also* Section 7(b) of Non-Competition Agreement (defining "solicit" as directly or indirectly initiating, contacting or engaging in any contact or communication "that has the purpose or effect of inviting, assisting, encouraging or requesting" a client to purchase competitive goods or services or terminate or diminish its relationship with Paro).

Finally, the Court should reject any argument by Kohan that Paro's motion is unfounded because the Company has not lost any clients as a result of his "solicitation." *Schorr Paper Products, Inc. v. Frary*, 392 N.E.2d 1148, 1153 (Ill. App. 1979) ("[W]hile there is nothing in the record to indicate that defendant has succeeded in making a sale to one of plaintiff's customers, there is no requirement that a court must wait until an injury occurs before granting injunctive relief in a restrictive covenant case.").

### 2. FirmKey Has Tortiously Interfered with Paro's Contractual Relationship with Kohan

Paro also is likely to succeed on the merits of its claim for tortious interference with the Non-Competition Agreement against FirmKey. FirmKey is well aware of the existence of the Non-Competition Agreement, Kohan is in breach of the Agreement, and FirmKey has induced and continues to induce the breach by operating a competitive business and employing Kohan.

### C. Paro Has No Adequate Remedy at Law, and It Will Suffer Irreparable Harm Without Injunctive Relief

A business' loss of its competitive position is intangible, incapable of being measured. *Cross Wood Products, Inc. v. Sutter*, 422 N.E.2d 953, 957 (Ill. App. 1981); *see also Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006) (loss of goodwill, competitive position, and customer relationships constitute irreparable harm "oftentimes fatal to businesses, [that] cannot be readily calculated and cured by an award of monetary damages"). Here, a legal remedy alone cannot and will not prevent or cure the harm that Paro will suffer from Defendants' unchecked, unlawful conduct. Accordingly, Paro has established that it has no adequate remedy at law.

"Irreparable injury" does not refer to injury that is "beyond repair or compensation in damages, but denotes transgressions of a continuing nature." *Leen v. Carr*, 945 F. Supp. 1151, 1157 (N.D. Ill. 1996). "Once a protectable interest is established, irreparable injury is presumed if the interest remains unprotected." *A-Tech Computer Services v. Soo Hoo*, 627 N.E.2d 21, 27 (Ill. App. 1993); *see also Gateway Sys. v. Chesapeake Sys. Solutions*, 2010 U.S. Dist. LEXIS 95470, *12 (N.D. Ill. Sept. 14, 2010) ("potential loss of customers and sales as a result of [defendant's] violation, and the threat that such losses will continue if an injunction is not granted, are sufficient grounds to justify preliminary relief"). Kohan's and FirmKey's


misconduct threatens Paro's operations, revenues and profits, client good will, and Confidential Information. Without an injunction prohibiting Kohan and FirmKey from engaging in their misconduct, Paro's injuries will continue through the date of trial – when it simply would be too late to remedy the wrongs inflicted by them.

### D. The Balancing of the Harms and Public Interest Considerations Favor Paro

This Court is tasked with considering whether Paro will suffer greater harm without the injunction than Defendants will suffer if it is issued. *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 678 (7th Cir. 2012). Kohan has acknowledged that enforcement of the restrictions in the Non-Competition Agreement "will not in any way preclude [him] from becoming gainfully employed." Kohan Dep. Ex. 2 at ¶ 8(b). Accordingly, the harm of denying Paro injunctive relief far outweighs the harm Defendants may endure if restrained from unfairly competing. Moreover, because Paro seeks only to enjoin Defendants' intentional unlawful activity, an injunction will not have an adverse impact on the public at large.

### III. CONCLUSION

For the foregoing reasons, Paro asks this Court to issue a preliminary injunction on such terms as the Court deems just and equitable.

Dated: September 29, 2023

Respectfully submitted,

**ADMIIN, INC. d/b/a PARO, INC.**

By: /s/ *Chad W. Moeller*
      One of Its Attorneys

Chad W. Moeller (cmoeller@nge.com)
Sonya Rosenberg (srosenberg@nge.com)
Collette A. Woghiren (cwoghiren@nge.com)
NEAL GERBER & EISENBERG LLP
2 N. LaSalle St., Suite 1700
Chicago, Illinois 60602
(312) 269-8000

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that she served a copy of the foregoing **Plaintiff's Supplemental Memorandum of Law in Support of Its Rule 65 Motion for Preliminary Injunction** on:

Thomas G. Pasternak
Akerman LLP
71 South Wacker Drive
47th Floor
Chicago, Illinois 60606
thomas.pasternak@akerman.com

via the Court's electronic filing system on this 29th day of September, 2023.

/s/ *Chad W. Moeller*
One of the Attorneys for Admiin, Inc. d/b/a Paro, Inc.

35624643.3