1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION
 3   ADMIN INC., d/b/a PARO,      )
     INC., a Delaware             )
 4   Corporation,                 )
                                  )
 5          Plaintiff,            )
                                  )  Case No. 1:22-cv-04430
 6      vs.                       )
                                  )  Judge Franklin U.
 7   LUKE KOHAN, an individual,   )  Valderrama
     and FIRMKEY SOLUTIONS,       )
 8   LLC, a Minnesota limited     )  Magistrate Judge M.
     liability company,           )  David Weisman
 9                                )
            Defendants.           )
10
11               The deposition of LUKE KOHAN,
12   called by the Plaintiffs for examination, taken
13   pursuant to the Federal Rules of Civil Procedure
14   of the United States District Courts pertaining to
15   the taking of depositions, taken before Robin M.
16   CHIMNIAK, CSR, RMR, CLNR, taken at Two North
17   LaSalle Street, 17th Floor, Conference Room N,
18   Chicago, Illinois, on the 19th day of September,
19   2023, at the hour of 8:33 a.m.
20
21
22
23   STENOGRAPHICALLY REPORTED BY:
     Robin M. CHIMNIAK, CSR, RMR
24   State of Illinois CSR License No. 084-001999
```

# TAB A –

# Excerpts from Deposition of Defendant Luke Kohan and Deposition Exhibits

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN       PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

9

1        Q.    Do you have any plans to move?

2        A.    We would like to, but nothing's

3    solidified yet.

4        Q.    To the extent that you move, are you

5    looking to move outside of New York?

6        A.    Yes; New Jersey.

7        Q.    Did you attend college?

8        A.    Yes.

9        Q.    Where?

10       A.    Miami of Ohio.

11       Q.    In Oxford?

12       A.    Yes.

13       Q.    Did you graduate?

14       A.    Yes.

15       Q.    When did you graduate?

16       A.    2015.

17       Q.    What is your degree in?

18       A.    I have a bachelor's degree in psychology.

19       Q.    Have you attended graduate school?

20       A.    No.

21       Q.    All right.  Do you have any

22   certifications or licenses?

23       A.    No.

24       Q.    Are you a member of any sort of agency

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY  9/19/2023

10

1  or organization on a professional level?

2       A.    What do you mean?  Like --

3       Q.    Well, are you a member of any clubs or

4  organizations?

5       A.    I used to be in a bowling club [laughter.]

6       Q.    Okay.

7       A.    I don't know if that's what you're

8  asking, but...

9       Q.    I'm speaking more like a professional

10  organization.  Any young professional memberships

11  or anything to that extent.

12       A.    No.

13       Q.    All right.  What was your first job out

14  of college?

15       A.    My first job out of college is I worked

16  at Groupon in Chicago.

17       Q.    How long did you work at Groupon?

18       A.    Just about four -- four years.

19       Q.    When did you start at Groupon?

20       A.    2016, January.

21       Q.    Did you live in Chicago at the time?

22       A.    Yes.

23       Q.    How long did you stay at Groupon?

24       A.    For about four years.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

11

1    Q.    You did say that.  Sorry.

2    A.    That's okay.

3    Q.    When did you leave Groupon?  In 2020?

4    A.    Yes.

5    Q.    Did you leave Groupon to go to Paro?

6    A.    I left Groupon to return home to New

7    York because I wasn't able to work remote and I

8    wanted to go home.

9    Q.    And you went home because of the

10   pandemic?

11   A.    No, this was before the pandemic.  I

12   just went home because I wanted to.

13   Q.    Okay.  Did you take off between leaving

14   Groupon and joining Paro?

15   A.    Yes.

16   Q.    How long?

17   A.    Let me rephrase.

18         I had a job in between Groupon and Paro

19   which lasted for the summer of 2020.

20   Q.    Okay.  What was that job?

21   A.    I sold project management software.

22   Q.    For a company?

23   A.    Yes.

24   Q.    Which company?

12

1       A.      It is called Rodeo.

2       Q.      R-o-d-e-o?

3       A.      Correct.

4       Q.      Is Rodeo's project management software

5  used in any specific industries?

6       A.      Yes.  It was catered towards creatives

7  and independent, like, advertisers and marketers.

8  It was pretty agnostic though.

9       Q.      What do you mean by that?

10       A.      Could sell to a manufacturing company,

11  could sell to a CPA firm, could sell to just about

12  anybody.

13       Q.      Were you employed by Rodeo or were you

14  a contractor?

15       A.      I was employed.

16       Q.      Why did you leave Rodeo?

17       A.      Because I hated it.

18       Q.      Backing up to Groupon, what did you do

19  for them?

20       A.      I sold for their things to do and

21  leisure team.

22       Q.      What is the "things to do and leisure

23  team"?

24       A.      I would -- specifically, like, who

ADMIN INC. v. LUKE KOHAN, et al.

KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY  9/19/2023

13

1   would I sell to?  Is that what you're asking?

2       Q.   Well, what type of products fall within

3   the things to do and leisure team?

4       A.   I essentially worked for a marketplace

5   where I would connect with local businesses in the

6   leisure space -- for example, a trampoline park --

7   and convince them to offer their services on

8   Groupon at a discount.

9       Q.   Okay.  Got it.

10           And you testified, I believe, that you

11  were with Rodeo for three months; is that correct?

12      A.   I testified that, yes, I believe it was

13  three months, but maybe it was four.  It could

14  have been two.

15      Q.   All right.  And you left Rodeo to join

16  Paro; is that correct?

17      A.   I left Rodeo and explored other job

18  opportunities, but Paro is the only job after

19  Rodeo.

20      Q.   Did you take any time off between

21  leaving Rodeo and joining Paro?

22      A.   Unwillingly, yes.  I wanted to work.

23      Q.   How much time did you take off?

24      A.   If I recall, leaving in July, and I

ADMIN INC. v. LUKE KOHAN, et al.

KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

14

1  started at Paro in October.  So I guess three

2  months.

3      Q.    Okay.  Do you recall when you started

4  at Paro?

5      A.    Yes.

6      Q.    What was your start date?

7      A.    October 19, 2020.

8      Q.    Okay.  My records indicate that you

9  started on October 3rd.  Are you certain that it

10  was October 19th?

11      A.    I am.

12      Q.    Were you supposed to start on

13  October 3rd, 2020, and that was delayed for a

14  couple weeks?

15      A.    Not to my knowledge.  I believe

16  paperwork and whatnot was completed around the

17  3rd, and I was set to start on the 19th full-time.

18      Q.    Okay.  And from what physical location

19  did you work for Paro?

20      A.    I worked remotely about 99 percent out

21  of my apartment.

22      Q.    Was that the Hell's Kitchen apartment?

23      A.    Two different apartments.  I used to

24  live in the East Side of New York and moved to

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

19

1      A.    No.

2      Q.    Do Rodeo and Paro operate in the same

3  industry?

4      A.    No.

5      Q.    Your résumé indicates that your first

6  job with Paro was Senior Account Executive

7  (Outbound 1).

8            Do you see what I'm referring to there?

9      A.    Yes, I do.

10     Q.    Is that accurate?

11     A.    Almost.  It should say outbound direct

12  1.

13     Q.    Okay.  What does the term "outbound"

14  mean, as it applies to Paro and your job

15  responsibilities for Paro?

16     A.    Outbound direct means that I was going

17  out to -- calling on businesses to sell them on

18  Paro's proprietary marketplace, where they can

19  then connect with their network of experts,

20  freelancers.

21     Q.    Okay.  And the businesses on which you

22  called for Paro, were those known internally as

23  Clients, with a capital C?

24     A.    To my understanding, the businesses

ADMIN INC. v. LUKE KOHAN, et al.

KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

20

1   that I called on were only referred to as Clients

2   once they actually signed a statement of work.

3       Q.    All right.  And prior to signing up

4   with Paro, they were prospective clients?  Is that

5   fair to say?

6       A.    I think it's fair to say that anybody

7   would be a prospective client if you called them.

8       Q.    And I understand that there's also an

9   inbound arm to Paro's business; is that correct?

10      A.    That is correct.

11      Q.    What does the inbound arm of the

12  business do relative to the outbound arm?

13      A.    Outbound sales reps go out and try to

14  generate interest in Paro's services.  Inbound

15  sales reps handle businesses that are already

16  aware of Paro's existence and already have an

17  interest in the services that Paro offers.

18      Q.    What were your responsibilities as a

19  senior account executive at Paro?

20      A.    During which time exactly?

21      Q.    Well, let's start with your first role,

22  the senior account executive (outbound direct 1).

23      A.    My responsibilities for outbound direct

24  1 were to call or email, get in touch with

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

21

1    businesses who I think would be -- who would have

2    a higher deal status, obviously, and sell them on

3    using Paro's marketplace in leveraging their AI

4    matchmaking to connect with the freelance experts.

5        Q.    And in this role, were you primarily

6    calling on prospective clients?

7        A.    Technically they're not a prospective

8    client unless I call them, so I guess yes.

9        Q.    And if you successfully sign them up

10   for Paro's marketplace, would you continue to

11   service and interact with those clients, or would

12   you hand those clients off to someone else?

13       A.    That depend -- depended on the

14   situation.  There were sometimes where I was more

15   involved with a client who I had signed

16   personally, and there were other instances that I

17   just pretty much -- they were transferred to their

18   customer success team.

19       Q.    And Paro has a different -- or had,

20   while you were there, a different customer success

21   team; is that correct?

22       A.    They -- like, they had a team for --

23   yes, they had a customer success team.

24       Q.    And that customer success team is

22

1    responsible for then servicing the clients and

2    interacting with clients once they sign up for

3    Paro's marketplace; is that correct?

4         A.    Yes.

5         Q.    What methods would you use to identify

6    and then contact prospective clients in your role

7    as outbound direct 1?

8         A.    Are you asking how would I identify a

9    prospect who I wanted to call?

10        Q.    Correct.

11        A.    Is that the question?

12              I would utilize career page websites

13   from the company in particular.  I would utilize

14   LinkedIn, Indeed, Upwork, and several other

15   platforms that helped me prospect.

16        Q.    And then what methods would you use to

17   contact the prospective clients?  Would you cold

18   call them?

19        A.    Sometimes.  There was a lot of emails

20   instead though.

21        Q.    Okay.  What about LinkedIn messages?

22        A.    Rarely.

23        Q.    Primarily email?

24        A.    Yes.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

23

1    Q.    And you held the senior account

2  executive role from October 2020 to July 2021;

3  correct?

4    A.    Sorry, can you repeat that?

5    Q.    You held the outbound direct 1 role

6  from October 2020 to July 2021; correct?

7    A.    That is correct.

8    Q.    All right.  And your next role was

9  outbound direct 2?  Is that correct?

10    A.    That's correct.

11    Q.    And was that a result of a promotion?

12    A.    Yes, it was.

13    Q.    All right.  In your outbound direct 1

14  role, to whom did you report?

15    A.    I reported to Alex George, John

16  Repka -- excuse me -- John Repka, Dylan Loch, and

17  that was it for that time frame.

18    Q.    And you reported to these three

19  individuals all at once?

20    A.    No.

21    Q.    You reported to each of them

22  individually over the course of your time in this

23  role?

24    A.    Yes.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

24

1     Q.     What position did Alex George hold?

2     A.     At the time of my outbound 1, she was

3  my direct manager just for the outbound direct

4  team.  And I believe that -- I can't say when with

5  certainty, but her role changed to the inbound

6  manager side at some point.

7     Q.     And John Repka, was he your direct

8  manager after Alex George assumed her new

9  responsibilities?

10    A.     No.  John Repka was -- Alex George was

11 supposed to be my first manager, but she went out

12 on maternity leave, so John Repka filled in.

13    Q.     I see.

14           And then at some point you reported do

15 Dylan Loch; is that correct?

16    A.     That is correct.

17    Q.     Did you report to Dylan Loch most

18 recently in the outbound 1 -- outbound direct 1

19 role?

20    A.     I don't recall the exact date that he

21 became a manager, but it was around that time.  He

22 started as a sales rep on my team with me, and

23 then he got promoted to manager.  But I don't

24 really remember the date when that happened.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

25

1          Q.    All right.  What are the differences,

2     if any, between your responsibilities as

3     outbound -- should that be outbound direct 2?

4          A.    That's correct.

5          Q.    What were the differences, if any, in

6     your responsibilities as a senior account

7     executive outbound direct 2 and an outbound direct 1?

8          A.    I was responsible for carrying a much

9     higher quota as an outbound 2 rep than an outbound

10    1.  And I believe during my outbound 2 assignment,

11    I also became a team lead for the sales team for a

12    brief -- very brief period.

13         Q.    All right.  Did you continue to report

14    to -- well, let me strike that.

15              Who did you report to in your role as

16    outbound direct 2?

17         A.    I believe it was Dylan Loch for the

18    entirety of that role.

19         Q.    All right.  Did anyone report to you in

20    your outbound direct 1 role?

21         A.    Report to me?

22         Q.    Yes.

23         A.    No.

24         Q.    Did anyone report to you in your

26

1    outbound direct 2 role?

2         A.    No.

3         Q.    You said you were a team lead for a

4    brief period.  What does that mean?

5         A.    It was so short-lived, I could tell you

6    what it was supposed to be, but it wasn't exactly

7    what it was supposed to be.

8              Team leads serve as the manager's

9    right-hand man.  If the manager is out one day,

10   maybe fill in for a morning meeting with the team

11   and run through some stuff.  And that was -- that

12   was really it.

13        Q.    All right.  In the outbound direct 2

14   role, did you have similar responsibilities as in

15   your outbound direct 1 role, insofar as you were

16   responsible for contacting prospective clients?

17        A.    Yes.

18        Q.    Are there any other differences or were

19   there any other differences between the outbound

20   direct 2 role and the outbound direct 1 role?

21        A.    There was a slight difference.  As

22   outbound 1 -- for the majority of my time as an

23   outbound 1 rep, I was able to sell to whomever,

24   whether that be a company or an accounting firm,

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN          PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

27

1    whatever it might be, and then Paro verticalized

2    where it would be outbound direct, inbound direct,

3    and their Paro for CPA team that they were

4    building during my time as outbound 2.

5        Q.    So I'm unclear then.

6              How did your responsibilities change?

7        A.    Because as outbound 2, I was prohibited

8    from closing business with accounting firms.  I

9    could only call on individual companies.

10       Q.    I see.  Okay.

11             And you remained in the outbound 2 role

12   for ten months; correct?

13       A.    Yes, that sounds right.

14       Q.    At which point you were promoted; is

15   that correct?

16       A.    Yes.  I was promoted to outbound 3.

17       Q.    All right.  And you were promoted to

18   outbound 3 in April of 2022; correct?

19       A.    That's correct.

20       Q.    What were your responsibilities as an

21   outbound direct 3 senior account executive?

22       A.    At the beginning of my assignment as

23   outbound 3, I was held to another higher quota

24   from that of outbound 2, and I sold to companies

ADMIN INC. v. LUKE KOHAN, et al.

KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

28

1   directly at the beginning until Paro

2   re-verticalized, and then I was on the Paro for

3   CPA east team.

4        Q.    And what did you do on the Paro for CPA

5   east team?

6        A.    I sold in an outbound capacity to

7   public accounting firms to offer staff

8   augmentation services.

9        Q.    Were you most recently only selling to

10  public accounting firms?

11       A.    I was most recently only selling to

12  public accounting firms in the east of the United

13  States.

14       Q.    All right.  I believe you said in your

15  outbound direct 2 role you were only selling to

16  companies and you were prohibited from selling to

17  CPA firms.  Did I understand that testimony

18  correctly?

19       A.    You understood that testimony correctly.

20       Q.    And by contrast, in your outbound

21  direct 3 role, you were not selling to companies,

22  but rather you were selling to CPA firms in the

23  eastern region of the United States; correct?

24       A.    I was selling directly to individual

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN       PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

29

1   companies in my outbound 3 role from April to

2   July.  And then from July until March 2023, I was

3   selling solely to the public accounting firms in

4   the east.

5       Q.    Okay.  And were those -- the public

6   accounting firms to which you were selling, were

7   those existing Paro clients or were those clients

8   that you mined and developed on your own?

9       A.    They were entirely prospective clients

10  who I converted to clients on my own.

11      Q.    All right.  You mentioned that in your

12  outbound 1, 2, and 3 roles, you had different

13  quotas.  Did I understand that correctly?

14      A.    Yes, you did.

15      Q.    Are you referring to sales quotas?

16      A.    Yes, I am.

17      Q.    In dollars and cents?

18      A.    Yes.

19      Q.    Do you recall what your different sales

20  quotas were in the outbound 1, 2, and 3 roles?

21      A.    Not entirely, but I can ballpark it if

22  that would be helpful.

23      Q.    That would be helpful.

24      A.    I believe my quota for outbound 1 was

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

30

1   on an annual basis, and I believe that was a quota

2   of 1.2 million for the year.

3         In outbound 2, I believe it switched to

4   more of a monthly quota or a quarterly quota.  And

5   I believe my number was around 600 or 650,000 per

6   quarter.

7         In outbound 3, I don't believe my

8   quotas changed when I went from direct outbound to

9   Paro for CPA, and I think that number stayed

10   somewhere near a million dollars per quarter.

11     Q.   And when you use the figures

12   1.2 million annually, 650,000 quarterly, and 1

13   million quarterly, are you referring to revenue to

14   Paro or the size of the contracts that the clients

15   would enter into with the experts?

16     A.   It varied.  It was predominantly based

17   off of what was referred to as FSV, which I

18   believe stands for final sale value.  So how much

19   the contract could potentially be worth.

20         And then towards the tail end of my

21   employment with Paro, it shifted to an invoice

22   revenue quota, meaning how many dollars does it

23   actually make, not how much is the contract worth.

24     Q.   Okay.  But in either case, your -- your

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN    PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY  9/19/2023

32

1   role, I would describe Paro as a proprietary

2   AI-driven marketplace that matches a company with

3   an independent expert from their network of

4   freelancers.

5        Q.    And your prospective clients were in

6   need of what type of services that Paro would

7   serve as a matchmaker?

8        A.    Is this still referring to the outbound

9   direct role?

10       Q.    Correct.

11       A.    For the outbound direct role,

12  prospective clients typically needed either some

13  sort of fractional accounting support -- actually,

14  that's all I would say, fractional accounting

15  support.

16       Q.    What is "fractional accounting support"?

17       A.    That means accounting that is done on a

18  part-time basis.

19       Q.    And just so I'm clear, a client who

20  would need fractional accounting support would use

21  Paro's marketplace to identify an expert that the

22  client could then engage to provide these

23  financial accounting -- or fractional accounting

24  support services?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

33

1    A.    Can you repeat that?

2    Q.    Sure.

3          MR. MOELLER:  Robin, could you read

4    that back.

5          THE COURT REPORTER:  "Question:  And

6    just so I'm clear, a client who would need

7    fractional accounting support would use

8    Paro's marketplace to identify an expert that

9    the client could then engage to provide these

10   financial accounting -- or fractional

11   accounting support services?"

12         THE WITNESS:  Thank you.

13             A prospective client would

14   sometimes have the opportunity to go shopping

15   for an expert by leveraging that marketplace.

16             But a lot of the times -- excuse

17   me -- a lot of the times sales reps would

18   input information so that the machine

19   learning could spit out an algorithm and

20   provide those recommended experts, and then

21   the sales rep would introduce however many

22   experts to that client until they chose one,

23   hopefully chose one.

24

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

34

1    BY MR. MOELLER:

2        Q.    Okay.  So this AI tool would spit out,

3    based on the client's needs and requisition, a

4    number of options from an expert standpoint; is

5    that correct?

6        A.    That's correct.

7        Q.    And then the client would review those

8    experts' credentials and experience and

9    specialties and other qualifications and select

10   one of those experts?

11       A.    Yes, that sounds about right.

12       Q.    Now, are there any other type of

13   services that these experts would provide to

14   clients other than fractional accounting support?

15           And I'm not just talking about, you

16   know, your role in the outbound direct 3.  I'm

17   talking about Paro as a whole.

18       A.    Yes.  Paro would offer staff

19   augmentation services to public accounting firms,

20   and that was slightly different -- well, very

21   different from the outbound direct approach,

22   because that was more like full-time

23   contract-based work specifically for public

24   accounting firms so that the expert could help

35

1   better service the public accounting firm's own

2   clients.

3        Q.    Are there any other type of financial

4   services that Paro offered its clients through

5   this marketplace of Paro's?

6        A.    I think fractional accounting services

7   pretty -- is general.  Anything accounting

8   related.

9        Q.    Would that include bookkeeping?

10       A.    Yes, it would.

11       Q.    Would that include responsibilities

12  performed by a controller?

13       A.    Yes, it would.

14       Q.    And responsibilities performed by an

15  auditor?

16       A.    Kind of.

17       Q.    Okay.  And an accountant?

18       A.    Yes, and accountant.

19       Q.    And a chief financial officer?

20       A.    Yes.

21       Q.    So anything that falls within the

22  financial services space more or less?

23       A.    Yeah, sure.  Yes.

24       Q.    Did you, in your roles at Paro, have

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY  9/19/2023

36

1    any interaction with the -- with the experts whose

2    services Paro would match with its clients' needs?

3         A.    Any of the experts?  Yes.

4         Q.    To what extent?  Describe for me the

5    nature of your interactions and the extent of your

6    interactions with experts.

7         A.    After the machine AI algorithm spit out

8    the suggested experts, I would determine who I

9    personally thought would be the most qualified to

10   service my prospective client.

11             And if I was recommended an expert

12   through that machine, I would email or call the

13   expert just to make sure they're truly qualified

14   and to gauge their interest.

15        Q.    You would vet them, in effect?

16        A.    I did my own layer -- extra layer of

17   vetting to make sure their engagement would be

18   smooth.

19        Q.    What percentage of the -- what word am

20   I looking for?  What percentage of the time did

21   clients use Paro's AI tool to request services

22   versus perhaps just picking up the phone and

23   saying, Mr. Kohan, I need -- I need a bookkeeper.

24   Can you get me one?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

37

1      A.      Instances where a client -- a

2   prospective client themselves would utilize the

3   actual marketplace to go shopping, quote/unquote,

4   was far less than me having a conversation with a

5   prospective client and them relying on me to

6   utilize the machine to provide results, I guess.

7      Q.      I see.

8              So if a client or prospective client

9   called you or contacted you directly and said, I

10  need a bookkeeper, would you then use Paro's AI

11  tool, or would you do your own legwork and

12  research to identify an expert to match with that

13  client?

14     A.      That would depend on which role you're

15  referring to during my time at Paro.

16     Q.      Any of the roles.

17     A.      In any of the roles?  I'm not --

18  actually, can you repeat that question for me,

19  please.

20     Q.      No, but I'll have Robin read it back.

21             THE WITNESS:  Robin, would you mind?

22             THE COURT REPORTER:  "Question:  So if

23      a client or prospective client called you or

24      contacted you directly and said, I need a

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

38

1    bookkeeper, would you then use Paro's AI

2    tool, or would you do your own legwork and

3    research to identify an expert to match with

4    that client?"

5         THE WITNESS:  Now I understand.  Thank

6    you.

7              I would predominantly leverage --

8    I would always leverage Paro's AI machine

9    during my time on the outbound direct team,

10   but that differed a little bit when I was on

11   the Paro for CPA east team.

12   BY MR. MOELLER:

13   Q.    How did it differ?

14   A.    I wanted to be -- for a large part of

15   my time on Paro for CPA east team, I was working a

16   very big public accounting firm.

17        THE WITNESS:  Am I allowed to say the

18   name of the accounting firm?

19        MR. PASTERNAK:  Yes.

20        THE WITNESS:  I was leading a sales

21   cycle with REDACTED, and I wanted to be

22   extra thorough with the contractors that I

23   was suggesting to REDACTED because it

24   was a very valuable relationship that I was

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

39

1    creating for Paro.

2  BY MR. MOELLER:

3    Q.    So utilizing this extra care, you

4  would -- you would be less reliant on the AI tool

5  and do more what I'll describe as manual legwork

6  to identify and vet the experts; is that fair to

7  say?

8    A.    It's almost fair to say.  I would say

9  that I tried my hardest to leverage the AI

10 machine, but in many instances I would go above

11 and beyond to just make sure that those people

12 were adequate for the role.

13   Q.    And is it fair to say in your

14 relationship with REDACTED

15 itself did not utilize the AI tool, but rather

16 contacted you directly for expert resources?

17   A.    That's correct.

18   Q.    All right.  Are you familiar with the

19 term "white label"?

20   A.    Yes, I am.

21   Q.    What does that mean to you?

22   A.    White label is synonymous with Paro for

23 CPA's team, meaning a public accounting firm would

24 sign a contract with an individual expert, and

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN       PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

42

1      A.    I maybe closed between 20 and 30 --

2      Q.    Okay.

3      A.    -- different clients.

4      Q.    And did those clients -- now we're

5  talking about the outbound direct 2 related

6  clients and the outbound direct 3 related clients.

7           Did those clients more or less reside

8  throughout the United States?

9      A.    For the outbound direct, yes, they did.

10     Q.    Okay.  And then, again, just so I'm

11  clear, when you transitioned to this white label

12  role, you focused predominantly on CPA firms with

13  a presence in the eastern part of the United

14  States; is that correct?

15     A.    That's correct.  And I was prohibited

16  from conducting business similar to anything in

17  the previous roles as an outbound direct rep.

18     Q.    All right.  Did Paro define, you know,

19  the eastern United States as a specific region or

20  was there a cutoff point?

21     A.    I assume it was -- I am quite confident

22  that it was 25 states in the east divided by 25

23  states in the west and throw in Hawaii and Alaska,

24  I guess, if you want.

www.ChimniakCourtReporting.com
312.781.9111                                    630.983.0030

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

43

1    Q.    All right.  So when we talk about the

2  east, or specific geographic regions at Paro, they

3  divided it between east and west; is that correct?

4    A.    Yes.

5    Q.    All right.  And the eastern half was

6  just that, that was half of the country?

7    A.    That's correct.

8    Q.    If, for example -- well, let's back up.

9           REDACTED            is an international firm;

10 correct?

11   A.    That's correct.

12   Q.    And you know they have offices

13 obviously not only all over the world, but all

14 over the United States, too; correct?

15   A.    That's correct, but I was working with

16 REDACTED           United States.

17   Q.    Okay.  If, for example, REDACTED

18 needed an expert in its office in Seattle, for

19 example, Seattle fell outside your assigned

20 region; correct?

21   A.    Yes, it did.

22   Q.    If that request was made to you, how

23 would that work in terms of your involvement in

24 fulfilling that -- that requisition?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN       PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

44

1        A.      I was grandfathered into the -- I was

2   solely responsible for spearheading the REDACTED

3   REDACTED sales cycle, which started about -- couldn't

4   even tell you when it started, but since I was

5   responsible for spearheading it, Paro trusted that

6   I was the right guy to do so.

7            So in order to ensure the relationship

8   with REDACTED was where we wanted it to be, I

9   was grandfathered in so that I was permitted, for

10  REDACTED, to work across the country.

11       Q.      I see.

12           So just so the record is clear, the

13  level of services that you personally provided to

14  REDACTED were not limited to the east region;

15  correct?

16       A.      That's correct, but I cannot say with

17  full certainty as to whether or not any of their

18  offices in the west actually utilized any of the

19  experts.

20       Q.      I see.

21           Was there anyone in the west region at

22  Paro assigned or the point person for REDACTED

23  REDACTED, or were you sort of the national point

24  person for REDACTED?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

45

1      A.    I was the national point person for

2   REDACTED .

3      Q.    And did you have a team that helped you

4   service REDACTED or were you a one-man band?

5      A.    That's a good question.  For the most

6   part, anything that was related to front-end for

7   what they say top funnel sales cycle, it was

8   entirely me.  But I did have a support system

9   around me where -- once an engagement was signed

10  with an expert.

11     Q.    Okay.  When you were performing the

12  white label services, did anyone report to you?

13     A.    No.

14     Q.    And who did you report to in your role

15  as the white label person?

16     A.    I believe it was about one month of

17  Dylan Loch until he resigned, and then it was

18  predominantly Chad Taylor and Alex Loewenstein.

19     Q.    Okay.  Do you recall what your sales

20  were from REDACTED ?

21     A.    Can you be more specific regarding --

22     Q.    Well, what -- what revenues -- while

23  you were in the role of the white label role and

24  during the time that you were servicing REDACTED

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

47

1      A.    Are you asking where the expert was

2   located or which office they conducted --

3      Q.    That's a good question.

4            Were the experts providing their

5   services more or less on a remote basis?

6      A.    Yes, they were.

7      Q.    Okay.  Do you recall which REDACTED

8   REDACTED offices those experts' services were

9   tethered to?

10     A.    I do not recall.

11     Q.    Do you recall where the experts were

12  physically located?

13     A.    I believe there was one in -- close to

14  Houston, Texas.  There was one in Pennsylvania.  I

15  don't recall the other experts that I signed for

16  that.

17     Q.    During your time at Paro, were you

18  responsible for identifying and signing up experts

19  to -- to be posted on Paro's marketplace?

20     A.    What do you mean by that?

21     Q.    Well, I understand that Paro matches

22  clients and experts; correct?

23     A.    Correct.

24     Q.    How did Paro go about identifying

48

1   experts to match with its clients?

2        A.    Paro had a recruitment team

3   specifically for attracting experts to be a part

4   of the network, but those recruiters did not

5   have -- you know, it was -- that was where the

6   line was drawn.  Was once the experts were

7   recruited, then it was kind of up to the sales

8   reps to get them work, if that makes sense.

9        Q.    Did you have any responsibilities for

10  recruiting experts?

11       A.    During my time working on REDACTED

12  REDACTED, yes, I did.

13       Q.    And how did you go about recruiting

14  those experts?

15       A.    I would scour the Internet, LinkedIn,

16  professional websites, whatever you want to call

17  it, and just call anybody who seemed like they

18  would be a good fit.

19       Q.    Okay.  And were the experts'

20  relationships with Paro exclusive?

21       A.    No.

22       Q.    Did they sign -- did the experts sign

23  any sort of contract with Paro?

24       A.    I'm not sure.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

53

1       A.     That's correct.

2       Q.     And that was different with respect to

3    REDACTED            ; right?

4       A.     Yes.

5       Q.     REDACTED           would pay the -- as far

6    as you know, pay this third-party payroll company

7    of sorts, and that payroll company would pay the

8    expert and Paro; is that correct?

9       A.     All sounds correct, except I can't

10   confirm the last part.

11      Q.     Okay.  You're not sure?

12      A.     I'm not sure.

13      Q.     I see.  Okay.

14             MR. MOELLER:  Are you ready for a

15      break?

16             THE WITNESS:  Sure.

17             MR. PASTERNAK:  Yes, let's take a

18      break.

19                  Off the record.

20                      (Whereupon a brief pause was

21                      taken in the proceedings from

22                      9:41 to 9:49 a.m.)

23   BY MR. MOELLER:

24      Q.     Mr. Kohan, is it fair to say that your

54

1   time at Paro was your first experience in this,

2   sort of, outsourced financial services industry?

3      A.   Yes, that's fair to say.

4      Q.   You had no prior experience in this

5   type of industry; is that fair?

6      A.   Mostly fair, yes.

7            Selling that industry, no, but general

8   accounting, day-to-day stuff, yes.

9                (Whereupon Kohan Deposition

10               Exhibit No. 2 was marked for

11               identification.)

12      THE WITNESS:  Thank you.

13   BY MR. MOELLER:

14      Q.   Mr. Kohan, this has been marked as

15   Exhibit 2.  You may have seen this list in

16   connection with the parties' private discussions.

17          I'll represent to you that this is a

18   list that, at least according to Paro, represents

19   a list of clients and experts with which and with

20   whom you've had contact at Paro.

21          Do you recognize this list?  Have you

22   seen it before?

23      A.   Yes, I've seen this list.

24      Q.   All right.  And prior to today, did you

58

1    clients and then needed someone to do the

2    accounting for the client -- for their client

3    directly.

4         Q.    Okay.  Let me shift gears a bit.

5              How were you compensated at Paro?

6         A.    I had a base salary, and I earned

7    commissions based on whatever the compensation

8    plan for that respective quarter or month would

9    have been.

10        Q.    Did you also receive some sort of

11   equity grants?

12        A.    Yes, I believe I did.

13        Q.    All right.  The clients that you

14   mentioned before, including REDACTED,

15   REDACTED, et cetera, et cetera, are

16   those clients, to your knowledge, for which you

17   received any sort of commissions or compensation?

18        A.    No for REDACTED, no for REDACTED, and

19   indirectly for REDACTED.  And

20   frankly, I'm not even sure I received commission

21   for that.

22        Q.    What about REDACTED?

23        A.    I don't even know what that is.

24        Q.    All right.  Got it.  Got it.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

                                                              61

1     Q.     REDACTED?

2     A.     Definitely not.

3     Q.     REDACTED?

4     A.     Don't think it ended up closing.

5     Q.     All right.  And then REDACTED

6  REDACTED?

7     A.     I don't remember who they are.

8     Q.     Okay.  Got it.

9            When you spoke with REDACTED and

10  other of your client contacts, did you keep any

11  sort of notes about your discussions in a CRM

12  database or anything of that sort?

13    A.     Yes.  It's common practice for reps to

14  record notes in a CRM, which Paro used

15  Salesforce --

16    Q.     Okay.

17    A.     -- for.

18    Q.     And how would you access Salesforce?

19    A.     I was given a user name and my own

20  password.

21    Q.     Okay.  And that user name and password

22  would grant you access to your specific Salesforce

23  account or portal, or would it give you access to

24  the portal as a whole?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

                                                                    62

1         A.    I think I know what you're asking.  I

2  -- let me know if I'm wrong.

3              I -- with those credentials, it was my

4  login and any activity or anything that I did in

5  my portal, like others could see if I left a note

6  on an account, for example, but it was just mine.

7  Nobody else could, like, use my login credentials.

8  But did I have -- I could see anything, yes.

9         Q.    And did you consider the information

10 that you populated into sales force to be

11 confidential to Paro?

12        A.    Meaning anything that I put in myself,

13 would that be confidential to Paro?

14        Q.    Correct.

15        A.    Sure.  Yes.

16        Q.    Okay.  And what type of information

17 would you typically log?  Would you log, sort of,

18 client's requisition and needs?

19        A.    Yes.

20        Q.    Would you log pricing?

21        A.    No, not really.  Well, budget, like

22 what the budget for, like, the prospective client

23 was, yeah, sure.

24        Q.    All right.  Would you log information

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN       PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

63

1   relating to the prospective experts that would be

2   matched with the specific client requisition?

3        A.    Occasionally, but not often.

4        Q.    Okay.  Does -- while you were at Paro,

5   did the company consider the identities of its

6   clients to be confidential?

7        A.    I'm not sure.

8        Q.    Did you consider them to be confidential?

9        A.    Not entirely.

10       Q.    Okay.  Did you consider the identities

11  of Paro's experts to be confidential?

12       A.    No.

13       Q.    Did you consider any information at

14  Paro, while you worked there, to be confidential

15  to Paro?

16       A.    Yes.

17       Q.    What type of information?

18       A.    Information about other employees.

19       Q.    Okay.  Such as what?  Compensation?

20       A.    Sure.  Compensation, monthly

21  commissions.

22       Q.    All right.  Any other information at

23  Paro that you consider to be confidential to Paro?

24       A.    Yes and no.  And I say "yes and no,"

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

64

1   because in sales it's common for a rep to use

2   what's called a third-party endorsement; typical

3   client, typical problem.

4            So when talking to another prospective

5   client, it's always good to be able to reference

6   other clients that you're working with in that

7   space or whatever it might be.  So I was -- reps

8   would commonly do so, so.

9        Q.   Did you consider Paro's pricing

10  information to be confidential to Paro?

11       A.   Yes, I did.

12       Q.   Did you consider Paro's profit margin

13  information to be confidential to Paro?

14       A.   Kind of.  Experts would know every

15  single time, so they're not a part of Paro,

16  though.

17       Q.   All right.  What about business

18  strategies, did you consider those to be

19  confidential to Paro?

20       A.   I wasn't really even involved in, you

21  know, like a -- I was just a rep.  So I didn't

22  really have strategic planning insight for

23  whatever the company was road mapping.  But if I

24  were to have, then, yes, it would probably be

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

65

1   confidential.

2       Q.    All right.  Did you consider your

3   interactions and the legwork and the time and

4   effort you spent mining the relationship with

5   REDACTED      to be confidential?

6       A.    I expected that to be confidential

7   because I -- REDACTED      g valued its

8   confidentiality with vendors like Paro that they

9   utilized.  So I just kind of assumed it's

10  confidential.

11      Q.    Okay.  Got it.

12           You mentioned earlier that with REDACTED

13  REDACTED  in particular you tried to -- and I'm

14  paraphrasing, so correct me if I'm wrong -- that

15  you tried to do your own, sort of, research about

16  matching experts with the needs of REDACTED      .

17           Do you remember talking about that?

18      A.    I remember we were discussing -- you

19  asked if I ever recruited experts.  Is that what

20  you're referring to?

21      Q.    Well, I'm referring to the matchmaking

22  process regarding REDACTED      's needs and the

23  number of experts that you would view as

24  candidates for that type of work and how you went

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

66

1    about proposing certain experts to REDACTED.

2              And my question is:  Where would you

3    locate and cull that information from, about the

4    experts and their credentials and whether they

5    provided a good match for the needs of REDACTED

6    REDACTED?

7         A.    There were several different resources

8    or hubs that I could leverage, for example, The

9    Matchmaking Machine, Paro's internal, like, I

10   guess, portal to get more granular with the

11   search.  And there were dozens of Google sheets,

12   like, that represented nuanced or niched kind of

13   experts.

14        Q.    And those Google sheets were prepared

15   internally at Paro?

16        A.    To my knowledge, I don't think anybody

17   from -- like, they didn't hire someone to do it.

18        Q.    Okay.  And just so I'm clear, the

19   information relating to the experts on Paro's

20   internal portal and on these Google sheets, did

21   you consider that information to be confidential,

22   proprietary to Paro?

23        A.    No, but -- I always just kind of saw it

24   as a gray area.  Why mess around and find out?

ADMIN INC. v. LUKE KOHAN, et al.

KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

67

1  Like, I wouldn't just start divulging information

2  that had to do with the company.

3       Q.    Why wouldn't you divulge that information?

4       A.    It just doesn't seem like a wise thing

5  to do when you're employed by someone.

6       Q.    That information was compiled and

7  organized internally by Paro; correct?

8       A.    Information regarding?

9       Q.    The experts on these -- on the internal

10 portal and these Google sheets.

11      A.    To my understanding, yes.  They didn't

12 hire an outside person to do that.

13      Q.    Okay.  And in order for you to access

14 this internal portal or these Google sheets, would

15 you have to enter your user name and password and

16 other credentials?

17      A.    Yeah.  Yes.

18      Q.    All right.  And was it limited to

19 certain folks within Paro on a need-to-know basis?

20      A.    No.

21      Q.    All right.  So the receptionist, if

22 there was a receptionist, would have login

23 credentials and she could access or he could

24 access to this internal portal if he or she wanted

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

69

1           A.     I recall signing what was referred to

2      as a nondisclosure and inventions agreement, which

3      subsequently ended up being a noncompete and all

4      the other stuff we're dealing with.

5                          (Whereupon Kohan Deposition

6                          Exhibit No. 3 was marked for

7                          identification.)

8                    THE WITNESS:  Thank you.

9      BY MR. MOELLER:

10          Q.     Okay.  So this is Kohan Exhibit 3.

11     This is a copy of your noncompetition agreement.

12               You understand that this is the primary

13     agreement that's at issue in this case; correct?

14          A.     Yes, I understand.

15          Q.     Okay.  And going to page 11, it's the

16     third-to-last page, is that a copy of your

17     electronic signature there?

18          A.     Yes, that is.

19          Q.     And is it fair to say that you executed

20     this document on or about October 3rd, 2020?

21          A.     Yes.

22          Q.     All right.  Do you recall when you

23     received a copy of this document?

24          A.     Yes, I do.

ADMIN INC. v. LUKE KOHAN, et al.

KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

70

1      Q.     When?

2      A.     After I was sent a job offer letter.

3      Q.     When were you sent the job offer

4  letter, if you recall?

5      A.     If I recall correctly, the order of

6  which the documents came was job offer letter,

7  employee handbook, and, again, what was referred

8  to as an inventions and nondisclosure agreement.

9           However, they needed to make a

10 revision -- I requested that they make a revision

11 in the job offer letter, which is why records

12 would probably show that that was signed after

13 this was signed and the employee handbook was

14 signed as well.

15     Q.     What revision in your offer letter did

16 you request?

17     A.     John Repka and I agreed that I would be

18 able to work remote perpetually, regardless of

19 what happened with COVID and back-to-office

20 policies, and I wanted that added into my offer

21 letter.

22     Q.     I see.

23           And was it, in fact, added to your

24 offer letter?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

73

1   Friday, October the 2nd?

2        A.    I believe so.  I'm not entirely sure.

3        Q.    Did you receive it by email?

4        A.    I received what was referred to as the

5   employment agreement, characterized by the

6   inventions and nondisclosure agreement, and, yeah,

7   I received that by email.

8        Q.    On October 2nd?

9        A.    I believe so.

10       Q.    And you signed it on Saturday,

11  October 3rd, the next day?

12       A.    That would make sense.

13       Q.    All right.  Did you read the agreement

14  before you signed it?

15       A.    No.

16       Q.    Do you normally sign things that you

17  don't read?

18       A.    I normally -- normally have the

19  understanding that I know what it is that I'm

20  actually signing.  And I just -- no, I didn't read

21  line by line of the agreement since I thought it

22  was just a nondisclosure, which is pretty common.

23       Q.    All right.  Why didn't you read it

24  before you signed it?

74

1      A.    Because it was referred to as a

2  nondisclosure and inventions agreement, which is

3  something that I was okay with.

4      Q.    I see.

5            Did you ask counsel to review it?

6      A.    I wasn't advised to do so, but I did

7  not.

8      Q.    You weren't advised to engage counsel?

9      A.    I was not.

10     Q.    Were you given the opportunity to?

11     A.    Sure.  No one said I couldn't.

12     Q.    So why didn't you?

13     A.    Because I was thought -- I thought I

14  was signing an inventions and nondisclosure

15  agreement.

16     Q.    All right.  Did anyone tell you, when

17  you received the agreement on Friday, October 2nd,

18  that you must sign it and return it by

19  October 3rd?

20     A.    No.

21     Q.    Okay.  You had testified earlier that

22  you began your employment with Paro, I believe, on

23  October 19th, 2020; correct?

24     A.    I believe that's the date.  If that's a

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

75

1    Monday, then yes.

2         Q.    All right.  At any point between

3    October 2nd, when you received the document, and

4    October 19th, when you started at Paro, did you

5    review the document in detail?

6         A.    Well, I had signed it a day after I had

7    received it, so I don't think there was a need to

8    review something I already signed.

9         Q.    All right.  You had, what, 14 days, 2

10   weeks, between the date on which you signed it and

11   the date on which you started to review it;

12   correct?

13        A.    Sure.

14        Q.    Did you read the title of the document

15   before you signed it?

16        A.    Nope.

17        Q.    You didn't read anything?

18        A.    Nope.

19        Q.    You just flipped to the signature page?

20        A.    Yep, because that is what the -- they

21   use -- Paro used something called HelloSign, which

22   is an electronic signature thing, and it just

23   makes you fill in pretty much your name, the date

24   on top, and then it automatically just jumps to

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

76

1   the bottom of where else you need to sign.

2       Q.    But you had an opportunity to scroll

3   through the document and review it, correct?

4       A.    I'm sure I could have scrolled back up

5   and done so, yes.

6       Q.    All right.  Did you have any questions

7   about the agreement?

8       A.    Nondisclosure and invention agreements

9   are typically pretty general, so no, I did not.

10      Q.    Did you ask for any revisions to be

11  made to the agreement?

12      A.    Not this agreement, no.

13      Q.    Why not?

14      A.    Because I thought I was signing an

15  invention and nondisclosure agreement.

16      Q.    Okay.  Well, you understand this is a

17  pretty important document; correct?

18      A.    It is why we're here today.

19      Q.    Yeah.

20            And you signed the agreement without

21  reading it?

22            MR. PASTERNAK:  Objection, asked and

23      answered multiple times.

24            MR. MOELLER:  Go ahead.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

77

1              MR. PASTERNAK:  You can answer again.

2              THE WITNESS:  Did you ask me if I had

3       signed it without reading it?

4  BY MR. MOELLER:

5       Q.    Yes.

6       A.    That's correct.

7       Q.    All right.  You didn't sign your offer

8  letter without reading it, did you?

9       A.    No, I read that offer letter.

10      Q.    Right.

11             In fact, you requested a revision to be

12 made to the offer letter; correct?

13      A.    Yes, I did.

14      Q.    You made that request to Mr. Repka?

15      A.    Yes.

16      Q.    And the company made the requested

17 revision; correct?

18      A.    As I've mentioned before, I'm pretty

19 sure they made that revision.

20      Q.    All right.  So when is the first time

21 that you did review this document?

22      A.    May 15th.

23      Q.    May 15th.

24             What's the significance of May 15th?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

78

1      A.    I received a cease and desist letter

2   from NGE, LLP, on behalf of Paro.

3      Q.    From my colleague, Ms. Rosenberg; is

4   that correct?

5      A.    That's correct.

6      Q.    And did that letter enclose a copy of

7   the agreement?

8      A.    Yes, it did.

9      Q.    And that's the first time you read the

10  agreement?

11     A.    Yes.

12     Q.    And that's the first time you

13  understood that there was a noncompetition and

14  there were nonsolicitation restrictions in this

15  agreement?

16     A.    I believe that I became aware that

17  there was some component of a noncompete or -- I

18  don't even know what it was referred to when I

19  learned of it, when another Paro employee was

20  leaving and was -- we were just shooting the

21  shit -- I'm sorry.  Can I say that word?  Talking,

22  and he brought it up.

23     Q.    Who was that employee?

24     A.    I couldn't even tell you.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

80

1    nonsolicitation restrictions?

2        A.    Well, again, my true first

3    understanding of what I would be bound or not

4    bound to didn't come until May 15th, and at that

5    point I had already signed what I thought was an

6    invention and nondisclosure agreement.  So to me,

7    I had already signed it, no matter what would have

8    been in there regardless.

9        Q.    All right.  But in any event, you

10   didn't go back to your boss at the time or

11   Mr. Burdick or anyone else saying, Wait a minute,

12   I think I may have signed a document that I never

13   read and I don't have an understanding of what's

14   in it?

15       A.    No.

16       Q.    All right.  Let's -- if you could turn

17   to page 10, please, romanette or subprovision i.

18   Do you see the last sentence of that paragraph?

19   And I'll read it for the record:

20            "Finally, I agree that I have been

21   provided an opportunity to seek the advice of an

22   attorney of my choice before signing that

23   agreement -- signing this agreement."

24            Do you see that?

81

1      A.    I see it now.

2      Q.    All right.  It's in all caps; right?

3      A.    That's right.

4      Q.    Kind of jumps out at you?

5      A.    For someone who read the agreement,

6  probably.

7      Q.    Okay.  You testified that you

8  understood this document to be a nondisclosure and

9  invention assignment agreement; correct?

10     A.    That's correct.

11     Q.    And in that respect, you understood

12 that this agreement required you to maintain the

13 confidentiality of Paro's confidential

14 information; correct?

15     A.    I don't understand the question.

16          MR. MOELLER:  Robin, could read it

17     back, and if you still don't understand it,

18     I'll rephrase it.

19          THE COURT REPORTER:  "Question:  And in

20     that respect, you understood that this

21     agreement required you to maintain the

22     confidentiality of Paro's confidential

23     information; correct?"

24          THE WITNESS:  Can you rephrase it?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN       PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

84

1              "The provision, development, marketing,

2      sale, or maintenance of products or services which

3      are substantially similar to those developed,

4      marketed, distributed, sold," et cetera, et

5      cetera.

6              You understood during your employment

7      the type of services and goods that Paro provided

8      and developed; correct?

9         A.    I understood what I was hired to do.

10        Q.    You understood what Paro did as a

11     business; correct?

12        A.    Before my first day of employment on

13     October 19th?

14        Q.    No, during your time at Paro, prior to

15     leaving, you understood the type of business that

16     Paro was engaged in; correct?

17        A.    Yes.

18        Q.    So there was no misunderstanding when

19     you left Paro what type of business it was engaged

20     in; right?

21        A.    Not really.

22        Q.    You didn't understand what the company

23     did?

24        A.    I understood what the company did

85

1    historically, but there were many changes to the

2    internal work structure that I saw the writing on

3    the wall that the role I was initially hired for

4    as an outbound direct rep was no longer going to

5    exist because of the shift in the work structure.

6            So I didn't really know what business

7    they were trending towards.

8        Q.    You certainly understood what your

9    responsibilities were; correct?

10       A.    Yes, I did.

11       Q.    All right.  And you were aware, just as

12   you described today, what your responsibilities as

13   an outbound direct 1 were, an outbound direct 2

14   were, an outbound direct 3 were; correct?

15       A.    That's correct.

16       Q.    Because in courting clients and in

17   matching those with experts, you would have to

18   describe to clients and prospective clients what

19   Paro actually did; right?

20       A.    Of course, yes.

21       Q.    Because how else could you sell Paro's

22   goods and services; correct?

23       A.    Correct.

24       Q.    All right.  And would you agree that

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

86

1    Paro conducts business at least nationally?

2         A.    Yeah, there's a good chance they touch

3    every state.

4         Q.    All right.  And I don't want to get

5    into legal discussions or privileged conversations

6    that you've had with your counsel, okay?  This is

7    not what I'm driving at.

8              But is it your position, as sort of a

9    layperson here today, that you should not be bound

10   by this noncompetition restriction?

11             MR. PASTERNAK:  Objection, calls for a

12        legal conclusion.

13   BY MR. MOELLER:

14        Q.    Go ahead.

15             MR. PASTERNAK:  You can answer if

16        you're comfortable.

17             THE WITNESS:  I think that this

18        noncompetition agreement would make it

19        difficult for anybody who is in sales to take

20        on a lot of other jobs that they specialize

21        in and that they excel in, and I think that

22        it is overbroad, ambiguous, and just

23        borderline imposes undue harm.

24   BY MR. MOELLER:

ADMIN INC. v. LUKE KOHAN, et al.

KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

87

1      Q.    What's ambiguous about it?

2      A.    Well, I would say the words

3  "substantially similar" is pretty broad and

4  ambiguous.  And I would say that "provision of

5  outsourced financial service" is pretty broad and

6  ambiguous.  And I would say that the agreement as

7  a whole is pretty confusing.

8      Q.    All right.  Well, doesn't that

9  underscore the importance of actually reading it

10 before you signed it?

11     A.    No doubt.  I should have read it.

12     Q.    And it underscores the importance of

13 perhaps consulting counsel before you signed it?

14     A.    I think it underscores the importance

15 of why an employer should specifically tell

16 someone, not in any agreement in one little

17 subsection that might be in all caps, that they

18 should do that before sending this agreement over.

19 And that's exactly why Illinois here changed that

20 law, because they agree.

21     Q.    This agreement doesn't prevent you from

22 selling widgets, does it?

23     A.    No.

24     Q.    Or cars?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

88

1        A.    Probably not.

2        Q.    All right.  Have you solicited any of

3    Paro's employees since you left?

4        A.    No.

5        Q.    Why not?

6        A.    Because I think they stink.

7        Q.    Okay.

8        A.    And because I know now that I can't,

9    even if I wanted to, which I don't.

10        Q.    All right.  I thought you were taking

11    the position that this whole agreement is

12    unenforceable.  Or is it just your position that

13    Section 4 is unenforceable?

14        A.    You asked me before specifically to the

15    noncompete.  The solicitation of employees and

16    clients, that's really not up for me to decide.

17        Q.    But have you solicited any of Paro's

18    clients since you left?

19        A.    No.

20                    (Beginning of attorneys' eyes

21                    only.)

22    REDACTED

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

89

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

90

1   REDACTED

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN          PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

91

1        REDACTED

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN       PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

92

1    REDACTED

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

93

1

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY  9/19/2023

94

1    REDACTED

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

95

1            REDACTED

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

103

1     A.    That's correct.

2     Q.    And you cofounded that company with

3 Samuel Harrison and Joseph Hamilton; is that

4 correct?

5     A.    That is correct.

6     Q.    How do you know Mr. Harrison and

7 Mr. Hamilton?

8     A.    They're my best friends.

9     Q.    Did you meet these gentlemen in

10 college?

11     A.    Yes, I did.

12     Q.    Did you know them before college?

13     A.    No.

14     Q.    Where does Mr. Harrison live?

15     A.    New Jersey.

16     Q.    Where does Mr. Hamilton live?

17     A.    Denver, Colorado.

18     Q.    And how did it come about that you and

19 Mr. Harrison and Mr. Hamilton decided to go into

20 business together?

21     A.    We've always -- all of us wanted to own

22 our own business, and both of them were pretty

23 miserable with their jobs as well, so we said,

24 screw it, let's do it.

104

1    Q.    And when did you make that decision,

2  the three of you?

3    A.    Officially, I guess, just murmurs for a

4  little bit.  Probably towards the end of January.

5    Q.    As of January 2023, what was

6  Mr. Harrison doing professionally?

7    A.    He was an investment banker at asset

8  something.  I don't know exact company.

9    Q.    Okay.  He was not in the business that

10  Paro operates in; correct?

11    A.    I'm not sure what that means.

12    Q.    Well, did he have any experience in

13  this industry prior to starting FirmKey?

14    A.    Well, yes.  As an investment banker, he

15  deals with a lot of financial services, I guess;

16  right?

17    Q.    Okay.  And what did Mr. Hamilton do

18  professionally as of January 2023?

19    A.    Mr. Hamilton is a CPA -- was at the

20  time, still is.  And he was doing audit and then

21  transitioned to transaction advisory services.

22    Q.    Did he work for a firm?

23    A.    Yes, he did.

24    Q.    Which firm?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

105

1      A.    Like the last firm he was at?

2      Q.    Correct.

3      A.    Intrinsic.

4      Q.    And was he a CPA for Intrinsic?

5      A.    Yes.

6      Q.    What does FirmKey do?

7      A.    FirmKey conducts business development

8    on behalf of a small group of what we refer to as

9    vendors who are boutique accounting teams or

10   firms.

11          We conduct that business development by

12   prospecting what I would deem -- what we would

13   deem suitable clientele and those who have --

14   hopefully have needs that align with specifically

15   what our vendors specialize in.

16     Q.    I see.

17          So instead of experts, you call those

18   folks vendors; is that correct?

19     A.    Yes, that's correct.

20     Q.    And does FirmKey introduce and match

21   clients and vendors?

22     A.    To an extent.  I would say the caveat

23   is that we're very thoughtful and intentful with

24   the way that we prospect potential clients, going

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

106

1   after opportunities that we may come across that

2   solely align with our group of vendors'

3   specialties rather than throwing shit at the wall

4   and seeing who can take it kind of thing.

5          Does that make sense?

6      Q.   I -- I think so.  If I'm understanding

7   you correctly, you take a more thoughtful approach

8   to vetting experts and making sure that their

9   skill set more directly matches the needs of a

10  client?  Is that a fair characterization?

11     A.   Sure.

12          And you can think of it like this.  We

13  represent -- we represent the vendors, those --

14  the vendors are really who we serve in that

15  capacity.  And obviously we treat the clients with

16  the same amount of respect, but rather than

17  trying -- our mindset is not, let's go help a

18  prospective client, it's let's help a vendor.

19     Q.   Okay.  But either way, you are a --

20  FirmKey is a matchmaker of sorts, correct,

21  matching vendors and clients?

22     A.   Sure.

23     Q.   Okay.  Why did you and Mr. Hamilton and

24  Mr. Harrison decide on forming FirmKey and that

ADMIN INC. v. LUKE KOHAN, et al.

KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

107

1   type of business, as opposed to any other business?

2       A.    Because we all have backgrounds in, I

3   guess, financial services, and it's something that

4   we understand, so it wouldn't make sense for us to

5   open up --

6       Q.    A dog grooming business?

7       A.    Correct, because I don't know anything

8   about dog grooming.

9       Q.    Okay.  But you do know a lot about what

10  FirmKey does; correct?

11      A.    Yes.

12      Q.    Based on your experience at Paro;

13  correct?

14      A.    I understand what FirmKey does because

15  I cofounded it.

16      Q.    And you were able to specialize in this

17  industry in particular based on your experience at

18  Paro; isn't that correct?

19      A.    There is probably some correlation

20  there, yes.

21      Q.    All right.  Did you consider your

22  obligations under your noncompete agreement prior

23  to forming FirmKey?

24      A.    Not until really May 15th.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN       PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

108

1        Q.    All right.  Did you and Mr. Hamilton

2   and Mr. Harrison engage counsel in connection with

3   your formation of FirmKey?

4        A.    Only to, like, file the business

5   entity, but not really to seek advice as to the

6   legalities of stuff.  We just needed someone to

7   file in the state of Minnesota.

8        Q.    All right.  Do you know why Minnesota,

9   of all states, was chosen as the location of

10  incorporation?

11       A.    That's where Sam is from and where he

12  still has a house and stuff, so -- I don't know.

13  I really don't know the significance behind

14  anywhere where you file an entity.

15       Q.    I see.

16            So even though Mr. Harrison currently

17  works and resides in New Jersey, he's originally

18  from Minnesota; is that correct?

19       A.    That's correct.

20       Q.    All right.  And just so the record is

21  clear, you personally never consulted legal

22  counsel in connection with your obligations under

23  the noncompete agreement when deciding to form

24  FirmKey; is that correct?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

109

1     A.    That's correct.  Not until May 15th.

2     Q.    All right.  Do you recall when you

3  tendered your resignation to Paro?

4     A.    You're asking me what date?

5     Q.    Correct.

6     A.    February 19th or 20th.  I don't know,

7  one of those days, somewhere around there.

8     Q.    Okay.  How did you tender your

9  resignation?  Did you do it by email, by text, in

10  person, by phone?

11     A.    I think I had a couple conversations

12  with like Chad Taylor and Alex Loewenstein.

13  That's -- I think that's actually it.  And then I

14  think Alex kind of led the process of getting HR

15  involved for an off-boarding process, if I recall

16  correctly.

17     Q.    All right.  Did Mr. Taylor, at the

18  time, report to Mr. Loewenstein?

19     A.    Yes.

20     Q.    All right.  And Mr. Taylor was your

21  direct manager; correct?

22     A.    That's correct.

23     Q.    Is it fair to say that you would have

24  told Mr. Taylor first about your intention to

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY  9/19/2023

111

1    got the hint that I had had enough at that point.

2    So that discussion, it was more so like a -- not a

3    venting or stuff to bitch about, it was more so,

4    like, you know what's transpired over the last

5    couple months, so this is where we're at.

6        Q.    All right.  When you tendered your

7    resignation to Mr. Taylor, what was the status of

8    FirmKey at that point?

9        A.    I don't know because I don't know the

10   exact date that you asked me before about when I

11   tendered that resignation.

12       Q.    Okay.  Do you recall if FirmKey was

13   operating prior to your departure from Paro?

14       A.    I don't recall if -- well, I can assure

15   you that actual operations and actual, like,

16   business development, the first date was

17   April 1st.  But I filed it -- the entity

18   application, whatever it is, on February 20th

19   maybe, I think.

20       Q.    Okay.  And was there significance to

21   the April 1st date?

22       A.    Yeah.  I needed some time to just chill

23   for a minute.  I was working really hard for two

24   and a half years and just wanted to relax a little

ADMIN INC. v. LUKE KOHAN, et al.

KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

115

1       Q.    All right.  When you had your

2   discussions with Mr. Taylor and Mr. Loewenstein or

3   anyone else at Paro about your tendering your

4   resignation and your intention to leave the

5   organization, did anyone remind you of your

6   noncompete agreement or reference anything about

7   your post-separation obligations to Paro?

8       A.    No.  Aside from an email from Haley

9   Besaw, who is, I think, on their people operations

10  team, who provided me with instructions for things

11  like terminating my employment.

12      Q.    Okay.  And as far as you recall, do

13  those communications -- or did those

14  communications include any reference to your

15  noncompete agreement?

16      A.    No.

17      Q.    Did you tell Mr. Taylor or

18  Mr. Loewenstein or anyone else at Paro what you

19  would be doing professionally after you left Paro?

20      A.    No, I did not.

21      Q.    Did you tell them that you had formed

22  FirmKey?

23      A.    No, I did not.

24      Q.    Is there a reason why not?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

116

1    A.    Yes.

2    Q.    Why?

3    A.    Because it's none of their business.

4    Q.    Okay.  Did anyone ask you what you'd be

5  doing?

6    A.    I think a couple people may have asked,

7  "so what's next," and I said, "I'm going to take a

8  little bit of time off," which is what I did.

9    Q.    All right.  Did you think you were

10  being truthful to those people?

11    A.    That was truthful.  I took some time

12  off.

13    Q.    Did anyone ask you what you were going

14  to be doing after you took some time off?

15    A.    I don't think so.

16    Q.    Did anyone ask you how much time you'd

17  be taking off?

18    A.    Nope.

19    Q.    Did you tell anyone how much time you'd

20  be taking off?

21    A.    Nope.

22    Q.    Okay.  Do you recall what your last day

23  with Paro was?

24    A.    March 10th, I believe.

ADMIN INC. v. LUKE KOHAN, et al.

KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY  9/19/2023

123

1    Paro's business model or --

2         Q.    Well, sure.  We're Paro's counsel so

3    there are no secrets.

4         A.    Well, it's on the record, so...

5              The differences include Paro -- Paro's

6    network of experts are all individuals.  They

7    don't allow for -- at least to my knowledge, while

8    I was still there, they don't allow for firms or

9    boutique teams to sign up as a profile.  That's

10   one.

11             Two, we have different pricing models.

12   Paro's pricing model is a markup, and FirmKey does

13   not charge its clients any additional fees.

14        Q.    How does FirmKey get paid?

15        A.    FirmKey receives 20 percent of whatever

16   rate is agreed upon in a contract.

17        Q.    So your markup is built into the

18   contract between the vendor and the client; is

19   that correct?

20        A.    Not exactly.  Our vendors -- our

21   vendors compensate us.

22        Q.    Okay.  Whereas Paro's model, the client

23   compensates them; is that your position?

24        A.    That is my position, yes.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

124

1     Q.    Okay.

2     A.    Should I keep going with differences?

3     Q.    Yes, please.

4     A.    Paro's entire foundation is built upon

5  a proprietary artificial intelligence powered

6  marketplace or platform and they identify as a

7  technology company.

8          FirmKey couldn't be more different in

9  that regard, in that we have no desire, nor the

10 knowledge of how to create an AI-powered

11 marketplace.  We're not a marketplace, we're not a

12 platform, and we rely very much on people skills

13 and our ability to make sense of situations, I

14 suppose you could call it, and we just use basic

15 technology to get us through the day, just like

16 every other company in the world does.

17    Q.    Okay.  Anything else?

18    A.    Paro is funded through multiple rounds

19 by VCP firms.  I really don't know which ones.

20 And we have no intention or desire to raise money

21 for anything.

22    Q.    Anything else?

23    A.    Paro has employees.  We don't.  It's

24 not to say that we won't at some point, but as it

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

127

1   BY MR. MOELLER:

2        Q.    Go ahead.

3              MR. PASTERNAK:  You can answer.

4   BY MR. MOELLER:

5        Q.    If you can answer.

6        A.    I don't think I could have been more

7   clear about those differences, as they all relate

8   to the operations, the end result, the identities.

9              But to reiterate, Paro is laser-focused

10  on providing staff augmentation services

11  specifically for public accounting firms.

12       Q.    That's one component of their business;

13  right?

14       A.    That is -- again, they are

15  laser-focused.  And as I mentioned before, the

16  writing was on the wall that an outbound direct

17  team would no longer exist, which you confirmed it

18  doesn't.

19             So I would say that it is

20  predominantly, if not already, very soon to be

21  what they focus on as they're only accepting

22  inbound leads from companies that are not public

23  accounting firms.

24             Should I keep going?

ADMIN INC. v. LUKE KOHAN, et al.

KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

129

1   so-called clients that I brought to Paro, if you

2   looked into Paro's systems, they're probably still

3   clients and probably still billing just as much as

4   when I left, today.

5          Q.    Correct.

6                So their clients still include non-CPA

7   firms?

8          A.    Yes, I answered that.  That's correct.

9          Q.    All right.

10         A.    To my knowledge.

11         Q.    And to your knowledge, does Paro

12  continue to solicit and mine relationships with

13  non-CPA firms?

14         A.    Solicit, no, not at all.  Zero.  They

15  don't have an outbound component for non-CPA

16  firms.

17         Q.    Okay.

18         A.    They rely on their inbound team to

19  receive what's called a warm lead, someone who is

20  already interested and needs the type of services.

21  But there's no one actively going out and

22  soliciting potential business for that business

23  unit.

24         Q.    I see.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN       PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

135

1              A F T E R N O O N   S E S S I O N

2    BY MR. MOELLER:

3         Q.    Mr. Kohan, we are back on the record.

4               What is your title at FirmKey?

5         A.    I'm a cofounder and CEO.

6         Q.    And do you also hold the title of

7    president?

8         A.    Technically, yes, but I don't really

9    promote that.

10        Q.    Okay.  And what are your

11   responsibilities as CEO?

12        A.    My responsibilities include business

13   development, bringing in business.  I'm involved

14   with a lot of the systems -- softwares that we

15   use, you know, the basic technology, just making

16   sure that works.  And as of late, I am our, seems

17   to be, legal counsel.

18        Q.    The acting general counsel?

19        A.    Yeah, internal.

20              Thank goodness for Mr. Pasternak though.

21        Q.    All kidding aside, you don't have a

22   legal background, do you?

23        A.    I do not.

24        Q.    Did you ever attend law school?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

136

1    A.    No.

2    Q.    Sit for a bar exam?

3    A.    Nothing.

4    Q.    Okay.  Got it.

5          Do you have any other responsibilities

6    as CEO than what you just described?

7    A.    Honestly, no, not -- not really.

8    Q.    What do your business development

9    responsibilities entail?

10   A.    My business development

11   responsibilities consist of reaching out to

12   companies who I feel would be a good prospective

13   client.

14   Q.    Companies that may need the services

15   that could be provided by your vendors?

16   A.    That's correct.

17   Q.    All right.  And you described how you

18   used to reach out to clients while you were at

19   Paro, primarily by -- I believe you said by email.

20         Is that the predominant method by which

21   you contact clients on behalf of -- prospective

22   clients on behalf of FirmKey?

23   A.    Predominantly, yes.

24   Q.    And do your business development

137

1   responsibilities also entail reaching out to

2   prospective, what you guys call, vendors?

3        A.    Yes.  That's a shared role though.  We

4   all -- we all do it.

5        Q.    That's a shared role with Mr. Harrison

6   and Mr. Hamilton?

7        A.    Yes.  Actually, all the roles that I

8   described are shared.

9        Q.    Okay.  What is Mr. Harrison's title?

10       A.    He is our chief operating officer.

11       Q.    And he's a cofounder as well?

12       A.    That's correct.

13       Q.    Do you consider -- the three of you

14   consider three equal -- consider yourselves three

15   equal cofounders; is that fair to say?

16       A.    Yes, of course.

17       Q.    And what are Mr. Harrison's

18   responsibilities as the COO?

19       A.    Frankly, it's a title that -- we just

20   needed to assign each other titles.  But his

21   responsibilities are more or less the same as mine

22   in terms of business development and making sure

23   that we're successful.

24       Q.    Does Mr. Harrison report to you?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

138

1     A.    Nobody reports to me.

2     Q.    Do you report to anyone?

3     A.    I don't report to anybody.

4     Q.    What is Mr. Hamilton's title?

5     A.    He is cofounder and chief financial

6  officer.

7     Q.    And what are his responsibilities as

8  chief financial officer?

9     A.    More or less the same as what Sam and I

10 responsibilities are.  Yeah, he's business

11 development and making sure that we're running a

12 successful business.

13    Q.    So just so I'm clear, you and

14 Mr. Harrison and Mr. Hamilton all have and share

15 business development responsibilities?

16    A.    Yes, that's correct.

17    Q.    All right.  Does FirmKey have a board

18 of directors?

19    A.    I don't think so.  It's just us three.

20 Like anybody additionally?  No.

21    Q.    All right.  Got it.

22          Who are FirmKey's shareholders?

23    A.    Just us three.

24    Q.    And do you own the company equally at

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

139

1    33 and a third percent?

2         A.    Yes.

3         Q.    Who owns that extra hundredth percent?

4         A.    I couldn't tell you.

5         Q.    Okay.  Got it.

6                    (Whereupon Kohan Deposition

7                    Exhibit No. 5 was marked for

8                    identification.)

9              THE WITNESS:  Thank you.

10   BY MR. MOELLER:

11        Q.    This has been marked as Exhibit 5.

12             Do you recognize this document?

13        A.    Yes, I do.

14        Q.    This is the operating agreement of

15   FirmKey Solutions, LLC; is that correct?

16        A.    Yes, it is.

17        Q.    Do you know who prepared this?

18        A.    I believe it was the same attorney who

19   filed our business entity.

20        Q.    Do you know that person's name?

21        A.    David Vegemast, V-E-G-E-M-A-S-T.

22        Q.    Where is Mr. Vegemast located?

23        A.    I believe Minnesota.

24        Q.    Is he a contact of Mr. Harrison's?

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

140

1      A.    He is.

2      Q.    All right.  This document indicates

3   that it's effective as of February 20th, 2023.

4           Do you see that?

5      A.    Yes, I see that.

6      Q.    And that would have been five to seven

7   days before you tendered your resignation to Paro;

8   is that correct?

9      A.    That sounds about right.  I don't

10  really know the exact date.  I don't remember the

11  date that I tendered my resignation.

12     Q.    Okay.  If you turn to page 2, Section

13  1.20 contains the definition of officer.

14          Do you see that?

15     A.    Yes, I do.

16     Q.    It says:

17          "'Officer' means a Natural Person who

18  has been appointed as Chief Executive Officer...."

19          You're chief executive officer;

20  correct?

21     A.    Yes.

22     Q.    And you're also president?

23     A.    Yes.

24     Q.    And you indicated that -- I have a

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN     PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

151

1   as opposed to vendors; correct?

2        A.    Yeah, that's correct.

3        Q.    All right.  And then you say you offer

4   a multitude of services, or your vendors do,

5   including CFO.

6             That's chief financial officer;

7   correct?

8        A.    Yes.

9        Q.    Controller?

10       A.    Yes.

11       Q.    What's the difference between CFO and

12   controller services?

13       A.    A CFO provides more strategic financial

14   leadership, and it's likely better suited to

15   assist with anything that has to do with raising

16   capital or S1 memos for IPOs or M&A activities,

17   where a controller gets more involved with the

18   general accounting compliance within an

19   organization.  For example, assisting with audit

20   readiness or whatever it might be for a particular

21   company.

22       Q.    And then it continues:  "...FP&A...."

23             What's FP&A?

24       A.    Financial planning and analysis.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

152

1      Q.    What is that?

2      A.    Creating models such as budgeting --

3    budgets, forecasts, historical cash flows,

4    whatever it might be.

5      Q.    "...CPA (Tax & Audit)...."

6            Traditional CPA services?

7      A.    Yes.

8      Q.    What is ERP implementation?

9      A.    Some accounting departments utilize

10   specific ERPs or softwares that are accounting

11   related, and some of our vendors are capable of

12   leading such implementation services.

13     Q.    Okay.  And then the final term is

14   "bookkeeping."

15           That's pretty self-explanatory;

16   correct?

17     A.    Correct.

18     Q.    All right.  Then it continues:

19           "FirmKey offers our clients:

20   (A) on-demand access to our vetted coalition of

21   specialists."

22           The "specialists" being your vendors?

23     A.    That's correct.

24     Q.    And what does FirmKey do to vet your

153

1  coalition of specialists?

2       A.    We connect with them and discuss their

3  backgrounds, discuss whether or not they hold any

4  active certifications.  I wouldn't exactly call it

5  a detailed background check, per se.  Vetted;

6  probably should have used the word "trusted."

7       Q.    Why is "trusted" a more accurate term

8  than "vetted"?

9       A.    "Vetted" might give -- perhaps it would

10 raise questions about whether or not a thorough

11 background check is actually conducted.

12      Q.    I see.  Okay.  And it continues:

13            "(B) flexible project-based or ongoing

14 fractional engagements."

15            What does that mean?

16      A.    It pretty much means that if a company

17 has a specific need, we'll be able to take care of it.

18      Q.    All right.  And I believe you described

19 what a fractional engagement is earlier in the

20 deposition, and that's sort of a part-time

21 engagement.  Is that a fair characterization?

22      A.    Sure.

23      Q.    All right.  And:

24            "(C) a far more cost-effective,

154

1    reliable, and rapid means of engaging with

2    qualified, US-based accountants and consultants."

3            What does that mean?

4        A.    Seriously?  It means that it's

5    cost-effective, that we are reliable, and we're

6    fast.

7        Q.    Okay.  I mean, A, B, and C on Exhibit

8    No. 6 sound a lot like what Paro does, doesn't it?

9        A.    I guess that depends on who you're

10   asking.

11       Q.    Well, I'm asking you.

12       A.    Me?  At this moment in time, not

13   really.  No.

14       Q.    All right.  You're aware of what goes

15   on at Paro on a day-to-day basis?

16       A.    Now?  No.

17       Q.    To your knowledge, does Paro provide

18   on-demand access to vetted or trusted experts?

19       A.    I wouldn't -- I would say that Paro

20   also moves quickly, yeah.

21       Q.    So is the answer to my question "yes"?

22       A.    My answer is Paro moves quickly.

23       Q.    Well, I'd like you to answer my

24   question.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

156

1       MR. MOELLER:  Go ahead.

2       THE WITNESS:  Robin, respectfully, I

3    already answered that question twice.

4       MR. MOELLER:  All right.  Could you

5    certify the question?  We'll raise it with

6    the Court tomorrow.

7               (Question certified.)

8  BY MR. MOELLER:

9    Q.    Does Paro offer its clients flexible

10  project-based or ongoing fractional engagements?

11       MR. PASTERNAK:  Objection, vague as to

12    time.

13       THE WITNESS:  Sure.

14         That's a part of it.

15  BY MR. MOELLER:

16    Q.    Does Paro offer its clients a

17  cost-effective, reliable, and rapid means of

18  engaging with qualified U.S.-based accountants and

19  consultants?

20       MR. PASTERNAK:  Same objection.

21       THE WITNESS:  Can I answer?

22       MR. PASTERNAK:  You can answer.

23       THE WITNESS:  I would definitely argue

24    that it's not cost-effective nor is it

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

157

1    reliable nor is it really all that rapid.

2    So, no.

3    BY MR. MOELLER:

4        Q.    Okay.  Do they offer a means of

5    engaging with qualified U.S.-based accountants and

6    consultants?

7             MR. PASTERNAK:  Same objection.

8             THE WITNESS:  Yeah.  I'd say they're

9        not all U.S. based though.

10   BY MR. MOELLER:

11       Q.    Okay.  But some of their offerings are

12   U.S. based; correct?

13       A.    Yeah.

14       Q.    Why did you post this, Exhibit 6?

15       A.    I posted this to let people know that

16   I've started a new company.

17       Q.    And you wanted to let them know what

18   FirmKey does; right?

19       A.    Yes.

20       Q.    How was the response to this post?  Was

21   it positive?

22       A.    It depends how you feel about cease and

23   desist letters.  But other than that, it was

24   pretty well received.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

159

1   this was a -- an excerpt from your company's web

2   page as of July 2023.

3            Does this look familiar to you?

4       A.   It does, but what I'm looking at has,

5   like, a lot of the same pages.  So I don't know if

6   that was on purpose, but...

7       Q.   Well, if you look at Paro 13, starting

8   on Paro 13, do you see in the bottom right-hand

9   corner --

10      A.   What page is it?

11      Q.   Page 5 of 6.

12      A.   I don't know if we're looking at the

13  same one.  This one [indicating]?

14      Q.   Yeah.

15      A.   Yeah, got it.

16      Q.   Okay.  And turning then to the next

17  page, page 6 of 6, it bears the heading "SUMMARY

18  OF SERVICES."

19           Do you see that?

20      A.   Yes, I do.

21      Q.   And is this a fair characterization,

22  accurate characterization of the types of services

23  that FirmKey offers to its clients?

24      A.   Yes.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

168

1   see what the competitive landscape is all about.

2        Q.   All right.  I mean, do you consider

3   FirmKey to be the only company in the entire

4   United States, if not the world, to be providing

5   the type of services that it provides?

6        A.   No.

7        Q.   Okay.  What other companies in the

8   United States that you're aware of provide the

9   same or substantially same type of services as

10  FirmKey?

11       A.   I could think of a couple similar

12  services or -- Upwork, Toptal, Makosi, TaskRabbit.

13       Q.   What was the first one you said?

14       A.   I don't remember.

15            MR. PASTERNAK:  Upwork.

16            THE WITNESS:  Upwork.

17  BY MR. MOELLER:

18       Q.   Upwork, okay.  I didn't mean to

19  interrupt you.

20            Any others?

21       A.   Nope.

22       Q.   Okay.  Not Paro though?

23       A.   Maybe someone would consider it.  I

24  don't know if I would.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

186

1      Q.     Okay.  Does Mr. Hamilton own a

2   residence in Colorado?

3      A.     He does now, yes.

4      Q.     Okay.  Did he not at the time that this

5   document was prepared?

6      A.     No, he did not.

7      Q.     The second whereas clause on page 1

8   says:

9           "...FirmKey is a company specializing

10  in creating business relationships and service

11  engagements for prospective clients and Clients in

12  need of accounting services and qualified Vendors

13  of such services as described."

14          Do you see that?

15     A.     Mm-hmm.  Yes.

16     Q.     Is that an accurate description of what

17  FirmKey specializes in?

18     A.     Pretty poorly written, but yeah.

19     Q.     Okay.  In Section 1, a description of

20  accounting services.  It says, in part:

21          "Vendor shall provide accounting

22  services to clients...who have engaged FirmKey to

23  match and introduce Clients to Vendors."

24          Do you see that?

187

1      A.    Mm-hmm.  Yes.

2      Q.    Is that accurate?

3      A.    This is the first sentence you're

4  talking about --

5      Q.    Correct.

6      A.    -- or the second sentence?

7            Yeah.

8      Q.    Is that accurate?

9      A.    Yes.

10     Q.    All right.  Isn't that what Paro does,

11 too?

12     A.    I'm not sure what Paro does now.

13     Q.    Is this what Paro did when you were

14 employed there?

15     A.    In some capacity, yes.

16     Q.    And just confirming in Section 3, which

17 is on page 2, it says [as read]:

18           "For the Services to be performed under

19 this contract, FirmKey shall pay Vendor the agreed

20 upon hourly rate or fixed fee."

21           Do you see that?

22     A.    Which clause are you talking about?

23     Q.    The very first sentence:

24           "For the Services to be performed under

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN      PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

203

1          THE COURT REPORTER:  Yes.

2          MR. MOELLER:  Will you ask it of Mr.

3      Kohan.

4          THE COURT REPORTER:  "Question:  To

5      your knowledge, does Paro provide on-demand

6      access to vetted or trusted experts?"

7          THE WITNESS:  Yes.

8          MR. MOELLER:  Thank you.

9          THE WITNESS:  You're welcome.

10              Thank you, Robin.

11          THE COURT REPORTER:  You're welcome.

12              (Certified question withdrawn.)

13  BY MR. MOELLER:

14      Q.    Mr. Kohan, other than the agreements we

15  discussed today, and that would include

16  specifically Exhibit No. 5, which is the operating

17  agreement, are you and your cofounders parties to

18  any agreements among yourselves in relation to

19  FirmKey?

20      A.    Not that I'm aware of, no.

21      Q.    Any sort of offer letters or employment

22  agreements or equity grant agreements, anything

23  along those lines?

24      A.    No.

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY 9/19/2023

216

1    REDACTED

ADMIN INC. v. LUKE KOHAN, et al.
KOHAN        PORTIONS OF THIS TRANSCRIPT ARE ATTORNEYS' EYES ONLY  9/19/2023

217

1   REDACTED

# Exhibit 1

Paro- 00026-00027

## Contact

www.linkedin.com/in/luke-kohan-657934b8 (LinkedIn)

## Top Skills

Microsoft Word
Microsoft Office
PowerPoint

## Languages

English
Spanish

# Luke Kohan

Co-Founder, FirmKey
New York, New York, United States

## Experience

**FirmKey Solutions**
Co-Founder
April 2023 - Present (2 months)
New York City Metropolitan Area

Connecting businesses with our network of trusted accounting consultants.

**Paro.ai**
2 years 6 months

Senior Account Executive (Outbound 3)
April 2022 - March 2023 (1 year)

Senior Account Executive (Outbound 2)
July 2021 - April 2022 (10 months)
New York City Metropolitan Area

Senior Account Executive (Outbound 1)
October 2020 - July 2021 (10 months)
New York City Metropolitan Area

**Groupon**
4 years 1 month

Business Development Director (Things To Do and Leisure Team)
April 2018 - February 2020 (1 year 11 months)
Greater Chicago Area

Business Development Manager (Things To Do and Leisure Team)
April 2017 - March 2018 (1 year)
Greater Chicago Area

Business Development Representative (Things To Do and Leisure Team)
June 2016 - March 2017 (10 months)
Greater Chicago Area

Business Development (Training Program)
February 2016 - May 2016 (4 months)

PARO 00026

Greater Chicago Area

---

## Education

**Miami University**
Bachelor's degree, Department of Psychology · (2011 - 2015)

**Half Hollow Hills High School West**
 · (2011)

PARO 00027

# Exhibit 2

Paro- 00004-00007

## Exhibit A

**Client Name**





**Expert Name**



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER



35432448.2

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

# Exhibit 3

Paro- 00028-00040

## NON-COMPETITION, NON-SOLICITATION, NON-DISCLOSURE AND
## INVENTION ASSIGNMENT AGREEMENT

This Non-Competition, Non-Solicitation, Non-Disclosure and Invention Assignment Agreement (the "**Agreement**") is made by and between Admiin Inc. d/b/a Paro Inc., a Delaware corporation, its subsidiaries, affiliates, predecessors, successors or assigns (collectively, the "**Company**"), and  Luke Kohan____, an individual, as of this 03____ day of _October___, 2012 0

WHEREAS, the Company desires to employ or to continue to employ me, and I desire to be so employed by the Company on the terms and conditions set forth herein;

WHEREAS, as a result of my employment with the Company, I acknowledge I have or will become privy to Confidential Information of the Company and, potentially, its Affiliates, and I understand such Confidential Information constitutes one of the legitimate business interests of the Company that must be guarded against unfair competition.

NOW, THEREFORE, for good and valuable consideration, including but not limited to the offer of employment or my continued employment with the Company, compensation I have received or will receive from the Company, access to the Company's Confidential Information and Customers, the receipt and sufficiency of which are hereby acknowledged, I agree as follows:

1.     **At-Will Employment. I UNDERSTAND AND ACKNOWLEDGE THAT NOTHING IN THIS AGREEMENT IS INTENDED TO ALTER THE AT-WILL EMPLOYMENT RELATIONSHIP BETWEEN THE COMPANY AND ME AND THAT MY EMPLOYMENT WITH THE COMPANY IS ON A STRICT "AT-WILL" BASIS. THIS MEANS THAT EMPLOYMENT IS NOT GUARANTEED FOR ANY PERIOD OR ON PARTICULAR TERMS, AND NEITHER THIS AGREEMENT NOR ANY COMMUNICATION SHOULD BE CONSTRUED AS A CONTRACT OF GUARANTEED EMPLOYMENT FOR A PARTICULAR PERIOD OF TIME. EITHER THE COMPANY OR I MAY TERMINATE MY EMPLOYMENT AT ANY TIME, WITH OR WITHOUT CAUSE OR NOTICE. NO REPRESENTATIVE OF THE COMPANY, OTHER THAN THE CHIEF EXECUTIVE OFFICER (AND THEN ONLY IN WRITING), HAS AUTHORITY TO ENTER INTO ANY AGREEMENT CONTRARY TO THE AT-WILL RELATIONSHIP.**

2.     **Confidential Information**.

a.     Definition of Confidential Information.  As used in this Agreement, the term "**Confidential Information**" means all information, knowledge and data, whether oral or written, electronic or in other form, that is not generally known to the public or otherwise readily ascertainable by proper means and relates to the actual or anticipated business or research and development of the Company, including, but not limited to, proprietary information, technical data, trade secrets, know-how, flow-charts, research, software, developments, inventions, processes, formulas, algorithms, prices and costs, technology, designs, drawings, engineering, hardware configurations, source and object codes, data and databases, compilations, marketing, finances, forecasts, product plans, business plans, internal processes, sales strategy, business

27341827.2

strategy, and other information regarding the Company's business, products, services, markets, suppliers, contributors, customers and customer lists, members and member lists, sponsors and sponsor lists, terms of customer agreements, advisory board members and advisory board member lists, information about customers learned during the period of my employment with the Company, including, but not limited to, the identities, preferences and purchasing histories of members, sponsors and/or customers of the Company on whom I called, with whom I became acquainted or about whom I received information during the period of my employment with the Company, and other information designated "confidential," "proprietary," and/or other similar designation. "Confidential Information" also includes information that is not generally known to the public or otherwise readily ascertainable by proper means that is owned or controlled by any third party that may disclose such information to the Company or to me under any obligation of confidentiality in the course of the Company's business. The term "Confidential Information" does not, however, include information that is in the public domain (other than information that became public as a result of a breach of a duty of confidentiality) or information rightfully received by me outside the course of my employment with the Company from a third party who does not owe the Company a duty of confidentiality with respect to such information.

b.  Protection of Confidential Information.  I agree at all times during the period of my employment with the Company and thereafter to (i) hold the Confidential Information in strictest confidence, and not to directly or indirectly copy, distribute, disclose, divert, or disseminate, in whole or in part, any of such Confidential Information to any person, firm, corporation, association or other entity except: (x) to authorized agents of the Company who have a need to know such Confidential Information for the purpose for which it is disclosed; or (y) to other persons for the benefit of the Company, in the course and scope of my employment with the Company, provided that I have received prior written authorization to such effect from an authorized officer of the Company, and (ii) refrain from directly or indirectly using the Confidential Information other than as necessary and as authorized in the course and scope of my employment with the Company.

c.  Third Party Information I Have Received.  I represent that my performance of all terms of this Agreement does not breach, has not breached and will not breach any agreement to keep in confidence proprietary information, knowledge or data (if any) acquired by me from any third party in confidence or trust prior or subsequent to the commencement of my employment with the Company. I agree that I have not improperly used or disclosed and that I will not, during the period of my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former employer or other person or entity and that I have not brought and will not bring onto the premises of the Company any non-public document or proprietary information belonging to any such third party, unless such document or information has become known to the public or within the industry through no fault or breach of mine or others or unless consented to in writing by such third party.

d.  Third Party Information the Company Has Received.  I recognize that the Company has received and in the future will receive from third parties confidential and/or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any

Doc ID: 8e47cd7fee5758697bf9bd7ab4b71fba79ba3c48

PARO 00029

person or entity or to use it except as necessary and as authorized in carrying out my work for the Company consistent with the Company's agreement with such third party.

      e.    <u>Trade Secrets Disclosure</u>.  I acknowledge that, pursuant to 18 U.S.C. Section 1833(b), I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (i) is made: (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and (y) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. If I file a lawsuit for retaliation by the Company for reporting a suspected violation of law, I may disclose a trade secret to my attorney and use the trade secret information in the court proceeding, if I: (A) file any document containing the trade secret under seal; and (B) do not disclose the trade secret, except pursuant to court order.

      f.    <u>Exception</u>.  Nothing in this Agreement prohibits me from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation. I understand that I do not need the prior authorization of the Company to make any such reports or disclosures, and that I am not required to notify the Company that I have made such reports or disclosures.

      3.    **Intellectual Property**.

      a.    <u>Definition of Intellectual Property</u>.  As used in this Agreement, the term **"Intellectual Property"** means all inventions, original works of authorship, trade secrets, concepts, ideas, discoveries, developments, improvements, combinations, methods, designs, trademarks, trade names, software, data, mask works, and know-how, whether or not patentable or registrable under copyright, trademark or similar laws, including, but not limited to, all specifications, data, know-how, formulae, algorithms, designs, compositions, processes, computer programs (including object code and source code, in machine readable and printed or otherwise perceptible form as well as software development, architecture, input and design), computer database technologies, systems, website and back-end technologies, customer lists, vendor lists, financial models, websites (including domain names), marketing plans (including brand and logo work), and any other information relating to the Company's business.

      b.    <u>Prior Intellectual Property</u>.  I have attached hereto, as <u>Exhibit A</u>, a list describing with particularity all Intellectual Property that was made by me prior to or during, but separate from, my employment with the Company that relates in any way to the Company's current or proposed business, including but not limited to products or research and development (collectively referred to as **"Prior Intellectual Property"**); if no such list is attached, I represent that there is no such Prior Intellectual Property. If, in the course of my employment with the Company, I incorporate into a Company product, process, service, documentation or other work product, or use in connection with my employment with the Company, any Prior Intellectual Property in which I have any interest, I agree to promptly advise the Company of such incorporation or use, and I hereby grant to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, transferable, worldwide license (with unlimited right to sublicense) to

          -3-

Doc ID: 8e47cd7fee5758697bf9bd7ab4b71fba79ba3c48

make, have made, use, offer for sale, sell, import, reproduce, distribute, publicly perform, publicly display, make derivative works based upon, and otherwise fully exploit such Prior Intellectual Property.

      c.    <u>Disclosure and Assignment of Company Intellectual Property</u>. As used in this Agreement, the term "**Company Intellectual Property**" means any Intellectual Property that I have solely or jointly conceived, reduced to practice, authored, or otherwise created, may solely or jointly conceive, reduce to practice, author, or otherwise create, or cause to be conceived, reduced to practice, authored or otherwise created, during the period of my employment with the Company or, to the extent relating to the Business (as defined below), for a period of three (3) months following the termination of my employment. I agree that I will promptly make full written disclosure to the Company and will hold in trust for the sole right and benefit of the Company all Company Intellectual Property. I further agree that all Company Intellectual Property comprising original works of authorship fixed in a tangible medium that I created or create within the scope of and during the period of my employment with the Company are, to the greatest extent permitted by applicable law, "works made for hire" as that term is defined in the United States Copyright Act. I hereby assign to the Company, or its designee, all my right, title, and interest in and to such Company Intellectual Property, except as provided in <u>Section 3(f)</u> below. I understand and agree that the decision whether or not to commercialize or market any Company Intellectual Property developed by me solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Intellectual Property.

      d.    <u>Maintenance of Records</u>. I agree to keep and maintain adequate and current written records of all Company Intellectual Property that is conceived, reduced to practice, authored, or otherwise created by me or at my direction (solely or jointly with others) during the period of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic communications and files, and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business.

      e.    <u>Patent and Copyright Registrations</u>. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Company Intellectual Property in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, and the execution of all applications, specifications, oaths, assignments and all other instruments which the Company deems necessary to apply for, obtain, maintain and transfer such rights and to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Company Intellectual Property. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of my employment with the Company. If the Company is unable for any reason to secure my execution of any instrument or papers to apply for or to pursue any application for any United States or foreign patents, copyright or trademark registrations, or other protection of any Company Intellectual Property, then I hereby irrevocably designate and appoint the Company

27341827.2

-4-

Doc ID: 8e47cd7fee5758697bf9bd7ab4b71fba79ba3c48

and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any instruments and papers related to such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright or trademark registrations or other protection of Intellectual Property thereon with the same legal force and effect as if executed by me.

        f.      Exception to Assignments. I understand that the provisions of this Agreement requiring assignment of Company Intellectual Property and Prior Intellectual Property to the Company do not apply to any invention which qualifies fully under the provisions of the Illinois Employee Patent Act 765 ILCS 1060 *et seq.* I will advise the Company promptly in writing of any inventions that I believe meet the criteria in Illinois Employee Patent Act 765 ILCS 1060 *et seq.* and are not otherwise disclosed on Exhibit A. I acknowledge the statement set forth below.

> NOTICE TO ILLINOIS EMPLOYEES: In accordance with the Illinois Employee Patent Act, 765 ILCS 1060 *et seq.*, employee is hereby advised that Section 3 of this Agreement regarding the Company's ownership of Intellectual Property does not apply to any invention for which no equipment, supplies, facilities or trade secret information of the Company was used and which was developed entirely on employee's own time, unless (i) the invention relates to the business of the Company or to the Company's actual or demonstrably anticipated research or development or (ii) the invention results from any work performed by employee for the Company.

        4.    **Conflicting Employment & Non-Competition.** I agree that during the period of my employment with the Company I will not engage in any other employment, occupation or consulting arrangement anywhere in the world, nor will I engage in any other activities that conflict with my obligations to the Company. During the Restricted Period (as defined below), I will not, anywhere in the Restricted Territory (as defined below), without the Company's prior written consent, directly or indirectly, alone or as a partner, member, manager, owner, joint venturer, officer, director, employee, consultant, agent, contractor, stockholder or in any other capacity of any company or entity, engage in the Business, have any financial interest in any company or entity engaging in the Business or make any loans to any company or entity engaging in the Business. For purposes of this Agreement, the term "**Business**" means (a) the provision of outsourced financial services, including bookkeeping and accounting, financial analysis and CFO strategy services, or (b) the provision, development, marketing, sale or maintenance of products or services which are substantially similar to those developed, marketed, distributed, sold, maintained or otherwise provided by, or actively planned to be developed, marketed, distributed, sold, maintained or otherwise provided by the Company during the term of my employment with the Company. Notwithstanding the foregoing, my ownership of not more than one percent (1%) of the outstanding shares of stock of any corporation having a class of securities actively traded on a national securities exchange or on the NASDAQ Stock Market shall not be deemed, in and of itself, to violate the provisions of this Section 4. I agree and acknowledge that the restrictions in this Section 4 shall apply throughout the Restricted Territory, and that the geographic scope of the restriction is necessary and reasonable because the Company conducts business at least nationally, and the restriction is necessary to protect the legitimate business interests of the Company. I further agree and acknowledge that the restrictions in this Section 4 shall apply to self-employment by me.

Doc ID: 8e47cd7fee5758697bf9bd7ab4b71fba79ba3c48

5.  **Returning Company Property and Documents**.  I agree that, within five (5) business days after the date on which my employment with the Company terminates for any reason, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all Confidential Information, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items, whether in written, electronic or other form, developed by me pursuant to my employment with the Company or otherwise belonging to the Company including, without limitation, those records maintained pursuant to Section 3(d).  I further agree that any property situated on the Company's premises and owned by the Company, including magnetic, solid state and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time, with or without notice, regardless of any locks, codes, password protection or other security measures as may exist or have been applied at any time.  In the event my employment with the Company terminates for any reason, I agree to sign and deliver to the Company, within five (5) business days after the effective date of such termination, a "Termination Certification" in a form to be provided by the Company.

6.  **Past Employment; Notification of New Employer**.

a.  Past Employment.  I hereby represent and warrant to the Company that (i) my employment or continuing employment with the Company and my execution, delivery and performance of this Agreement do not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which I am a party or by which I am bound, and (ii) I am not a party to or bound by any employment agreement, non-compete agreement, non-solicitation agreement, confidentiality agreement or any other restrictive covenant or agreement with any other person or entity, except as may have been disclosed to the Company in writing and attached to this Agreement as an addendum, none of which has been or will be violated by me or by the Company's conduct of its business as currently conducted and as proposed to be conducted.

b.  Notification of New Employer.  In the event that I seek employment with or engagement in any capacity by another person or entity, at any time during the period of my employment with the Company or thereafter, I hereby agree to notify such person or entity of my obligations under this Agreement prior to commencing my employment with, or engagement by, such person or entity.  Further, I hereby consent to the Company providing notice to such person or entity as to my obligations under this Agreement, including that the Company may transmit a copy of this Agreement to such person or entity.  At the Company's request, I agree to disclose to the Company in writing the name and location of my new employer and my job title and anticipated job responsibilities with my new employer.

7.  **Non-Solicitation**.

a.  Solicitation of Employees.  I agree that during my employment with the Company and during the Restricted Period, I shall not directly or indirectly solicit, induce, recruit or encourage any Company Employee (as defined below) to leave his or her employment, or take away or hire any such Company Employee, or attempt to solicit, induce, recruit, encourage or take away or hire any such Company Employee, either for myself or for any other

Doc ID: 8e47cd7fee5758697bf9bd7ab4b71fba79ba3c48

PARO 00033

person or entity. For purposes of this Agreement, the term **"Company Employee"** means (x) any person who is an employee of the Company at the time of my solicitation of and/or communication with such person, or (y) any person who at any time was an employee of the Company within the 180-day period immediately preceding (A) the termination of my employment with the Company or (B) my solicitation of and/or communication with such person.

b.    Solicitation of Customers. I agree that during my employment with the Company and during the Restricted Period, I shall not directly or indirectly induce or solicit or attempt to induce or solicit any Customer (as defined below) of the Company. My agreement "not to solicit" means that I will not directly or indirectly initiate, contact or engage in any contact or communication, of any kind whatsoever, that has the purpose or effect of inviting, assisting, encouraging or requesting any Customer to: (i) transfer his/her/its business from the Company to me, my employer or any third party, or (ii) purchase any products or services from me, my employer or any third party that are or may be competitive with the Company's products or services, or use any products or services of mine, my employer or of any third party that are or may be competitive with the Company's products or services, or (iii) otherwise diminish, divert, discontinue or terminate his/her/its patronage and/or business relationship with the Company. For purposes of this Agreement, the term **"Customer"** means any customer of the Company: (x) with which, for which or to which I communicated, performed any services, or sold or licensed any products during the 24-month period preceding the termination of my employment with the Company or (y) of which I have or had knowledge during my employment with the Company.

8.    **Consideration for and the Reasonableness of Sections 2, 4 and 7; Tolling; Modification; and Definitions of Restricted Period and Restricted Territory.**

a.    Consideration. I agree and acknowledge that I have received valuable and adequate consideration in exchange for the restrictions in Sections 2, 4 and 7 of this Agreement, including but not limited to the offer of employment or continued employment with the Company, compensation I have received or will receive from the Company, and access to the Company's Confidential Information and Customers.

b.    Reasonableness of Restrictions. I understand how important the relationships which the Company has with its Customers and Company Employees are, as well as how significant the maintenance of its Confidential Information is to the business and success of the Company, and I acknowledge the steps the Company has taken, is taking and will continue to take to develop, preserve and protect these relationships and Confidential Information. Accordingly, I agree that the scope and duration of the restrictions and limitations described in this Agreement, particularly in Sections 2, 4 and 7, are reasonable and necessary to protect the legitimate business interests of the Company, and I agree and acknowledge that all restrictions and limitations relating to the period following the end of my employment with the Company will apply regardless of the reason my employment ends. I also agree and acknowledge that the enforcement of Sections 2, 4 and 7 will not in any way preclude me from becoming gainfully employed or engaged as a contractor in such manner and to such extent as to provide me with an adequate standard of living.

27341827.2                                    -7-

Doc ID: 8e47cd7fee5758697bf9bd7ab4b71fba79ba3c48

c. _Tolling_. In the event of a breach or violation by me of Sections 4 and/or 7 of this Agreement, the non-competition and non-solicitation periods appearing in Sections 4 and 7 shall be tolled (retroactive to the date such breach commenced) until such breach or violation has been duly cured.

d. _Modification_. If any provision or term in Sections 2, 4 and/or 7 of this Agreement is declared invalid or unenforceable by a court of competent jurisdiction, the invalid and unenforceable portion shall be reformed to the maximum time, geographic scope, activity-related restrictions and/or limitations permitted by applicable law, so as to be valid and enforceable.

e. _Definition of Restricted Period_. For purposes of this Agreement, the term **"Restricted Period"** shall mean the period commencing on the date of this Agreement and terminating on the first anniversary of the date on which my employment with the Company is terminated for any reason.

f. _Definition of Restricted Territory_. For purposes of this Agreement, the term **"Restricted Territory"** shall mean the United States and each other country, province, state, city or other political subdivision in which the Company carries on, had carried on the Business during the term of my employment and/or the Restricted Period.

9. **Representations and Covenants**

a. _As to Compliance_. I represent that as of the date of my execution of this Agreement, I am in full compliance with and have not breached any terms or conditions of this Agreement.

b. _As To Fulfillment of Terms_. I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement does not and will not breach any agreement with respect to intellectual property or to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment with the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith and will not use or incorporate into any Company product or service any intellectual property of any third party without the written consent of the Company following full disclosure.

c. _As To Intellectual Property_. I agree that, to the best of my knowledge, all work, or any part thereof, which I have delivered or may deliver to the Company does not, and will not, upon delivery to the Company, infringe upon any patent right, copyright, trade secret right or other intellectual property right of any third party. I hereby represent and warrant that I have not entered into any agreement or commitment with any third party which may affect the Company's title to such work or right to market and distribute such work.

d. _As To Non Disparagement_. I agree not to do anything, and not to make any oral or written statement to any person (including but not limited to any employee, client, customer, supplier, or vendor of the Company), that disparages or places in a false or negative light: (i) the Company; or (ii) any past or present officer, director, employee, representative,

Doc ID: 8e47cd7fee5758697bf9bd7ab4b71fba79ba3c48

PARO 00035

partner, investor, member, manager or similar business relation, or any product or service, of the Company. I further agree that I will not directly or indirectly cause or direct others to take any actions or make any statements that violate this provision.

10. **Legal and Equitable Remedies**. I acknowledge that the breach of this Agreement would cause substantial loss to the goodwill of the Company, and cause irreparable harm for which there is no adequate remedy at law. Further, because my services are personal and unique, because damages alone would not be an adequate remedy, and because I may have access to and become acquainted with the Confidential Information and Intellectual Property of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance, or other equitable relief, without having to post bond or prove actual damages, and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement, including, without limitation, money damages. I shall be liable to pay all costs, including reasonable attorneys' and experts' fees and expenses, that the Company may incur in enforcing or defending this Agreement, whether or not litigation is actually commenced and including litigation of any appeal taken or defended by the Company where the Company succeeds in enforcing any provision of this Agreement.

11. **General Provisions**.

a. <u>Governing Law; Consent to Personal Jurisdiction</u>. This Agreement will be governed by the laws of the State of Illinois. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in Chicago, Illinois for any lawsuit arising from or relating to this Agreement, and agree that such courts shall be the sole and exclusive venue for any such lawsuits (except with respect to post-judgment enforcement proceedings) filed by either party, in regard to claims or actions arising from or relating to this Agreement; provided, however, that nothing in this <u>Section 11(a)</u> shall restrict the Company from bringing a lawsuit in another venue to the extent the Company is also bringing a lawsuit against a third party who is not subject to jurisdiction in Chicago, Illinois.

b. <u>No Oral Modification or Waiver</u>. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed both by me and by a duly-authorized representative of the Company. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

c. <u>Severability</u>. Subject to the provisions of <u>Section 8(d)</u> hereof, if one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

d. <u>Successors and Assigns</u>. This Agreement (i) will be binding upon my heirs, executors, administrators and other legal representatives, and (ii) will inure to the benefit of and be binding upon the successors and assigns of the Company. I agree and acknowledge that I shall not have the right to assign any of my duties and obligations hereunder.

e. <u>Waiver of Jury Trial</u>. EACH PARTY HERETO HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS

Doc ID: 8e47cd7fee5758697bf9bd7ab4b71fba79ba3c48

PARO 00036

DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY ADDENDUM OR OTHER AGREEMENT WHICH, IN ANY WAY, ARISES OUT OF OR RELATES TO MY EMPLOYMENT WITH THE COMPANY OR ANY OTHER RELATIONSHIP BETWEEN MYSELF AND THE COMPANY.

       f.    <u>Survival</u>.  The provisions of this Agreement shall survive the termination of my employment with the Company and the assignment of this Agreement by the Company to any successor in interest or other assignee.

       g.    <u>Drafting and Construction</u>.  THE TERMS OF THIS AGREEMENT HAVE BEEN CONSIDERED AND NEGOTIATED BETWEEN THE PARTIES IN AN ARM'S LENGTH TRANSACTION, AND SHALL NOT BE CONSTRUED AGAINST EITHER PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.  Titles and headings to sections hereof are for the purpose of reference only and do not affect the provisions hereof or the rights or obligations of the parties hereto.

       h.    <u>Entire Agreement</u>.  This Agreement, together with Exhibit A hereto, sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions, representations and agreements made regarding the terms of my employment, whether written or oral.  I acknowledge and agree that I have not relied on any such prior discussions, representations or agreements in entering into this Agreement.

       i.    <u>Voluntary Nature of Agreement</u>.  I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE.  I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *I AM WAIVING MY RIGHT TO A JURY TRIAL*.  FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

       j.    <u>Affiliates</u>.  With respect to any of my obligations under this Agreement, I agree that I will cause any person or entity affiliated with me or that is under my control to comply with the terms of this Agreement as if such person or entity were a party hereto.

       k.    <u>Construction</u>.  As used herein, all provisions shall include the masculine, feminine, neuter, singular and plural thereof, wherever the context and facts require such construction.

       l.    <u>Counterparts</u>.  This Agreement may be executed and delivered in one or more counterparts (including by facsimile, e-mail, or other electronic transmission), each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

**[Signature Page Follows.]**

Doc ID: 8e47cd7fee5758697bf9bd7ab4b71fba79ba3c48

PARO 00037

**IN WITNESS WHEREOF**, the parties hereto have executed this Non-Competition, Non-Solicitation, Non-Disclosure and Invention Assignment Agreement voluntarily and of their own free act and deed, without any coercion, duress or undue influence, as follows:

Signed: *Luke Kohan*

Print Name:  Luke Kohan

Dated:  October          03   , 2012̲0̲


Agreed and Accepted:

THE COMPANY:

ADMIIN INC. d/b/a PARO INC.


By:

Name: Michael Burdick
Title:  Chief Executive Officer

Dated:  10 / 03 / 2020                , 201_

27341827.2

Doc ID: 8e47cd7fee5758697bf9bd7ab4b71fba79ba3c48

**Exhibit A**

**ADMIIN INC. d/b/a PARO INC.**
**LIST OF PRIOR INTELLECTUAL PROPERTY**
**AND ORIGINAL WORKS OF AUTHORSHIP**

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

_LK_ No inventions or improvements
____ Additional Sheets Attached
____ Due to confidentiality agreement(s) with prior employer(s), I cannot disclose certain
inventions that would otherwise be included on the above-described list.

Employee's Signature: *Luke Kohan*

Print Name: Luke Kohan

Dated: October 03 , 2012 0

A-1

27341827.2

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Non-Competition, Non-Solicitation, Non-Disclosure and... |
| **FILE NAME** | #27341827v2 - (Pa... Assignment .docx |
| **DOCUMENT ID** | 8e47cd7fee5758697bf9bd7ab4b71fba79ba3c48 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| ◉ **VIEWED** | **10 / 02 / 2020** 18:25:38 UTC | Viewed by - (lukekohan5@gmail.com) IP: 24.186.121.96 |
| ⤴ **SIGNED** | **10 / 03 / 2020** 19:41:23 UTC | Signed by - (lukekohan5@gmail.com) IP: 24.186.121.96 |
| ⊘ **COMPLETED** | **10 / 03 / 2020** 19:41:23 UTC | The document has been completed. |

Powered by **HELLOSIGN**

PARO 00040

# Exhibit 4

Paro- 00042

Hi Katrina -

This email is to inform Paro that I have put in my 2 weeks notice as of this morning, February 27. While it has been arguably the most rewarding 2 years of my life, both personally & professionally, it is time for me to explore other career opportunities. I am incredibly thankful for my time with Paro, and wish the organization continued success.

Separately, I have informed Alex & Chad that I would like to have as big of an impact as I can over the next 2 weeks, in terms of off-boarding my book to other reps, continued mentorship for those in need, and ensuring Paro is set up for success upon my departure.

Please let me know what additional information you'll need from me in order to formalize things. Thanks very much and have a great start to the week.

Best --

—
**Luke Kohan**
**Paro** | Senior Account Executive (Outbound 3)

phone **773 466 8534**
email **Luke@paro.ai** 
website **paro.ai**

P⚲RO



# Exhibit 5

Kohan-00001-000018

**OPERATING AGREEMENT**
**OF**
**FIRMKEY SOLUTIONS LLC**

**[A Board-Managed Limited Liability Company]**

This Operating Agreement ("Agreement") is executed by the Members of FirmKey Solutions LLC, a Minnesota limited liability company (the "Company"), effective as of the 20th day of February, 2023, to provide for the governance and management of the Company, including the relations among the Members of the Company and between the Members and the Company. This Agreement may not be amended without the consent of sixty-seven percent (67%) or more of the Voting Power of the Members.

**ARTICLE I**
**DEFINITIONS**

1.1     Act. "Act" means the Minnesota Revised Uniform Limited Liability Act which is codified as Minnesota Statutes chapter 322C, including any amendments thereof from time to time.

1.2     Agreed Value. "Agreed Value" has the meaning set forth in paragraph 4.8.1.

1.3     Articles of Organization. "Articles of Organization" means the Articles of Organization which were filed with the Minnesota Secretary of State to form the Company under the Act, including any subsequent amendment or restatement of such articles.

1.4     Authenticated Electronic Communication. "Authenticated Electronic Communication" means any form of communication, not directly involving the physical transmission of paper, that: (i) creates a Record that may be retained, retrieved and reviewed by the recipient of the communication; (ii) may be directly reproduced in paper form by the recipient through an automated process; and (iii) sets forth information from which the recipient can reasonably conclude that the communication was sent by the purported sender.

1.5     Available Cash. "Available Cash" means all net revenues from the Company's operations, including net proceeds from all sales, refinancing, and other dispositions of Company assets, in excess of the amount reasonably necessary for the operating needs of the Company, including capital improvements, debt reduction, and operating reserves.

1.6     Board. "Board" means the Board of Directors.

1.7     Code. "Code" means the Internal Revenue Code of 1986, including any amendments thereof from time to time.

1.8     Contact Information. "Contact Information" means the name, mailing address, email address, and telephone number of a Person.

1.9     Contribution. "Contribution" means any tangible or intangible property or other benefit, including money, services performed, a contract to perform services, or promissory notes provided by a Person to the Company in order to become a Member of the Company, or by a Member of the Company in accordance with this Agreement (or other agreement between the Member and the Company).

1.10    Director. "Director" means a Natural Person who is serving on the Board.

1

1.11    Dissociated Member. "Dissociated Member" means a Member who has withdrawn as a Member, been expelled as a Member, or otherwise become dissociated from the Company as provided in Article V hereof.

1.12    Dissociation. "Dissociation" means a withdrawal by a Member, an expulsion of a Member, or other event causing a Person to become a Dissociated Member as provided in Article V hereof.

1.13    Distribution. "Distribution" means a transfer of money or other property from the Company to a Person on account of a Transferable Interest.

1.14    Encumber. "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.15    Encumbrance. "Encumbrance" means, with respect to any Transferable Interest, or any part thereof, a mortgage, pledge, security interest, lien, or proxy coupled with an interest, option, or preferential right to purchase.

1.16    Involuntary Transfer. "Involuntary Transfer" means any Transfer or Encumbrance of a Transferable Interest, or any part thereof, by operation of law, court order, dissolution of a marriage, assignment for the benefit of creditors, foreclosure of a mortgage or security interest, execution of a judgment or other legal process, including a purported Transfer to or from a trustee in bankruptcy or receiver.

1.17    Member. "Member" means a Person that has become a Member of the Company as provided in paragraph 2.2 hereof and has not become a Dissociated Member.

1.18    Natural Person. "Natural Person" means a Person who is an individual.

1.19    Notice. "Notice" may be given to a Person, by manual delivery, by United States mail, or by Authenticated Electronic Communication directed to the Person's Contact Information. Notice given by manual delivery or by Authenticated Electronic Communication shall be effective immediately. Notice given by United States mail shall be effective when the same is properly addressed to the intended recipient and deposited in a United States mailbox with postage prepaid.

1.20    Officer. "Officer" means a Natural Person who has been appointed as Chief Executive Officer, President, Chief Operating Officer, Chief Financial Officer, Treasurer or Secretary of the Company as provided in Article VIII hereof.

1.21    Official Capacity. "Official Capacity" means (i) serving as a Director or as an Officer of this Company or (ii) serving at the request of the Company as a director, officer, partner, trustee, governor, manager, employee, or agent of another organization or employee benefit plan.

1.22    Organizer. "Organizer" means the Natural Person who signed and filed with the Minnesota Secretary of State the Articles of Organization to form this Company.

1.23    Person. "Person" includes an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, public benefit corporation, governmental unit or agency, or other legal entity.

1.24    Personal Representative. "Personal Representative" means the Person duly serving as the personal representative or executor of the estate of a deceased Member.

1.25    Record. "Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

1.26     Remote Communication. "Remote Communication" means electronic communication, conference telephone, video conference, the Internet, or such other means by which Members not physically present in the same location may communicate with each other on a substantially simultaneous basis.

1.27     Taxable Income. "Taxable Income" shall be determined in accordance with Section 703 of the Code.

1.28     Tax Matters Partner. "Tax Matters Partner" shall have the meaning set forth in Section 6231(a)(7) of the Code.

1.29     Transfer. "Transfer" means any sale, gift, or other disposition of a Transferable Interest, or any part thereof, including an Encumbrance, an Involuntary Transfer, or a Voluntary Transfer.

1.30     Transferable Interest. "Transferable Interest" means the right, as originally associated with a Person's capacity as a Member, to receive Distributions from the Company in accordance with this Agreement, whether or not the Person remains a Member or continues to own any part of such right. A Transferable Interest may be evidenced by a certificate issued by the Company in a Record, and subject to the limitations set forth in Article IV hereof, may be transferred.

1.31     Transferee. "Transferee" means a Person to which a Transferable Interest has been transferred. A Transferee shall not be deemed to be a Member unless such Transferee becomes a Member pursuant to paragraph 2.2 hereof.

1.32     Transferring Member. "Transferring Member" means a Member that proposes to Encumber or Transfer a Transferable Interest pursuant to a Voluntary Transfer, whose employment is terminated, or whose Transferable Interest has been Encumbered or Transferred pursuant to an Involuntary Transfer.

1.33     Triggering Event. "Triggering Event" means: (i) the effective date of a Dissociation as provided in Article V hereof; (ii) the date that a Member who is a Natural Person and who is employed by the Company terminates his or her employment with the Company, whether voluntarily or involuntarily; (iii) the date that a Transferring Member gives Notice of a Voluntary Transfer as provided in paragraph 4.5 hereof; or (iv) the date that a Transferee gives Notice of an Involuntary Transfer as provided in paragraph 4.6 hereof.

1.34     Valuation Agreement. "Valuation Agreement" means an agreement signed by a majority of the Directors in the form attached hereto with respect to the value of a Transferable Interest.

1.35     Voluntary Transfer. "Voluntary Transfer" means any Encumbrance or Transfer of a Transferable Interest, or any part thereof, excluding: (i) any Transfer by reason of the death of a Member who is a natural Person; (ii) any Involuntary Transfer; and (iii) any Dissociation.

1.36     Voting Power of the Members. "Voting Power of the Members" is allocated among the Members in proportion to the value of each Member's Contributions.

## ARTICLE II
## MEMBERS

2.1     Management of the Company. Except as otherwise provided in this Agreement, or in the Act, Members shall not participate in the management of the Company.

2.2     Becoming a Member. A Person shall not become a Member of the Company, or acquire a Transferable Interest, unless and until the Person has been accepted as a Member by the Board (or by the Organizer if the Board has not been established).

3

2.3     Required Contributions. Effective as of June 3, 2020, the Members shall be required to make initial Contributions into the Company as follows: Luke B. Kohan – Three Thousand and 00/100 Dollars ($3,000.00), Joseph M. Hamilton – Three Thousand and 00/100 Dollars ($3,000.00), and Samuel R. Harrison – Three Thousand and 00/100 Dollars ($3,000.00). Thereafter, no additional Contributions shall be accepted and required, and no Transferable Interests shall be granted by the Member(s), without the consent of at least sixty-seven percent (67%) of the Voting Power of the Members. Should additional Contributions be made, a statement of such contributions shall be prepared and retained among the Company's legal records. If a Member fails to make a required Contribution by December 31 of a calendar year in which the Members properly agree to make additional Contributions, then effective January 1 of the following calendar year, the Transferable Interests and Voting Power of the Members shall be adjusted amongst the Members based in proportion to the Member Capital accounts on said January 1.

2.4     Assent to Operating Agreement. A Person who becomes a Member of the Company is deemed to have assented to this Agreement.

2.5     Liability of Members. The debts, obligations, or other liabilities of the Company, whether arising in contract, tort, or otherwise, are solely the debts, obligations, or other liabilities of the Company, and do not become the debts, obligations, or other liabilities of a Member solely by reason of the Member acting as or being a Member.

2.6     No Automatic Agency. A Member is not an agent of the Company solely by reason of being a Member.

2.7     Right to Information. A Member shall have the right to information concerning the activities of the Company as follows:

2.7.1     During regular business hours and at a reasonable location specified by the Company, a Member may obtain from the Company and inspect and copy full information regarding the activities, financial condition, and other circumstances of the Company as is just and reasonable if: (i) the Member seeks the information for a purpose material to the Member's interest as a Member; (ii) the Member makes a demand in a Record received by the Company, describing with reasonable particularity the information sought and the purpose for seeking the information; and (iii) the information sought is directly connected to the Member's purpose. Within ten (10) days after receiving a demand from a Member, the Company shall notify the Member of when and where the Company will provide the information, and if the Company declines to provide the demanded information, the reasons for declining to provide the information.

2.7.2     Whenever this Agreement or the Act provides for a Member to give or withhold consent to a matter, before the consent is given or withheld, the Company shall, without demand, provide the Member with all information that is known to the Company and is material to the Member's decision.

2.7.3     On ten (10) days' demand to the Company made in a Record, a Dissociated Member may have access to information to which the Person was entitled while a Member if the information pertains to the period during which the Person was a Member and the Person seeks the information in good faith. Within ten (10) days after receiving the demand, the Company shall in a Record inform the Dissociated Member: (i) of the information that the Company will provide in response to the demand; (ii) when and where the Company will provide the information; and (iii) if the Company declines to provide any demanded information, the Company's reasons for declining.

2.7.4     The Company may charge reasonable costs of labor and material in copying the information demanded by a Member or Dissociated Member.

4

2.7.5    The Company may adopt reasonable restrictions and conditions on access to and use of information to be furnished to Members and Dissociated Members, including designating information as confidential and imposing nondisclosure and safeguarding obligations on the recipient.

2.7.6    A Member or Dissociated Member may exercise the rights provided in this paragraph through an agent or, in the case of a Natural Person under legal disability, a legal representative. Any restriction or condition imposed by this Agreement or by the Company apply both to the agent or legal representative and the Member or Dissociated Member.

2.8    <u>Distributions</u>. Distributions shall be allocated among Members and Dissociated Members in proportion to the value of the Contributions made by each Member and Dissociated Member. To the extent permitted under the Act, the Company shall make Distributions in an amount that does not exceed the Company's Available Cash.

2.9    <u>Compensation</u>. Members may be compensated for their services performed for or on behalf of the Company to the extent determined by sixty-seven percent (67%) or more of the Voting Power of the Members.

2.10    <u>Duty of Good Faith and Fair Dealing</u>. A Member shall discharge the Member's duties and exercise the Member's rights under this Agreement and the Act in a manner which is consistent with the contractual obligation of good faith and fair dealing, including acting in a manner that is honest, fair, and reasonable.

## ARTICLE III
## MEETINGS OF MEMBERS

3.1    <u>Regular Meetings of Members</u>. The Company shall hold regular meetings of Members at such times and at such locations as may be determined by the Members.

3.2    <u>Special Meetings of Members</u>. A Member may demand a special meeting of the Members to take action requiring consent of Members under this Agreement or the Act upon not less than twenty (20) days' Notice to all Members in a Record setting forth the date and time of the meeting. Any meeting held upon demand of a Member shall be held at the Company's principal place of business or by Remote Communication.

3.3    <u>Meetings by Remote Communication</u>. Meetings of Members may be conducted solely by one or more means of Remote Communication if the same Notice is given of the meeting as would be required by this Agreement for a meeting, and if the number of Members participating in the meeting would be sufficient to constitute a quorum at a meeting. Participation in a meeting by Remote Communications shall constitute presence at the meeting.

3.4    <u>Written Action</u>. Any action required or permitted to be taken at a meeting of the Members may be taken by written action signed, or consented to by Authenticated Electronic Communication, by the Voting Power of the Members required to take the same action at a meeting of the Members at which all Members were present. The written action is effective when signed, or consented to by Authenticated Electronic Communication, by the required Voting Power of the Members, unless a different effective date is provided in the written action. When written action is taken by less than all of the Members, all Members shall be notified immediately of its text and effective date, except that failure to provide such Notice does not invalidate the written action.

3.5    <u>Quorum</u>. At least sixty-seven percent (67%) of the Voting Power of the Members present at a duly called meeting is a quorum for the transaction of business. If Members holding Voting Power of at least thirty-three percent (33%) withdraw from such meeting, then no further business shall be transacted at the meeting and the meeting shall be adjourned.

3.6     Waiver of Notice of Meeting. A Member may orally, or in writing, waive Notice of a meeting of the Members before, at or after such meeting. Attendance by a Member at a meeting of the Members is also a waiver of Notice of such meeting, except where the Member objects at the beginning of the meeting to the transaction of business because the meeting allegedly is not lawfully called or convened and does not participate thereafter in the meeting.

3.7     Proxies. A Member may vote by proxy by filing an appointment of proxy with the Company at or before the meeting at which the appointment is to be effective. Proxies may be filed in writing or by Authenticated Electronic Communication.

3.8     Acts of the Members. The Members shall take action agreed to by sixty-seven percent (67%) or more of the Voting Power of the Members.

### ARTICLE IV
### TRANSFERABLE INTERESTS

4.1     Prohibition. A Member may not Encumber or Transfer a Transferable Interest, or any part thereof, except pursuant to this Agreement, or with the approval of the Board.

4.2     Transfers to Trusts. A Member who is a natural Person shall be allowed to Transfer the Member's Transferable Interest to a revocable trust without the consent of the Company provided: (i) the Member is the settlor and sole trustee of such Trust; and (ii) such Interest remains subject to all the terms of this Agreement.

4.3     Death of a Member Who is a Natural Person. In the event of the death of a Member who is a Natural Person, the Personal Representative of the deceased Member's Estate shall give Notice to the Company.

4.3.1     The Notice shall identify: (i) the name and date of death of the deceased Member; and (ii) the Contact Information for the Personal Representative.

4.3.2     Upon receiving such Notice, the Company shall have the option, exercisable within thirty (30) days following receipt of such Notice, to purchase the Transferable Interest of the deceased Member, for the price and upon other terms hereinafter provided.

4.3.3     If the Company does not exercise its option to purchase the Transferable Interests of the deceased Member, then the Personal Representative shall be entitled to Transfer the Transferable Interest of the deceased Member as provided by law.

4.4     Termination of Employment of a Member Who is a Natural Person. If a Member's employment by the Company is voluntarily or involuntarily terminated for any reason, other than death, the Company shall have the option, exercisable within thirty (30) days following such termination of employment, to purchase the Transferable Interest of the Member for the price and upon other terms hereinafter provided. If the Company does not exercise its option to purchase the Transferable Interests of the Transferring Member, then the Transferring Member shall be entitled to retain ownership of the Transferable Interest, and the Member's Transferable Interest shall remain subject to this Agreement.

4.5     Voluntary Transfers. A Transferring Member shall give Notice to the Company of a proposed Voluntary Transfer by such Member.

4.5.1     The Notice shall identify: (i) the Contact Information of the proposed Transferee; (ii) the amount of the consideration to be paid by the Transferee, if any; and (iii) the other terms of the Transfer.

4.5.2    The Company shall have the option, exercisable within thirty (30) days following receipt of such Notice, to purchase the Transferable Interest of the Member, for the price and upon other terms hereinafter provided.

4.5.3    If the Company does not exercise its option to purchase the Transferable Interests of the Transferring Member, then the Transferring Member shall be entitled to Transfer the Transferable Interest to the proposed Transferee pursuant to the precise terms, and under the precise conditions set forth in the Notice to the Board. Such sale shall be completed within sixty (60) days after the expiration of the period for the Company to elect to purchase the Transferable Interest of the Transferring Member, or the Transferring Member's right to sell such Transferable Interest shall lapse and the Transferable Interest shall remain subject to this Agreement.

4.6    Involuntary Transfers. In the event a Transferee acquires the Transferable Interest of a Member pursuant to an Involuntary Transfer, the Transferee shall immediately give Notice to the Company.

4.6.1    The Notice shall include: (i) Contact Information of the Transferee; (ii) the name of the Transferring Member; and (iii) a description of the transaction by which the Transferee acquired the Transferable Interest.

4.6.2    The Company shall have the option, exercisable within thirty (30) days following receipt of such Notice, to purchase the Transferable Interest acquired by the Transferee for the price and upon the other terms hereinafter provided.

4.6.3    If the Company does not exercise its option to purchase the Transferable Interest acquired by the Transferee, then the Transferee may retain the Transferable Interest.

4.7    Dissociations. In the event a Transferee acquires the Transferable Interest of a Member pursuant to a Dissociation, the Transferee shall immediately give Notice to the Company.

4.7.1    The Notice shall include: (i) Contact Information of the Transferee; (ii) the name of the Dissociated Member; and (iii) a description of the transaction by which the Transferee acquired the Transferable Interest.

4.7.2    The Company shall have the option, exercisable within thirty (30) days following receipt of such Notice, to purchase the Transferable Interest acquired by the Transferee for the price and upon the other terms hereinafter provided.

4.7.3    If the Company does not exercise its option to purchase the Transferable Interest acquired by the Transferee, then the Transferee may retain the Transferable Interest.

4.8    Purchase Price of Transferable Interests. The purchase price for a Transferable Interest shall be the Agreed Value as set forth in a Valuation Agreement, which may be amended by the Member's from time to time.

4.8.1    If the date of the most recent Valuation Agreement is not based upon a Member's capital account and was agreed to more than eighteen (18) months before the Triggering Event, then the purchase price for a Transferable Interest shall be determined by the agreement of the Company, the Personal Representative (in the case of a deceased Member), the Transferring Member (in the case of a Voluntary Transfer), and the Transferee (in the case of an Involuntary Transfer or Dissociation), as the case may be.

4.8.2    If the parties are unable to reach unanimous agreement as to the purchase price for a Transferable Interest within thirty (30) days following a Triggering Event, the value of the

Transferable Interest shall be determined by appraisal. Within forty-five (45) days following a Triggering Event, the Company and the Personal Representative, the Transferring Member, or the Transferee, as the case may be, shall each select one appraiser and the two appraisers so selected shall agree upon a third appraiser. The appraisers shall be instructed not to give any consideration to the fact that the Transferable Interest being valued may be more or less than a majority of the outstanding Transferable Interests or that the Transferable Interest being valued is not readily transferable. The decision of a majority of the three (3) appraisers as to the value of the Transferable Interest shall be binding upon the parties.

4.9     Closing and Payment of the Purchase Price. The closing shall take place at a time and place to be determined by the Company; provided, however, that such closing must take place within one-hundred twenty (120) days following the Triggering Event, or within thirty (30) days following the determination of the value of the Transferable Interest under paragraph 4.8, whichever is later.

4.9.1     The Company shall pay the purchase price for the Transferable Interest in five equal payments, without interest, with the first payment at closing and the remaining four equal payments over four years on each anniversary date of the closing.

4.9.2     At the closing, the Personal Representative, the Transferring Member, or the Transferee, whichever is applicable, shall deliver to the Company such instruments as are necessary and proper to terminate the Transferable Interest being sold.

## ARTICLE V
## DISSOCIATION OF A MEMBER

5.1     Power to Voluntarily Withdraw. A Person has the power to dissociate and withdraw as a Member at any time by giving Notice to the Company. The withdrawal shall be effective as of the date the Company receives Notice of the withdrawal unless a later date is specified in the Notice.

5.2     Expulsion by the Members. A Person may be expelled as a Member by the unanimous consent of the other Members if:

5.2.1     It is unlawful to carry on the Company's activities with the Person as a Member;

5.2.2     There has been a Transfer of the Person's Transferable Interest in the Company, other than a Transfer for security purposes or a charging order which has not been foreclosed;

5.2.3     The Person is a corporation and, within ninety (90) days after the Company notifies the Person that it will be expelled as a Member because the Person has filed a certificate of dissolution or the equivalent, the Person's charter has been revoked, or its right to conduct business has been suspended by the jurisdiction of its incorporation, the certificate of dissolution has not been revoked or the Person's charter or right to conduct business has not been reinstated; or

5.2.4     The Person is a limited liability company or partnership that has been dissolved and whose business is being wound up.

5.3     Expulsion by Court Order. On application by the Company, a Person may be expelled as a Member by judicial order because the Person:

5.3.1     Has engaged, or is engaging, in wrongful conduct that has adversely and materially affected, or will adversely and materially affect, the Company's activities;

8

5.3.2    Has willfully or persistently committed, or is willfully and persistently committing, a material breach of this Agreement; or

5.3.3    Has engaged, or is engaging, in conduct relating to the Company's activities which makes it not reasonably practicable to carry on the activities with the Person as a Member.

5.4    <u>Dissociation of a Member who is a Natural Person</u>. A Natural Person becomes a Dissociated Member if:

5.4.1    The Person dies;

5.4.2    A guardian or general conservator for the Person is appointed; or

5.4.3    There is a judicial order finding that the Person has otherwise become incapable of performing the Person's duties under this Agreement or the Act.

5.5    <u>Other Events Causing Dissociation</u>. A Person becomes a Dissociated Member:

5.5.1    If the Person becomes a debtor in bankruptcy;

5.5.2    If the Person executes an assignment for the benefit of creditors;

5.5.3    If the Person seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the person or of all or substantially all of the Person's property;

5.5.4    In the case of a Person that is a trust or is acting as a Member by virtue of being a trustee of a trust, the trust's entire transferable interest in the Company is distributed;

5.5.5    In the case of a Person that is an estate or is acting as a Member by virtue of being a Personal Representative, the estate's entire Transferable Interest in the Company is distributed;

5.5.6    The Company participates in a merger in compliance with the requirements of the Act, and: (i) the Company is not the surviving entity; or (ii) as a result of the merger, the Person ceases to be a Member;

5.5.7    The Company participates in a conversion in compliance with the requirements of the Act;

5.5.8    The Company participates in a domestication in compliance with the requirements of the Act, and as a result of the domestication, the Person ceases to be a Member; or

5.5.9    The Company terminates its existence.

5.6    <u>Wrongful Dissociation</u>. A Person's dissociation is wrongful only if the dissociation is in breach of an express provision of this Agreement, or occurs before the termination of the Company, and:

5.6.1    The Person withdraws as a Member by express will;

5.6.2    The Person is expelled as a Member by judicial order under paragraph 5.3;

5.6.3    The Person is dissociated under paragraph 5.5.1 by becoming a debtor in bankruptcy; or

9

5.6.4    In the case of a Person that is not a trust other than a business trust, an estate, or a Natural Person, the Person is expelled or otherwise dissociated as a Member because it willfully dissolved or terminated.

A Person that wrongfully dissociates as a Member is liable to the Company and the other Members for damages caused by the dissociation to the extent provided in the Act. The liability is in addition to any other debt, obligation, or other liability of the Member to the Company or the other Members.

5.7    Effect of Person's Dissociation as a Member. When a Person becomes a Dissociated Member:

5.7.1    The Person's right to participate as a Member in the management and conduct of the Company's activities terminates;

5.7.2    Except as otherwise provided in this Agreement or in the Act, any Transferable Interest owned by the Person immediately before Dissociation in the Person's capacity as a Member, is owned by the Person following such Dissociation solely as a Transferee;

5.7.3    The Company shall have the option to purchase the Transferable Interest of the Dissociated Member from the Transferee as provided in paragraph 4.7 hereof; and

5.7.5    The Person's Dissociation does not of itself discharge the Person from any debt, obligation, or other liability to the Company or the other Members that the Person incurred while a Member.

## ARTICLE VI
## BOARD OF DIRECTORS

6.1    Management. The activities and affairs of the Company are to be managed by or under the direction of a Board of Directors elected by the affirmative vote of sixty-seven percent (67%) or more of the Voting Power of the Members.

6.2    Qualifications of Directors. Directors must be Natural Persons. Directors need not be Members, except that the Dissociation of a Member who is also a Director disqualifies the Person from serving as a Director.

6.3    Number of Directors. The Board shall consist of at least one (1) Director, with the actual number of Directors to be decided from time to time by the Members.

6.4    Terms. A Director shall serve for a term of three (3) years and until a successor is elected and has qualified, or until the earlier death, resignation, removal, or disqualification of the Director.

6.5    Resignation. A Director may resign at any time by mailing or delivering written notice to the Company at its registered office. Said resignation is effective without acceptance when the notice is given to the Company, unless a later effective time is specified in the notice.

6.6    Removal. A Director may be removed at any time, with or without cause, by the affirmative vote of a majority of the Members.

6.7    Vacancies. When a vacancy on the Board occurs, the Company shall provide all Members Notice of the vacancy and the cause of the vacancy. Within thirty (30) days of the date of the Notice, the Members may fill the vacancy by the affirmative vote of a majority of the Members. If the

vacancy is not filled by the Members, the vacancy may be filled by the affirmative vote of a majority of the remaining Directors, even though less than a quorum.

6.8     No Automatic Agency. A Director is not an agent of the Company solely by reason of serving on the Board.

6.9     Right to Information. A Director shall have the right to information concerning the activities of the Company as follows:

6.9.1     On reasonable Notice, a Director may inspect and copy during regular business hours, at a reasonable location specified by the Company, any Record maintained by the Company regarding the Company's activities, financial condition, and other circumstances, to the extent the information is material to the Director's rights and duties under this Agreement or the Act.

6.9.2     The Company shall furnish to each Director, without demand, any information concerning the Company's activities, financial condition, and other circumstances which the Company knows and is material to the proper exercise of the Director's rights and duties under this Agreement or the Act, except to the extent the Company can establish that it reasonably believes the Director already knows the information. The duty imposed by this subparagraph applies to each Director to the extent the Director knows any of such information.

6.9.3     The Company shall furnish to each Director, on demand, any other information concerning the Company's activities, financial condition, and other circumstances, except to the extent the demand or information demanded is unreasonable or otherwise improper under the circumstances. The duty imposed by this subparagraph applies to each Director to the extent the Director knows any of such information.

6.9.4     The Company may charge reasonable costs of labor and material in copying the information demanded by a Director.

6.9.5     The Members or the Board may adopt reasonable restrictions and conditions on access to and use of information to be furnished to Directors, including designating information as confidential and imposing nondisclosure and safeguarding obligations on the recipient.

6.11     Compensation. Directors may be compensated for their services performed for or on behalf of the Company to the extent determined by the Members.

6.12     Duty of Loyalty. A Director owes to the Company and the Members the duty:

6.12.1     To account to the Company and to hold as trustee for it any property, profit, or benefit derived by the Director: (i) in the conduct or winding up of the Company's activities; (ii) from a use by the Director of the Company's property; or (iii) from the appropriation of a Company opportunity;

6.12.2     To refrain from dealing with the Company in the conduct or winding up of the Company's activities as or on behalf of a Person having an interest adverse to the Company; and

6.12.3     To refrain from competing with the Company in the conduct of the Company's activities before the dissolution of the Company.

The Members may, by unanimous action, authorize or ratify, after full disclosure of all material facts, a specific act or transaction that otherwise would violate this paragraph.

11

6.13     Duty of Care. A Director is to act in the conduct and winding up of the Company's activities with the care that a Person in a like position would reasonably exercise under similar circumstances, and in a manner the Director reasonably believes to be in the best interests of the Company. In discharging this duty, a Director may rely in good faith on opinions, reports, statements, or other information provided by another Person that the Director reasonably believes is a competent and reliable source for the information.

6.14     Duty of Good Faith and Fair Dealing. A Director shall discharge the Director's duties and exercise the Member's rights under this Agreement and the Act in a manner which is consistent with the contractual obligation of good faith and fair dealing, including acting in a manner that is honest, fair, and reasonable.

6.15     Committees. The Board may establish one or more committees having the authority of the Board in the management of the business and affairs of the Company. A committee may consist of one or more Natural Persons, who need not be Directors. A majority of the members of a committee is a quorum for the transaction of business. Minutes, if any, of committee meetings shall be made available upon request to other members of the committee and to any Director.

## ARTICLE VII
## MEETINGS OF THE BOARD

7.1     Regular Meetings of the Board. The Board shall hold regular meetings at such times and at such locations as may be determined by the Board.

7.2     Special Meetings of Board. A Director may demand a special meeting of the Board upon not less than ten (10) days' Notice to all Directors in a Record setting forth the date and time of the meeting. Any meeting held upon demand of a Director shall be held at the Company's principal place of business or by Remote Communication.

7.3     Location of Meetings. Meetings of the Board may be held from time to time at any place within or without the State of Minnesota that the Board may select. If the Board fails to select a place for a meeting, the meeting shall be held at the Company's principal place of business.

7.4     Meetings by Remote Communication. Meetings of the Board may be conducted solely by one or more means of Remote Communication if the same Notice is given of the meeting as would be required by this Agreement for a meeting, and if the number of Directors participating in the meeting would be sufficient to constitute a quorum at a meeting. Participation in a meeting by Remote Communications shall constitute presence at the meeting.

7.5     Written Action. Any action required or permitted to be taken at a meeting of the Board may be taken by written action signed, or consented to by Authenticated Electronic Communication, by the number of Directors required to take the same action at a meeting of the Board at which all Directors were present. The written action is effective when signed, or consented to by Authenticated Electronic Communication, by the required number of Directors, unless a different effective date is provided in the written action. When written action is taken by less than all of the Members, all Members shall be notified immediately of its text and effective date, except that failure to provide such Notice does not invalidate the written action.

7.6     Notice of Meetings. A Director may call a meeting of the Board of Directors by giving ten (10) days' Notice to all Directors of the date, time, and place of the meeting. If the date, time, and place of a meeting of the Board have been announced at a previous meeting of the Board of Directors, no additional notice of such meeting is required. Notice of a meeting of the Board of Directors need not state the purposes of the meeting.

7.7     Waiver of Notice of Meeting. A Director may orally or in writing waive notice of a meeting of the Board of Directors before, at or after such meeting. Attendance by a Director at a meeting of the Board of Directors is also a waiver of notice of such meeting, except where the Director objects at the beginning of the meeting to the transaction of business because the meeting allegedly is not lawfully called or convened and does not participate thereafter in the meeting.

7.8     Quorum. A majority of the Directors present at a duly called meeting is a quorum for the transaction of business.  If a Director who was present when such meeting was called withdraws from such meeting, then no further business shall be transacted at the meeting and the meeting shall be adjourned.

7.9     Number of Directors Required to Take Action. Except where a larger proportion or number is required by this Agreement or the Act, the Board may take action by the affirmative vote of a majority of the Directors present at a duly held meeting.

## ARTICLE VIII
## OFFICERS

8.1     Chair. The Board may elect one of the Directors to be "Chair," who shall preside at all meetings of the Board of Directors and at all meetings of the Members.

8.2     Chief Executive Officer. The Board may designate a Natural Person as "President," "Chief Executive Officer," "CEO," "Principal" or another title of similar import, who shall:

8.2.1   Serve as an agent of the Company at the will of the Board, without prejudice to any rights the Person may have under a contract with the Company;

8.2.2   Have general active management of the business of the Company, subject to the supervision and control of the Board;

8.2.3   See that all orders and resolutions of the Board are carried into effect;

8.2.4   Sign and deliver in the name of the Company any deeds, mortgages, bonds, contracts, or other instruments pertaining to the business of the Company, except in cases in which the authority to sign and deliver is required by law to be exercised by another person or is expressly delegated by the Board to some other Person;

8.2.5   Maintain records of and, whenever necessary, certify all proceedings of the Board and the Members; and

8.2.6   Perform other duties prescribed by the Board.

8.3     Chief Financial Officer. The Board may designate a Natural Person as "Treasurer," "Chief Financial Officer," "CFO," "Principal" or another title of similar import, who shall:

8.34.1  Serve as an agent of the Company at the will of the Board, without prejudice to any rights the Person may have under a contract with the Company;

8.3.2   Keep accurate financial records for the Company;

8.3.3   Deposit all money, drafts, and checks in the name of and to the credit of the Company in the banks and depositories designated by the Board;

8.3.4   Endorse for deposit all notes, checks, and drafts received by the Company as ordered by the Board, making proper vouchers for the Board;

8.3.5    Disburse Company funds and issue checks and drafts in the name of the Company, as directed by the Board;

8.3.6    Give to the Chief Executive Officer and the Board, whenever requested (i) an account of all transactions by the Chief Financial Officer, and (ii) an account of the financial condition of the Company; and

8.3.7    Perform other duties prescribed by the Board or by the Chief Executive Officer.

## ARTICLE IX
## FINANCIAL AND TAX MATTERS

9.1    Books and Records. The Company's books and records will be kept in accordance with generally accepted accounting principles, consistently applied, and will reflect all Company transactions and be appropriate and adequate for all Company business. The Company books will be kept on a fiscal year ending December 31st. The Company's records will be maintained at a place agreed to by the Members.

9.2    Single Member. If at any time the Company has only one Member, the Company shall be deemed to be a "disregarded entity" under Treasury Regulation § 301.7701-2(c)(2).

9.3    Accounting as a Partnership. If at any time the Company has two (2) or more Members, the Company will be treated as a "partnership" for federal and state tax purposes in accordance with Treasury Regulation § 301.7701-3(f)(2).

9.3.1    Within ninety (90) days after the end of each Fiscal Year, the Company will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, a Form K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of such Member's federal and state income tax (or information) returns, including a statement showing such Member's share of income, gain or loss, and credits for the Fiscal Year.

9.3.2    The Company will establish and maintain a capital account for each Member as required by Treasury Regulation § 1.704-1(b)(2)(iv).

9.3.3    The Board shall designate a Director to serve as the Tax Matters Partner.

## ARTICLE X
## DISSOLUTION AND WINDING UP

10.1    Causes for Dissolution. The Company will be dissolved upon the affirmative vote of a majority of the Transferable Interests of the Company. The death, disability, or bankruptcy of a Member shall not cause the dissolution of the Company.

10.2    Winding-Up. Upon its dissolution, the Company will dissolve and the Board will immediately commence to wind up its affairs.

10.3    Profits and Losses. The Members will continue to share in profits and losses during liquidation in the same manner and proportions as they did before dissolution.

10.4    Sale of Assets. The Company's assets may be sold, if a price deemed reasonable by the Members may be obtained. The proceeds from liquidation of the Company's assets will be applied as follows:

10.4.1   First, all of the Company's debts and liabilities to Persons other than Members will be paid and discharged in the order of priority as provided by law;

10.4.2   Second, all of the Company's debts and liabilities to Members will be paid and discharged in the order of priority as provided by law; and

10.4.3   Third, all remaining assets will be distributed proportionately among the Members in proportion to their Transferable Interests.

10.5   <u>Gain or Loss</u>. Any gain or loss on the disposition of any assets of the Company in the process of liquidation will be credited or charged to the Members in proportion to their Transferable Interests; provided, however, that gain or loss with respect to property contributed to the Company by a Member will be shared among the Members so as to take into account any variation between the basis of the property so contributed and its fair market value at the time of Contribution, in accordance with any applicable Treasury regulations. Any property distributed in kind in the liquidation will be valued and treated as though it were sold and the cash proceeds distributed. The difference between the value of property distributed in kind and its book value will be treated as a gain or loss on the sale of property and will be credited or charged to the Members accordingly.

10.6   <u>Members' Rights to Payments</u>. The Members will look solely to the Company's assets for the payment of any debts or liabilities owed by the Company to the Members and for the return of their capital contributions and liquidation amounts. If the Company property remaining after the payment or discharge of all of its debts and liabilities to Persons other than Members is insufficient to return the Members' capital contributions, the Members will have no recourse therefor against the Company or any other Members, except to the extent that such other Members may have outstanding debts or obligations owing to the Company.

## ARTICLE XI
## INDEMNIFICATION

To the extent permitted by law, any Natural Person who was or is a party or is threatened to be made a party to any proceeding, wherever and by whomever brought, by reason of his or her former or present Official Capacity, shall be indemnified by this Company against expenses, including attorneys' fees, judgments, fines, and amounts paid in settlement actually and reasonably incurred by him or her in connection with such proceeding, except where the Natural Person in his Official Capacity brings an action against the Company or its Members. Such reimbursement shall be made in advance of the final disposition of the proceeding to the extent provided by law. A Person shall not have a right to indemnification or indemnification advances by the Company with respect to any threatened, pending, or civil, administrative, arbitration, investigative, or other proceeding brought by or in the right of the Company against such Person. Except as expressly provided herein, no other Person shall be indemnified by the Company for expenses incurred in connection with a proceeding to which such Person was or is a party or is threatened to be made a party by reason of the former or present Official Capacity of such Person.

## ARTICLE XII
## MISCELLANEOUS

12.1   <u>Company Seal</u>. The Company shall have not have a seal.

12.2   <u>Entire Agreement</u>. This Agreement is the entire agreement among the Members or between the Members and the Company with respect to the governance and management of the Company and the relations among the Members, the duties and rights of the Board and Directors, and supersedes any arrangement, understanding, or previous agreement of whatsoever nature, whether oral or in a Record, entered into by the Members with respect to such matters.

12.3 <u>Severability</u>. Every provision of this Agreement is intended to be severable. If any term or provision hereof is invalid for any reason whatsoever, its invalidity will not affect the validity of the remainder of this Agreement.

IN WITNESS WHEREOF, the undersigned members have executed this Agreement on the date written above and do hereby consent to the Agreement and agree to be bound thereby.

Members:


_Luke Kohan_
_____
Luke B. Kohan


_Joe Hamilton_
_____
Joseph M. Hamilton


_Sam R. Harrison_
_____
Samuel R. Harrison

16

**EXHIBIT A**

| Member | Voting Power | Transferrable Interest |
|---|---|---|
| Luke B. Kohan | Thirty-Three and One-Third (33 and 1/3%) | Thirty-Three and One-Third (33 and 1/3%) |
| Joseph M. Hamilton | Thirty-Three and One-Third (33 and 1/3 %) | Thirty-Three and One-Third (33 and 1/3%) |
| Samuel R. Harrison | Thirty-Three and One-Third (33 and 1/3 %) | Thirty-Three and One-Third (33 and 1/3%) |

**VALUATION AGREEMENT**

DATE: February 20, 2023

     For the purposes of paragraph 4.8 of the Operating Agreement of FirmKey Solutions LLC dated the 20ᵗʰ day of February, 2023, the value of each Transferable Interest of FirmKey Solutions LLC as of the date hereof shall be the value the Transferring Member's partnership capital account at the date of the Triggering Event.

Members:


Luke B. Kohan


Joseph M. Hamilton


Samuel R. Harrison

# Exhibit 6

Paro- 00025



**Luke Kohan** • 2nd
Co-Founder, FirmKey
1h • 🌐

**💠+ Connect**

I am incredibly excited to announce the official launch of FirmKey Solutions, where accounting & convenience intersect!

For boutique accounting firms and independent consultants, FirmKey serves as an extension of your business development team. We are creating new engagement opportunities and fostering long-term client relationships without the exorbitant costs and time-consuming training of traditional in-house business development teams. When it comes to prospecting and sourcing new opportunities, we are meticulous - solely targeting industries, services, and nuanced projects that align with our partners' respective backgrounds, interests, and bandwidth.

For companies in need of accounting / consulting support, our experts span a wide range of industries and provide multiple levels of support including CFO, Controller, FP&A, CPA (Tax & Audit), ERP Implementation, and Bookkeeping. FirmKey offers our clients:

(A) on-demand access to our vetted coalition of specialists

(B) flexible project-based or ongoing fractional engagements

(C) a far more cost-effective, reliable, and rapid means of engaging with qualified, US-based accountants and consultants.


Shoot me an email if you're interested in learning more, would love to hear from you! **Luke@firmkeysolutions.com**

**#accounting #consulting**

PARO 00025

# Exhibit 7

Paro- 00008-00014

**🔒 PageVault**

| | |
|---|---|
| Document title: | FirmKey Solutions – Accounting Services |
| Capture URL: | https://firmkeysolutions.com/ |
| Page loaded at (UTC): | Mon, 10 Jul 2023 13:42:24 GMT |
| Capture timestamp (UTC): | Mon, 10 Jul 2023 13:45:11 GMT |
| Capture tool: | 10.24.3 |
| Collection server IP: | 3.90.170.83 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.0.5359.215 Safari/537.36 |
| Operating system: | Windows_NT (Node 16.17.1) |
| PDF length: | 7 |
| Capture ID: | fxrruUHy36KgJM7Xehyd1E |
| User: | nge-bmrkvicka |

PDF REFERENCE #:    1CtKS9RbDN5ZgiqsH4NLGo

PARO 00008









Finance & Accounting Services
For The Modern Business

WHERE ACCOUNTING & CONVENIENCE INTERSECT







Document title: FirmKey Solutions – Accounting Services
Capture URL: https://firmkeysolutions.com/
Capture timestamp (UTC): Mon, 10 Jul 2023 13:45:11 GMT

PARO 00010





We Connect
Businesses With Our
Coalition of Boutique
Accounting Teams

Document title: FirmKey Solutions – Accounting Services
Capture URL: https://firmkeysolutions.com/
Capture timestamp (UTC): Mon, 10 Jul 2023 13:45:11 GMT



We Connect
Businesses With Our
Coalition of Boutique
Accounting Teams

Document title: FirmKey Solutions – Accounting Services
Capture URL: https://firmkeysolutions.com/
Capture timestamp (UTC): Mon, 10 Jul 2023 13:45:11 GMT



**FirmKey** Solutions



## SUMMARY OF SERVICES

**CFO**
Strategic Financial
Leadership
Capital Raising
IPO
Process Optimization

**Technical Accounting**
US GAAP & ASC (606
/ 842)
Internal Control
Testing
Department Oversight
Accounting Processes

**Audit**
Assurance &
Attestation
10Q Filing & 10K
Reporting
Audit Preparation
Coaching & 3rd Party
Liaison

**Tax**
Preparation & Review
Planning & Strategy
Nexus & SALT
ERC Calculation &
Filing

**FP&A**
Financial Modeling &
Analysis
Financial Reporting &
Dashboard
Cashflow
Management
Budgeting &
Forecasting

**ERP Implementation**
QuickBooks, Xero
Gusto
NetSuite
SAP Products
MS Dynamics

**Transaction Advisory**
Buy & Sell-Side Due
Diligence
Quality of Earnings
Reporting
Opening Balance
Sheet Preparation
Pre & Post Integration
Support

**Bookkeeping**
Full Charge
Bookkeeping
Chart of Accounts /
General Ledger
Sales Tax
Payroll

# Where Accounting & Convenience Intersect.

 Get started    Explore features



ACCOUNTING

Document title: FirmKey Solutions – Accounting Services
Capture URL: https://firmkeysolutions.com/
Capture timestamp (UTC): Mon, 10 Jul 2023 13:45:11 GMT

# Exhibit 8

Kohan- 00019-00020

## FIRMKEY SOLUTIONS LLC

## MINUTES OF INITIAL MEETING
## OF
## MEMBERS AND BOARD OF DIRECTORS

The undersigned, representing all of the members and directors of FirmKey Solutions LLC, a Minnesota limited liability company (the "Company"), subject to Chapter 322C of the Minnesota Statutes, do hereby adopt in writing the following resolutions:

RESOLVED, that officers of this Company are hereby instructed to cause the following documents to be filed with the legal records of this Company:

1.   Articles of organization filed in the office of the Secretary of State of the State of Minnesota; and

2.   Certificate of organization issued by the Secretary of State of the State of Minnesota.

RESOLVED, that contributions of Three Thousand and 00/100 Dollars ($3,000.00) each by Luke B. Kohan, Joseph M. Hamilton, and Samuel R. Harrison shall be accepted and that, upon transfer to this Company of said contributions, said individuals shall each become a member and shall own a thirty three and one-third percent (33 and 1/3%) voting power and transferable interest in the Company.

RESOLVED, that the Written Action of Organizer is accepted and ratified, wherein the organizer, effective June 1, 2022, resigns his position as organizer and turns over the management of the Company to the Board of Directors.

RESOLVED, that the Company shall have no seal.

RESOLVED, that this Company shall keep at its principal executive office the original or copies of all legal records of the Company.

RESOLVED, the transferable interests in the Company are ordinary membership interests of one class, without series, and shall have the rights provided by Minnesota law.

RESOLVED, that the Company shall document transferable interests pursuant to properly executed minutes of meeting of the members, and shall not use certificates to document voting power or transferable interests in the Company.

RESOLVED, no additional contributions shall be accepted and no membership interests shall be granted by the member(s) without the consent of at least sixty-seven percent (67.00%) or more of the outstanding voting power of the members. Should additional contributions be made, a statement of such contributions be shall prepared and retained among the Company's legal records. If a Member fails to make a required Contribution by December 31 of a calendar year in which the Members properly agree to make additional Contributions, then effective January 1 of the following calendar year, the

- 1 -

Transferable Interests and Voting Power of the Members shall be adjusted amongst the Members based in proportion to the Member Capital accounts on said January 1.

RESOLVED, a capital account shall be established for each member and shall be maintained in accordance with Treasury Regulation Section 1.704-1(b).

RESOLVED, the members acknowledge that the Company will be treated as a "partnership" for tax purposes.

RESOLVED, that this Company shall keep its financial and tax records on the basis of a fiscal year ending December 31, with the initial fiscal year ending December 31, 2023.

RESOLVED, effective February 20, 2023, the director(s) of the Company shall be the following persons who are hereby elected until their successor(s) are duly elected and qualified:

> Luke B. Kohan
> Joseph M. Hamilton
> Samuel R. Harrison

RESOLVED, Luke B. Kohan is hereby designated to act on behalf of the Company as the "partnership representative" within the meaning of Section 6223 of the Internal Revenue Code.

RESOLVED, the undersigned agree that Luke B. Kohan, Joseph M. Hamilton, and Samuel R. Harrison shall each have signatory authority with respect to the Company's primary demand deposit account.

RESOLVED, effective February 20, 2023, the following-named persons are hereby elected as legal officers of the Company set forth opposite their name below:

> Luke B. Kohan – Chief Executive Officer and President
> Joseph M. Hamilton – Chief Financial Officer and Treasurer
> Samuel R. Harrison – Chief Operating Officer and Secretary

RESOLVED, hereinafter the Board of Directors shall elect officers of the Company.

The actions contained herein shall be effective as of the 20th day of February, 2023.

Members:

_____
Luke B. Kohan

_____
Joseph M. Hamilton

_____
Samuel R. Harrison

Director:

_____
Luke B. Kohan

_____
Joseph M. Hamilton

_____
Samuel R. Harrison

# Exhibit 9

Kohan- 000021-000026

### *FIRMKEY SOLUTIONS LLC*

### VENDOR TERMS & CONDITIONS AGREEMENT

**This Vendor Terms & Conditions Agreement** ("Agreement") is made as of _____ (the "Effective Date"), between _____ a _____, on behalf of itself and its Affiliates, with principal offices at _____ ("Vendor") and FirmKey Solutions LLC, a Minnesota limited liability company with principal offices at 5821 E. Geddes Circle, Centennial, CO 80112 ("FirmKey")(with Vendor and FirmKey individually referred to as a "party" or collectively as the "parties"). For purposes of this Agreement, "Affiliate" means any entity directly or indirectly controlled by, controlling, or under common control with Vendor.

**WHEREAS,** Vendor is an independent accounting or other financial services company in good standing or an individual - engaged in the business of providing accounting services (defined under Section 1) for companies and individuals; and

**WHEREAS,** FirmKey is a company specializing in creating business relationships and service engagements for prospective clients and Clients in need of accounting services and qualified Vendors of such services as described.

**NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the parties hereto agree as follows:**

**Section 1. <u>Description of Accounting Services</u>.** Subject to the terms and conditions of this Agreement, Vendor shall provide accounting services to clients (hereinafter "Clients') who have engaged FirmKey to match and introduce Clients to Vendors. Accounting services under this Agreement shall refer to accounting, financial reporting, taxation and/or consulting services ("Services"). Accounting Services shall be specified in a written Statement of Work ("SOW") executed by Vendor and Client. The form of SOW to be executed is attached hereto at Exhibit A of which said attachment shall be incorporated and made a part of this Agreement. Each SOW, signed by both parties (a) shall reference this Agreement; (b) details the scope of work to be performed, including, but not limited to, all applicable services, deliverables and other materials to be provided by Vendor; (c) specifies the applicable hourly rate or fixed- fee schedule for performing such services; and (d) includes such additional terms and conditions and information as the parties may determine necessary. To the extent of any conflict between the terms of a SOW and this Agreement, this Agreement shall prevail unless the SOW specifically states otherwise. The SOW shall constitute the only authorization for Vendor to take any action that will result in expense to or otherwise on behalf of Client. Client may request additional Services, as specified in an additional SOW or in which the additional SOW may cancel and supersede a prior executed SOW (which must be mutually agreed upon in writing between Vendor and Client). The Services shall be performed at the locations identified in the SOW, or if not identified, from such location specified by Vendor.

**Section 2. <u>Vendor Responsibilities</u>.**

**2.1 <u>Vendor Conditions</u>.** As a condition precedent to Vendor's right to perform the Services, Vendor shall, at Vendor's expense:

    a. If applicable, procure any consents or rights required from the owner or licensor of third-party software or system for Vendor to provide the Services as contemplated under this Agreement;

    b. Maintain its equipment, peripherals, systems and software in accordance with their applicable specifications;

    c. Provide sufficient, qualified personnel who are capable of performing the Services including duties, tasks, and obligations under this Agreement and any SOW in a competent and professional manner;

    d. Provide to FirmKey all cooperation and information reasonably requested by FirmKey from time to time in connection with Vendor's performance of the Services;

    e. Perform such other duties and tasks as may be reasonably required to permit FirmKey to perform its duties, tasks and obligations under this Agreement and any SOW; and

    f. Carry adequate amounts of business insurance to cover potential legal liabilities related to Services to be performed.

1

**2.2   Vendor Failure to Perform.**  Vendor acknowledges and agrees that its failure to perform or to timely perform any of its obligations under this Agreement and any SOW may affect the timing and amount of fees for of Services to be provided to Vendor under this Agreement and any SOW.  FirmKey shall not be liable for any deviations from any schedule or work plans agreed to by Vendor and Client under a SOW due to such failure(s) by Vendor.

**2.3   Vendor Invoice Consistency.**  With respect to each SOW - Vendor shall disclose to FirmKey their hourly rates and/or fixed-fee amounts, and rates / amounts shall be the same rates or amounts as Vendor charges its other customers and clients for similar services that are not contracted through FirmKey.  If Vendor increases or decreases its hourly rates or fixed-fee charges for said other customers and clients, then it may increase or decrease its hourly rate or fixed-fee amounts by the same rate or amount to Client's pursuant to a newly executed SOW.  Vendor further agrees that in the case of a rate and/or fixed fee increase or decrease consistent with the terms under this Section 2.3 it will notify FirmKey at least fourteen (14) days prior to said increase or decrease.

**2.4   FirmKey Rate and Fee Consent.**  Vendor understands and acknowledges that a Client hourly rate and/or fixed fee amount may be different than Vendor rate and fees.  Vendor must get consent from FirmKey as to hourly rates and fixed fee amounts prior to preparing a SOW to a Client or prospective client.  Hourly rates and fixed fee amounts shall be agreed to by FirmKey, FirmKey's Clients, and FirmKey's prospective clients.

**Section 3.   General Payment Terms.**  For the Services to be performed under this Agreement, FirmKey shall pay Vendor the agreed upon hourly rate or fixed fee. Invoices shall provide sufficient detail such that FirmKey can identify the SOW to which the fees pertain and for services provided on a time and materials basis. The invoice shall contain the name of the individual performing the Services as well as the number of hours spent performing the Services. Unless otherwise provided in a SOW, FirmKey shall remit payment to Vendor on a monthly calendar basis. FirmKey shall fulfill  Vendor payments by the 15th of each month, based on the previous month's total recorded time and/or fixed rate as stated in a SOW. Vendor reserves the right to suspend agreed upon services in SOW if FirmKey fails to remit payment within a fourteen (14) day window from the 15th day of the month. Unless Vendor is suspected of or if FirmKey is notified of Vendor's (a) poor quality of work (accuracy and/or timeliness); (b) poor client communication; (c) material breach; or (d) is not forthcoming of the Vendor rates charged to Vendor's non-FirmKey clients; FirmKey is otherwise obligated to fulfill Vendor payments, regardless of whether FirmKey is able to successfully collect payment on respective Client invoice. Vendor is not permitted to expense travel, lodging, meals, telephone, postage, courier and other out of pocket expenses incurred throughout the duration of said engagement; without the explicit written confirmation of Client and FirmKey, or if otherwise explicitly stated in an agreed upon SOW. If Vendor is permitted to incur additional expenses, Vendor is to record said expenses on its timesheet by the end of given month. FirmKey is to include said expenses in its client invoice on the 1st day of the subsequent billin g month.

**Section 4.   Taxes.**

**4.1   FirmKey Taxes.**  FirmKey shall pay all personal property, sales, use, occupation, and other taxes (excluding taxes based upon Vendor's net income or per Section 1.2, unless stated in SOW) that are imposed by any federal, state, local or foreign  government authority as a result of the execution or performance of this Agreement.

**4.2    Vendor Taxes.**  Vendor shall be responsible for any type of state or local employment taxes, including withholding or reporting tax, social security taxes, workers' compensation taxes or costs, unemployment compensation taxes or costs, or any other taxes or charges, workmen's  compensation, employee state insurance, other employment law deductions, or private insurance related to Vendor's personnel's receipt of compensation and performance of Services under this Agreement.

**Section 5.   Confidentiality.**

**5.1   Confidentiality Obligations.**  During the term of this Agreement, from time to time, either party may disclose (the "Disclosing  Party") or make available to the other party (the "Receiving Party"), whether orally, electronically or in physical form, confidential or proprietary information concerning the Disclosing  Party and/or its business, products,

or services in connection with this Agreement (together, "Confidential Information"). Confidential Information includes, without limitation, FirmKey Clients, FirmKey Vendors, Service pricing, set-up instructions, network configuration documentation, computer programs, schematics, source code, object code, cost or profit figures and projections, credit information, current, future or proposed products or services, plans and technology, business forecasts, financial records, accounting records, and technical information included in or on tracings, flow charts, drawings, field notes, calculations, specifications and engineering data, Vendor information (including agreements, software and products), product plans, projections, analyses, plans or results, the existence of any business dealings or agreements between FirmKey and Vendor, and any other information which is normally and reasonably considered confidential. Each party agrees that during the term of this Agreement and thereafter: (a) it will use Confidential Information belonging to the Disclosing Party solely for the purpose(s) of this Agreement; and (b) it will take reasonable precautions to ensure that it does not disclose Confidential Information belonging to the Disclosing Party to any third party (other than the Receiving Party's employees, contractors and/or professional advisors on a need -to- know basis who are bound by obligations of nondisclosure and limited use at least as stringent as those contained herein) without first obtaining the Disclosing Party's written consent. Upon request by the Disclosing Party, the Receiving Party will return all copies of any Confidential Information to the Disclosing Party. Each party agrees that it and each of its employees, agents, and subcontractors will protect the confidentiality of such Confidential Information and will cause others to protect such Confidential Information no less than to the extent set forth herein.

**5.2 Confidentiality Exclusions.** For purposes hereof, "Confidential Information" will not include any information that the Receiving Party can establish: (a) was independently developed by the Receiving Party without use of or reference to any Confidential Information belonging to the Disclosing Party; (b) was acquired by the Receiving Party from a third party having the legal right to furnish same to the Receiving Party without disclosure restrictions; or (c) was at the time in question (whether at disclosure or therea fter) generally known by or available to the public (through no fault of the Receiving Party).

**5.3 Required Disclosures.** These confidentiality obligations will not restrict any disclosure required by order of a court or any government agency, provided that the Receiving Party gives prompt notice to the Disclosing Party of any such order and reasonably cooperates with the Disclosing Party at the Disclosing Party's request and expense to resist such order or to obtain a protective order.

**Section 6. Ownership of Work Product.** For the purposes of this Agreement, "Work Product" is defined as all inventions, improvements, computer programs, processes, systems, which are produced in direct connection with and in accordance with the terms of a SOW in which said Work Product is to be produced. Vendor agrees to assign and hereby assigns to Client all rights, title, and interest it may have in the Work Product, including the source code, compilers, related documentation and materials, and any modifications an d enhancements to the Work Product at all stages of development and upon completion in accordance with an applicable SOW. Vendor has not and shall not assign, license, or otherwise transfer ownership, rights, title, or interest in or to the Work Product to any third party (including but not limited to copyright, patent, trademark, trade secret or any other intellectual proprietary right).

**Section 7. Representations and Warranties of Vendor.** Vendor warrants that Services shall be performed in a competent and professionalmanner in accordance with applicable commercial standards. The execution, delivery and performance of this Agreement by Vendor will not violate, contravene, result in a breach of or constitute a default under any contract with a third party. Vendor shall be responsible for all Services under this Agreement associated with the subcontracting by Vendor in the performance of Services hereunder. Vendor is not permitted to outsource deliverables associated with a SOW in any jurisdiction outside the United States without explicit written confirmation from FirmKey, Client or prospective client. All risk regarding the quality and performance of Services is borne by Vendor.

**Section 8. Limitation of Liability.** To the maximum extent permitted by applicable law, neither party will be liable to the other for indirect, consequential, special, incidental, or punitive damages, including but not limited to loss of profits or revenue, loss of or use of equipment, lost data, damages for loss of goodwill, work stoppage, computer failure, or malfunction, costs of replacement goods, services, or substitute equipment, or any and all other commercial damages or losses, even if advised of the possibility thereof, and regardless of the legal or equitable theory upon which the claim is based, furthermore, in no event shall either party's aggregate liability under this agreement exceed the fees the FirmKey paid to vendor under the SOW giving rise to the applicable claim, even if such damages were foreseeable.

**Section 9. Indemnification.** To the maximum extent allowed by law, each party to this Agreement will defend, indemnify and hold harmless the other party and its directors, officers, employees, and agents (collectively, the "Indemnitees"), from and against any and all claims, losses, damages, suits, judgments, (collectively referred to as "Claims"), that the Indemnitees may suffer or incur arising out of or in connection with: (a) a party's breach of warranty or terms under this Agreement; (b) any breach by a party of its: (i) confidentiality obligations, (ii) obligations to comply with laws, or (iii) obligation to pay any compensation, fees, salary, bonuses, mandatory or fringe employee benefits, social security, taxes or other withholdings which are alleged to be owed in respect of any personnel or contractors of a party; (c) any personal injury (including death) or damage to property resulting from a party, said party's personnel or its agents' acts or omissions; and (d) a party's introduction of any unauthorized material, including without limitation, a "computer virus" or other contaminant into the other party's environment. The Indemnitees will give prompt notice of any Claim to the indemnifying party and said party will defend the Indemnitees at the Indemnitees' request. An indemnifying party may settle, at its sole expense, any Claim for which said party is responsible under this Section provided that such settlement shall not limit, unduly interfere, or otherwise adversely affect the rights granted herein, said party obligations under this Agreement, or impose any additional liability on the other party. Each party reserves the right to employ counsel at its own expense and participate in the defense and/or settlement of any Claim. If the Services hereunder are proven to infringe on a third party's trademark, patent, copyright or other intellectual property right, or Vendor determines that any of the services shall infringe such rights, or FirmKey is enjoined from using any such Services, then Vendor, at Vendor's expense and sole option, shall (1) replace such infringing services with non-infringing, equivalent and conforming services or (2) modify such infringing services so such services become non-infringing.

**Section 10. Term and Termination.**

**10.1 Agreement Term and Termination.** The term of this Agreement shall be indefinite and shall continue unless terminated by FirmKey or Vendor if the other party breaches or defaults on any of the provisions of this Agreement, and such breach is not cured within ten (10) days after the breaching party receives written notice in which case the SOW is terminated at the end of the ten-day period. Either Vendor or FirmKey may terminate this Agreement or any SOW without cause or reason upon providing at least ten (10) days prior written notice. In such case - Vendor will be compensated for work performed through the effective termination date based on work hours performed through the effective date of termination and/or a day-based pro-rata amount with respect to fixed fee SOW. Vendor shall not be entitled to payment for Service work performed after the effective termination date or initially expected to be performed after the effective termination date.

**10.2 Effect of Termination.** Upon expiration or termination of this Agreement (or any SOW, as applicable) each party shall, upon the request of the other: (a) return all papers, materials, and properties of the other held by such party, and (b) Vendor will assist FirmKey in the orderly termination of Services, including timely transfer of the Services to another designated service provider.

**Section 11. Assignment.** Both parties may assign all or any part of this Agreement, with the consent of the other party, which consent shall not be unreasonably withheld.

**Section 12. Record Keeping and Audit.** Vendor agrees to maintain accurate and complete records relating to the provision of Services under this Agreement and any SOW. Vendor agrees that, during the term of this Agreement and for a period of one (1) year after the termination of this Agreement or the applicable SOW, as appropriate, FirmKey or its designee(s) may, at any time upon not less than a thirty (30) day notice to Vendor, examine the books and records of Vendor related to Vendor's performance under this Agreement ("Audit"). Vendor shall cooperate with any such Audit and shall provide all relevant books, records, data, and other documentation reasonably requested by FirmKey. An Audit shall be conducted during normal business hours and at Firmkey expense. If FirmKey is required to bring a legal action against Vendor and prevails with respect to such action, then Vendor shall be responsible for payment to FirmKey of any attorney fees, court costs, and any related penalties or fines incurred by FirmKey.

4

**Section 13. Relationship; Authority**. Nothing contained in this Agreement will be deemed to create, or be construed as creating, a joint venture or partnership between the parties. Neither party is, by virtue of this Agreement or otherwise, authorized as an agent or legal representative of the other party, unless provided in writing. Neithe r party is granted any right or authority to assume or to create any obligation or responsibility, express or implied, on behalf or in the name of the other party, or to bind such other party in any manner.

**Section 14. Non-Circumvention Covenant**. Vendor agrees to not, in any manner, circumvent, bypass, or obviate, directly or indirectly, the intent of this Agreement through any transaction, transfer, pledge, agreement, assignment, or otherwise with any FirmKey Client or potential client as initiated and/or introduced to Vendor by FirmKey. Specifically, Vendor shall not provide any form of accounting services as defined under Section 1 to a FirmKey Client or to any potential client introduced to Vendor for the purpose of providing future Services. Vendor is not permitted to correspond or negotiate with any of FirmKey's Clients or prospective clients in connection with rates or fees. Vendor is required to notify FirmKey if (a) additional engagement opportunities are presented or available with a Client; or (b) if a Client directly refers additional business opportunities by way of introduction to a Client's personal or professional network. Vendor agrees that substantial and adequate consideration has been rendered under this Agreement to support the legality of the covenant under this Section 14. Vendor acknowledges that FirmKey will be irreparably harmed by its violation of this covenant, and that such harm may not be compensable entirely with monetary damages. If Vendor violates this covenant, FirmKey may, but shall not be required to, seek injunctive relief and/or any other remedy allowed at law, in equity, or under this Agreement. Any injunctive relief sought by FirmKey shall be in addition to and not in limitation of any monetary relief or other remedies or rights to which FirmKey is or may be entitled at law, in equity, or under this Agreement. The obligations under this Section 14 shall survive the termination of this Agreement and any SOW.

**Section 15. Miscellaneous.**

**15.1 Entire Agreement and Amendment.** This Agreement contains the entire understanding of the parties and may be amended only by a writing signed by the parties. This Agreement (including its Exhibit), and any SOWs included hereunder shall constitute the entire agreement between FirmKey and Vendor. Any amendment or modification to this Agreement or any duly executed SOW hereunder shall not be valid, enforceable, or binding on the parties unless such amendment or modification (a) is a written instrument duly executed by the authorized representatives of both parties and (b) references this Agreement and any SOW, if applicable, and identifies the specific sections contained therein which are amended or modified.

**15.2 Survival of Terms and Obligations.** The terms and obligations made by the parties under this Agreement, and any and all Exhibits and SOWs thereto, shall survive the termination of the Agreement and shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any other party hereto, any person controlling any such party or any of their officers or directors, whether prior to or after the termination of this Agreement until three (3) years from said termination date.

**15.3 Choice of Law/Venue.** This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the laws of the State of Colorado, excluding its conflict of laws principles. The jurisdictional venue for any proceedings involving this Agreement shall be held in Colorado.

**15.4 Use of Name and Publicity.** Vendor shall not publicly use the name, logo, trademark, trade name, or other marks of FirmKey without FirmKey's prior written consent.

**15.5 Severability.** If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, then the remaining portions of the Agreement shall be construed as if not containing such provision, and all other rights and obligations of the parties shall be construed and enforced accordingly.

**15.6 Notices.** All notices, demands or other communications hereunder shall be in writing and shall be deemed to have been duly provided if delivered in person, via email, or by United States mail, certified or registered, postage prepaid, return receipt requested, or otherwise actually delivered to the appropriate party as follows:

Notices to FirmKey:                                Notices to Vendor:

Luke Kohan, President & CEO                         _____
5821 E Geddes Circle                               _____
Centennial, CO 80112                               _____
Email: Luke@firmkeysolutions.com                   Email:


**15.7  No Waiver.** No waiver or failure to exercise any option, right, or privilege under the terms of this Agreement on any occasion or occasions shall be construed to be a waiver of the same or any other option, right or privilege on any other occasion.


**Accepted and agreed to:**

FirmKey Solutions LLC                              Vendor: _____

By: **Luke Kohan**                                 By: _____

Name: Luke Kohan                                   Name: _____

Title: President                                   Title: _____

Date: _____                          Date: _____


6