IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ADMIIN INC. d/b/a PARO INC.,<br>a Delaware Corporation, | )<br>)<br>) |
| Plaintiff, | ) Case No. 1:23-cv-04430 |
| v. | )<br>)<br>) |
| LUKE KOHAN an individual,<br>and FIRMKEY SOLUTIONS LLC,<br>a Minnesota limited liability company, | )<br>)<br>)<br>) |
| Defendants. | ) |

**DEFENDANTS' MEMORANDUM OF LAW**
**OPPOSING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Since the Court denied Plaintiff's motion for TRO and through subsequent discovery, it has become only more evident that Plaintiff has frivolously made claims and, in bad faith, have continued to pursue their claims. The subject Non Competition Agreement remains overbroad and ambiguous, problematic and unreasonable, and consequently unenforceable. Mr. Kohan has never, is still not, and will not, engage in the solicitation of Paro's clients and employees. Mr. Kohan has never, is still not, and will not, misappropriate or threaten to misappropriate Paro's trade secrets and confidential information. FirmKey has never, is not, and will not, tortiously interfere with Mr. Kohan's contractual obligations to Paro. In denying Plaintiff's motion for TRO, the Court opined that the scope of the restrictive covenant is problematic, overbroad, ambiguous, unreasonable, imposes undue hardship, and precludes Mr. Kohan from working in any capacity in his industry. Also still true is the fact that Mr. Kohan still is not soliciting Plaintiff's clients.

What has changed is the development of new evidence undermining Plaintiff's claims and its request for entry of a preliminary injunction. Specifically, Plaintiff's 30(b)(6) witness Michael Chen testified that Paro has no evidence regarding solicitation of Paro's clients, and Paro has not

73089921;1

suffered irreparable harm, and Paro has not been damaged. And in turn, Paro recently dropped its baseless misappropriation of trade secrets claim.

In light of the foregoing, and for the additional reasons discussed below, Plaintiff's Motion for a Preliminary Injunction should be denied as Plaintiff's likelihood of success on the merits is improbable (to say the least), as the law requires.

First, Admiin Inc. d/b/a Paro Inc. ("Paro" or "Plaintiff") and FirmKey Solutions LLC ("FirmKey") differ in the services provided. Both parties identify, market, and operate themselves differently as well, making the Non Competition Agreement inapplicable and not violated.

Second, the Non Competition Agreement is unenforceable given its combination of unfathomably broad restrictive covenants. The restricted territory is over broad in that it reaches nationwide and internationally. The prohibited activities are ambiguous and preclude Mr. Kohan from working in a field of his choosing and expertise.

Third, there was a mistake of fact when Mr. Kohan signed the Non Competition Agreement, making it unenforceable.

Fourth, Mr. Kohan is not soliciting any of the Plaintiff's clients. Plaintiff has provided no real evidence of a breach of the non-solicitation agreement, other than a LinkedIn document, and its 30(b)(6) witness admitted that Paro has no evidence of solicitation.

Finally, there is no tortious interference here, as Paro has not even asserted many of the requirements of that tort, let alone tried to prove them.

I.        **APPLICABLE LAW**

"Injunctive relief is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.' In deciding whether to grant preliminary injunctive relief, a court must consider four traditional criteria," including whether the plaintiff has

a reasonable likelihood of success on the merits. *Klinger v. Conan Doyle Est., Ltd.*, 988 F. Supp. 2d 879, 894 (N.D. Ill. 2013), aff'd, 755 F.3d 496 (7th Cir. 2014); *Troogstad v. City of Chicago*, 571 F. Supp. 3d 901, 907 (N.D. Ill. 2021) ("When considering a motion for temporary restraining order, the Court must employ the same test as a request for a preliminary injunction: the plaintiff has the burden to show (1) a likelihood of success on the merits … The first factor—'likelihood of success on the merits'—requires the plaintiff to make a 'strong showing that she is likely to succeed on the merits' of her claim; a mere 'possibility of success is not enough' to warrant emergency relief"). For the aforementioned five reasons, Paro has not established that it has a likelihood of success here and its motion should be denied.

## II. BACKGROUND FACTS

### A. Kohan's Employment with Paro

Kohan began his employment with Paro on October 19, 2020. Prior to joining Paro, Kohan worked at Groupon (January 2016-January 2020) and Rodeo (July 2020 – October 2020). Before joining Paro, he had prior experience in working for "marketplaces" and "matchmaking" between businesses and consumers. ***Exhibit A, Declaration of Luke Kohan***, ¶ 1.

Kohan held several different positions during his time at Paro, and in those roles, Kohan was responsible for identifying prospects, creating prospect-leads, and converting prospective clients into clients. During his last nine months with Paro (July 2022 to March 2023), Kohan worked on the "CPA east" (or "white label") team, which focuses solely on providing staff augmentation services to public accounting firms. Although Paro's business model is predicated on its proprietary matchmaking algorithm, Kohan often times went above and beyond just using the algorithm to ensure he was presenting the most qualified experts to prospective clients. Kohan Dec., ¶ 2.

Prior to the commencement of Kohan's employment, Paro's VP of People, Randi Jakubowitz, sent Kohn an email with the subject line "Welcome to Paro – Onboarding Info" stating:

> "Congrats on your offer & we are thrilled about having you join Paro! In order to get things ready for you, can you please take a few minutes to sign off on the following items:
>
> Your offer letter will be delivered shortly to you email via Hellosign for review & signature (it may come from Michael Burdick, our CEO)
>
> Please electronically sign your **Non-disclosure & innovation agreement** (click the link and it will take you to the appropriate page to sign).
>
> We will need for you to electronically sign Paro's Employee Handbook (click the link and it will take you to the appropriate page to sign).
>
> Please complete this Electronic Onboarding Form so we can get you set up in the payroll & benefit systems…"

***Exhibit B, October 2, 2020 Email***, emphasis added, *see also* Kohan Dec., ¶3.

Notably, Jakubowitz referred to the employment agreement as a "non-disclosure and innovations agreement," not a Non Competition Agreement, and that is what Mr. Kohan was led to believe and understood it to be. Such an agreement is blatantly distinguishable from the exhaustive employment agreement in which Kohan was deceived into signing. Kohan Dec., ¶ 4.

Moreover, Jakubowitz did not inform Kohan that those documents were in fact a condition of his employment and that Kohan would be contractually bound to far more strenuous post-employment obligations. Kohan Dec., ¶ 5.

Next, Paro's CEO Michael Burdick sent Kohan an "offer letter" on Friday, October 2nd at 1:39pm, 2 minutes before Jakubowitz emailed Kohan the "onboarding information." Then, at 2:24

pm, Kohan received an email from Hellosign prompting him to sign, what he now knows as, the Non Competition Agreement. Kohan Dec., ¶6.

At 2:24pm, the same time that he received the employment agreement, Kohan emailed Jakubowitz requesting the offer letter be revised. On October 3rd at 3:40pm, Hellosign again prompted Kohan to sign the employment agreement. He was pressured to sign it and not given time to review it, understand it, or consult with an attorney regarding it. Kohan signed the employment agreement at 3:41pm, just 1 minute after receiving the document. Kohan Dec., ¶7. The disheveled and unclear manner, if not duress-laden manner, in which the document was represented, delivered, and demanded to be signed, led to a mistake of fact by Kohan. He did not know what the document was, through no mistake or negligence on his part. Kohan Dec., ¶ 7.

## III. ARGUMENT

### A. PARO CANNOT SUCCEED ON THE MERITS

Paro has not established a strong showing that it is likely to succeed on the merits for several reasons, each of which on its own is sufficient grounds for denial here.

#### 1. Mr. Kohan and FirmKey Have Not Breached the Non Competition Agreement

The Non Competition Agreement in question states as follows:

> During the Restricted Period (as defined below*), I will not, anywhere in the Restricted Territory (as defined below*), without the Company's prior written consent, directly or indirectly, alone or as a partner, member, manager, owner, joint venturer, officer, director, employee, consultant, agent, contractor, stockholder or in any other capacity of any company or entity, engage in the Business, have any financial interest in any company or entity engaging in the Business or make any loans to any company or entity engaging in the Business. For purposes of this Agreement, the term "**Business**" means (a) the provision of outsourced financial services, including bookkeeping and accounting, financial analysis and CFO strategy services, or (b) the provision, development, marketing, sale or maintenance of products or

- 5 -

> services which are substantially similar to those developed, marketed, distributed, sold, maintained or otherwise provided by, or actively planned to be developed, marketed, distributed, sold, maintained or otherwise provided by the Company during the term of my employment with the Company.

Exhibit A to Complaint at ¶ 4.

Paro and FirmKey identify, market, and operate differently and are therefore not competitors and FirmKey is not operating in Paro's "Business." Kohan Dec., ¶ 8. Thus, neither Mr. Kohan nor FirmKey are in violation of the Non Competition Agreement. The myriad of differences between FirmKey and Paro's businesses include the following:

- Paro is an artificial intelligence-powered marketplace that delivers finance and accounting solutions to businesses through a combination of expert fractional talent, data-driven tools, and guiding insights via its proprietary AI-powered platform. Kohan Dec., ¶ 11. In contrast, FirmKey is an agency conducting business development on behalf of its small group of independent, boutique accounting teams ("Vendors"). Kohan Dec., ¶ 9

- Paro's network of experts are individuals, where FirmKey's are boutique firms. Kohan Dec., ¶ 10

- The companies use different pricing models. Paro charges its clients a substantial markup, while FirmKey charges its Vendors 20% of their respective rates. Kohan Dec., ¶ 11.

- FirmKey is not a tangible marketplace, nor a platform. Kohan Dec., ¶12.

- Paro has been funded by multiple rounds. FirmKey is bootstrapped. Kohan Dec., ¶ 13.

- Paro has multiple employees, FirmKey has none. Kohan Dec., ¶ 14.

- Paro 'is on [their] way to becoming the clear market leader in the US-based staff augmentation space for [public accounting] firm'. FirmKey does not offer such services. Kohan Dec., ¶ 15.

- Kohan was assigned to Paro's Outbound Direct team until July 2022. It has been 15 months since his assignment to the team, and furthermore, Paro dismantled this business unit in Q1 of 2023. Paro does not have an Outbound team, its Inbound team only deals with incoming leads. Kohan Dec., ¶ 16.

Based on the above, Paro's business is far different from FirmKey's business. Mr. Kohan and FirmKey secure engagement opportunities for their Vendors that meticulously align with their Vendors' industry experiences and technical specialties. Paro sells its proprietary AI marketplace while FirmKey has no technology driven process. Paro provides 1099/W2 staff augmentation for public accounting firms while FirmKey connects companies in need of an accounting team with FirmKey's Vendors. Paro's sales org is predominantly 'Inbound' (i.e., companies and firms submit their interest), Mr. Kohan and FirmKey are entirely 'Outbound' (i.e., cold calling, emailing, and selling to secure opportunities). Kohan Dec., ¶ 17.

For these reasons, there is no violation of the non-compete agreement, as FirmKey is not engaging in Paro's "Business" as defined in the Non Competition Agreement.

### 2. The Non Competition Agreement Is Not Enforceable

Whether a non-compete covenant is enforceable is a question of law and such clauses are closely scrutinized. *Bishop v. Lakeland Animal Hosp., P.C.*, 268 Ill. App. 3d 114, 117, 644 N.E.2d 33, 35 (1994). They are not favored and are strictly construed against the employer. *Burk v. Heritage Food Serv. Equip., Inc.*, 737 N.E.2d 803, 811 (Ind. Ct. App. 2000). Restrictive covenants must be reasonable in term of scope to be enforceable. *Unisource Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977, 982 (C.D. Ill. 2003). The Non Competition Agreement at issue here is not enforceable because it is far too broad in both the prohibited activity and in geographic scope, and because it is insolubly ambiguous.

      i.      The Prohibited Activity Definition is Overly Broad and Insolubly Ambiguous

The activity that is prohibited by the Non Competition Agreement is as follows.

> "**Business**" means (a) *the provision of outsourced financial services*, including bookkeeping and accounting, financial analysis and CFO strategy services, or (b) the provision, development, marketing, sale or maintenance of products or

> services, which are *substantially similar* to those developed, markets distributed, sold, maintained or otherwise provided by, or actively planned to be developed, marketed, distributed, sold, maintained or otherwise provided by the Company during the term of my employment with the Company. (emphasis added)

Exhibit A to Complaint at page 5, ¶ 4.

This prohibited activity is problematically broad and irreconcilably ambiguous. The phrase "the provision of outsourced financial services" covers a vast universe of activities and, if enforced, would prevent Mr. Kohan from taking virtually any job in his chosen area of expertise. *See AssuredPartners, Inc. v. Schmitt*, 2015 IL App (1st) 141863, ¶ 35-36, 44 N.E.3d 463, 472-73 (scope of activities that barred defendant from earning a living for all professional liability insurance products and services was unenforceable); *Dryvit Sys., Inc. v. Rushing*, 132 Ill. App. 3d 9, 14, 477 N.E.2d 35, 39 (1985) (finding an agreement unfair because, in part, it "makes no attempt to reasonably limit the restrictions, thereby placing the employee in the position of peril"); *Distributor Service, Inc. v. Stevenson et al.,* 16 F.Supp.3d 964, 972-973 (S.D.Ind. 2014) (finding the scope of activities was unreasonable and unenforceable when it covered "any type of activity" that the party would engage in for a competitor)*; Clark's Sales & Serv., Inc. v. Smith,* 4 N.E.3d 772, 782 (Ind. Ct. App. 2014) (finding a "services competitive" restriction was overly broad, onerous and an undue restriction on the party's economic freedom); *MacGill v. Reid*, 850 N.E.2d 926, 932 (Ind. Ct. App. 2006) (the clause "own, manage, or materially participate in any business substantially similar" was overbroad and unenforceable); *Lanmark Technology, Inc. v. Canales,* 454 F.Supp.2d 524, 529 (E.D. Va. 2006) (finding a restriction "breathtakingly and excessively broad" when it prevented an employee from assisting a competitor to obtain any business opportunity, perform any services similar to services performed by the prior employer that relates to any contract or project currently being performed by the prior employer, any business

opportunity the prior employer is pursuing, and any person or organization for which the prior employer is or has performed services).

The phrase "substantially similar" found in the Non Competition Agreement is the definition of ambiguous and provides no guidance on what activities might be prohibited. It is capable of many meanings. Because the prohibited activities are too broad and ambiguous the Non Competition Agreement is unenforceable. *Bishop*, 268 Ill. App. 3d at 117 (a contract is ambiguous if it is capable of more than one meaning); *Unisource*, 244 F.Supp.2d at 982 (finding the contract ambiguous and unintelligible and therefore unenforceable); *Lanmark,* 454 F.Supp.2d at 529 ("where a non-compete clause is ambiguous, that is, it is susceptible to two or more differing interpretations, one of which is functionally overbroad, and thus unenforceable, the clause fails").

        ii.        The Geographic Territory is Virtually Unlimited

Further rendering the Non Competition Agreement unenforceable, the geographic scope of the Non Competition Agreement is virtually unlimited.

The definition of "Restricted Territory" in the agreement provides:

> For purposes of this Agreement, the term "**Restricted Territory**" shall mean the United States and each other country, province, state, city or other political subdivision in which the Company carries on, had carried on the Business during the term of my employment and/or the Restricted Period.

Exhibit A. to Complaint at ¶ 8 J.

This broad geographic scope would prevent the Defendants from doing business virtually anywhere in the world, as Paro operates worldwide, and is unlimited and therefore not enforceable. "If the scope of the covenant is broader than is necessary to protect the goodwill of the business sold, the covenant is invalid." *Gutreuter v. Fiber Bond Corp.*, 710 F. Supp 227, 232 (N.D. Ill. 1989). In *Gutreuter*, the Court found a non-competitive agreement unenforceable and overbroad

because it precluded a party from seeking employment at all in thirteen specific states and the District of Columbia and in parts of thirteen other states and parts of Canada. *Id.* The geographic scope here is much broader than the scope found unenforceable in *Gutreuter*. *See also Assured Partners*, 44 N.E. 3d at 473 (geographic scope that prohibits activity anywhere in the United States or its territories deemed unreasonable); *Callahan v. L.G. Balfour*, 179 Ill. App. 3d 372, 379, 534 N.E.2d 565, 569 (1989) (geographic scope of Chicago and seven counties overly broad); *Dryvit System*, 477 N.E.2d at 38 (finding very broad geographical scope of the Continental United States unreasonable); *Buffkin v. Glacier Grp.*, 997 N.E.2d 1, 13 (Ind. Ct. App. 2013) (a restriction prohibiting services anywhere in the continental United States exceeds the bounds of reasonableness); *see also Oce N. Am, Inc. v. Brazeau*, 2009 WL 6056775 (N.D. Ill, Sept. 4, 2008) *report and recommendations adopted* 2010 WL 5033310 (N.D. Ill. Mar. 18, 2010).

Plaintiff's cited cases are distinguishable.

- In *Mintel Int'l Grp., Ltd. v. Neergheen,* the court stated that it did "not have before it at this early stage of the case either the factual record or the legal support grounded in Illinois cases to be convinced that every provision that [the plaintiff] seeks to enforce ultimately can be sustained as a matter of law." Here, Defendant had copied, emailed, and/or printed certain confidential and proprietary files – including lists and strategic documents – the day before his departure. 2008 WL 2782818, at *4 (N.D. Ill. July 16, 2008). In contrast, this Court has before it a robust factual record and Illinois case law demonstrating the Non Competition Agreement is unenforceable.

- In *Instrumentalist Co. v. Band, Inc.,* the court held that enforceability of a restrictive covenant in an employment agreement is dependent on whether, *given the particular facts of the case,* the restraints imposed thereby are reasonably necessary. 134 Ill. App. 3d 884, 895, 480 N.E.2d 1273, 1281 (1985) (emphasis added). The relevant facts in *Instrumentalist* included that the former employee was with its prior employer for 14 years as the near-exclusive relationship holder with advertisers and that the prohibited activities in the at-issue restrictive agreement were narrowly tailored. *Id.* at *895-96. In contrast, here, Mr. Kohan was only with Paro for three years and, as discussed above, the prohibited activities in the Non Competition Agreement are unreasonably overbroad.

- In *Gorman Pub. Co. v. Stillman*, the court found that because of the limited scope of the non-compete clause, specifically "the limited number of jobs to which the covenant applied," the temporal and geographic restrictions must also be viewed as imposing

only an insignificant burden. 516 F. Supp. 98, 104 (N.D. Ill. 1980). The court did not hold as a general matter that geographic limitations of the entire United States are reasonable. As the restricted activities defined in the Non Competition Agreement in this case are almost without limit, and not at all narrowly tailored like the restriction in *Gorman*, the overbroad geographic scope is far from insignificant.

- In *TLS Mgmt. Mktg. Servs., LLC v. Mardis Fin. Servs., Inc.*, the court deemed it the more accepted and prudent practice to wait until the factual context surrounding such covenants is fully developed before assessing reasonableness and opted not to invalidate a non-compete provision on the pleadings. 2016 WL 6999480, at *8 (S.D. Miss. Nov. 30, 2016). Similarly, in *Am. Transp. Grp., LLC v. Power, No*., the court refused to find the absence of a geographic limitation was *per se* unreasonable at the motion to dismiss stage where it was required to take all reasonable inferences in the employer's favor. 2018 WL 1993204, at *4 (N.D. Ill. Apr. 27, 2018). Here, in contrast, the factual record is sufficiently developed for the Court to determine the broad geographic scope of the Non Competition Agreement is unreasonable.

The Court's reliance on *Oce* and *AssuredPartners* in denying Plaintiff's Motion for a TRO was well-founded and Paro's recent attempts to distinguish those cases fail. *Oce* and *AssuredPartners* more closely resemble the facts at issue here.

In *AssuredPartners,* to quote this Court, "the court found unreasonable a non-compete restrictive covenant which prohibited the employee, a wholesale insurance broker specializing in lawyers' professional liability insurance, from working in professional liability insurance anywhere in the United States or its territories. The court focused on the fact there was no qualification in the restrictive covenant that the restrictions were limited to the employee's activities relating to the specific professional liability insurance practice he had developed during his prior employment, but rather applied to all liability insurance practices. Additionally, the court was troubled by the broad geographic scope, which restricted the employee from working in his chosen field in the United States and its territories. This restriction observed the court, would place an undue burden on him by forcing him to leave the country to work in the same field. … *AssuredPartners* supports the general proposition that restrictions on activities must be narrowly

tailored to protect only against activities that threaten the employer's interest." (ECF No. 17, p. 15-16 of 30) (internal citations omitted).

The Court also found similarities between the covenant at issue in this case and the covenant at issue in *Oce*. To again quote this Court, "[i]n *Oce,* employees employed in non-sales or non-service capacities were restricted from becoming 'associated with, through ownership, employment, self-employment, consultancy, contract or otherwise, any Competing Business.' The covenant was nationwide for a period of 12 months. The court found the covenant was not enforceable under Illinois law, noting that Illinois law disfavors non-competition clauses, which are closely examined, and the subject covenant was overly broad to secure any of the company's protectable interests. Further, the court identified several cases where one-year, nationwide non-competition agreements were found to be invalid, and noted that the plaintiff did not point to any case .where a similar covenant had been. upheld. Finally, the court stated that 'if the temporal and geographic restrictions on an employee's conduct are broad, as they are here, the agreement's activity restrictions should be correspondingly narrowly drawn to protect the employee's ability to be employed in his chosen field.'" (ECF No. 17, p. 16-17 of 30) (internal citations omitted).

Both cases support Defendants' position, and Paro's attempts to distinguish them fail. It claims that *AssuredPartners* is distinguishable because the defendant had decades of prior experience prior to signing his non-competition agreement. (ECF No. 45, p. 11). But the court's finding that the non-competition agreement in *AssuredPartners* was unenforceable was because the scope of the restricted activity was unreasonably overbroad compared to the scope of work the defendant had performed for its former employer. Paro also tries to distinguish *Oce* by claiming it applied the wrong test and because defendant's job with his new employer was in a different

- 12 -

business than his prior job. (ECF No. 45, p. 12). There is no basis for Paro's speculative argument that the *Oce* decision would have come out differently had a different test been applied.

### 3. Defendants Are Not Soliciting Paro Customers

Mr. Kohan has sworn under oath that he and FirmKey are not soliciting Paro clients. This should in itself dispose of non-solicitation issues for purposes of this motion, if not certainly make Paro unlikely to succeed on these issues. But more importantly, Paro's 30(b)(6) witness Michael Chen testified that there is no evidence of solicitation:

"As of this hearing, I'm not aware of a solicitation of Paro clients."

**Exhibit C, Michael Chen Deposition Transcript ("Chen Trans.") 68:17-18**.

The only "evidence" Paro can put forth is a LinkedIn post, which is weak at best, silly at worst. There is no evidence that this post was designed to "induce members of his network to contact and work with FirmKey", and it certainly does not rise to the level of solicitation.

Again, the non-binding cases relied on by Paro do not support its position, and they are cited improperly without pinpoint cites, making it difficult to determine what is being relied on in them. In all of these cases, the posts specifically invited calls to join the new businesses, unlike the LinkedIn post at issue here. *Compare with Am. Achievement Corp. v. Jostens, Inc.*, 622 F. Supp. 3d 749, 762 (D. Minn. 2022) (noting subject post said to contact the new company); *NRT Texas LLC v. Wilbur*, 2022 WL 5434332, at *7 (S.D. Tex. Sept. 7, 2022) (finding posts explicitly invited real estate agents to contact defendant about joining new company); *Mobile Mini, Inc. v. Vevea*, 2017 WL 3172712, at *6 (D. Minn. July 25, 2017) (finding the purpose of a post saying "Give me a call today for quote" was to entice members to call). In Paro's other cited case, the court concluded that the record included unchallenged evidence that would be readily

- 13 -

characterized as solicitations. *Amway Glob. V. Woodward*, 744 F. Supp. 2d 657, 673 (E.D. Mich. 2010).

### 4. There has been Unilateral Mistake So The Non Competition Agreement is Unenforceable

Given the above facts, it is abundantly clear that Mr. Kohan was mistaken in what he was signing. He was duped into believe it was a [non-disclosure and innovations] agreement. The law is clear that such a mistake renders the underlying agreements unenforceable.

The principle was well explained in *Steinmeyer v. Schoopel*, 226. Ill 9, 13, 80 NE 564, 565 (1907).

> If there is apparently a valid contract in writing, but by reason of a mistake of fact by one of the parties, not due to his negligence, the contract is different with respect to the subject matter of terms from what was intended, equity will give to such a party a remedy by cancellation where the parties can be replaced in status quo. The ground for relief is, that by reason of the mistake there was no mutual assent to the terms of the contract.

Service. December, 11, 1984 (the doctrine unilateral mistake should allow recission of the contracts): *Irmen v. Wrzeniniski*, No. 90565362 (Ill. Circt. Du Page County, 1 June 29, 1920) (for discussion).

Here, due to the unilateral mistake of fact, the contract is unenforceable. Further, the only document Jakubowitz stated "needed to signed" was the Employee Handbook. At no point did Jakubowitz inform Kohan that signing what she referred to as a "non-disclosure and innovations agreement" would be a condition of his employment. These transgressions are precisely why Illinois enacted the Freedom to work Act in which an employer is obligated to advise a potential employee to seek counsel prior to signing an employment agreement.

## IV. FIRMKEY HAS NOT TORTIOUSLY INTERFERED

Paro does not even try to properly allege, let alone offer proof of, a tortious interference with contract claim. The required elements under Illinois law are the existence of a valid and

- 14 -

enforceable contract between the plaintiff and a third party, defendant's awareness of the contract, defendant's intentional and unjustified inducement of a breach, defendant's wrongful conduct caused a subsequent breach of the contract by the third party, and damages. *Arkeyo LLC. V. Saggezza, Inc.*, 2021 WL 2254959 at *7 (N.D. Ill. 2021); *GSI Grp. , LLC v. Chief Industries, Inc.*, 2021 BL 497959 (C.D. Ill 2021). All that Paro has said on this issue is a single sentence, with no mention of wrongful conduct or damages. (ECF No. 45, p. 12). There are no damages to assert.

## V. THERE IS NO IRREPARABLE HARM

Mr. Chen also admitted that Paro has suffered no irreparable harm.

Q. "Has [Paro] suffered any irreparable harm yet?"

A. "At this time, not that I'm aware of."

**Exhibit C, Chen Trans. 68:4-6.**

## VI. PARO'S MISAPPROPRIATION CLAIM

Defendants note that Paro has dropped its misappropriation of trade secrets claim. Br. at fn 1. This is undoubtedly because it has realized the claim is baseless, and Defendants will seek their attorneys' fees under the DTSA and ITSA for having to defend against this frivolous claim both at the time of its filing and as pursued in bad faith until September 30.

## VII. THE COURT SHOULD IMPOSE A BOND REQUIREMENT

Federal Rule of Civil Procedure 65(c) states that the court may grant a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper. Here, Plaintiff has ignored this requirement and Defendants submit that if the Court enters a temporary restraining order that a bond in the amount of $30,000.00 should be required. If the Court enters a preliminary injunction, the bond amount should be raised to an amount sufficient to cover the period of the preliminary injunction. These amounts cover the

- 16 -

potential damage to Mr. Kohan and FirmKey if they should be precluded from conducting their business.

## VIII. CONCLUSION

For all these reasons, Paro's motion for a preliminary injunction should be denied.

Date: October 4, 2023

Respectfully submitted,

/s/ *Thomas G. Pasternak*
Thomas G. Pasternak
Akerman LLP
71 South Wacker Drive
46th Floor
Chicago, IL 60606
Telephone: (312) 634-5700
Facsimile: (312) 424-1900

Attorneys for Defendants,
*Luke Kohan and*
*FirmKey Solutions LLC*

## CERTIFICATE OF SERVICE

I certify that on October 4, 2023 I filed a true and correct copy of the foregoing **DEFENDANT'S MEMORANDUM OF LAW OPPOSING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** with the court using the ECF system, which will provide notice and a copy to counsel of record:

>Chad W. Moeller
>Sonya Rosenberg
>Collette A. Woghiren
>NEAL GERBER & EISENBERG LLP
>2 N. LaSalle St., Suite 2200
>Chicago, IL 60602
>cmoeller@nge.com
>srosenger@nge.com
>cwoghiren@nge.com

>/s/ *Thomas G. Pasternak*
>Thomas G. Pasternak

73089921;1